**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| VICOF II TRUST; VIDA LONGEVITY FUND, LP; WELLS FARO BANK, NATIONAL ASSOCIATION, as securities intermediary for VICOF II TRUST and VIDA LONGEVITY FUND, LP; and PF PARTICIPATION FUNDING TRUST, | Index No. 19-cv-11093 (AKH) |

                                       Plaintiffs,

    v.

JOHN HANCOCK LIFE INSURANCE COMPANY OF NEW YORK,

                                     Defendant.

---

VICOF II TRUST; VIDA LONGEVITY FUND, LP; LIFE ASSETS TRUST II S.A. DELAWARE TRUST; VIDAQUANT SUBFUND DELAWARE TRUST; VIDA INSURANCE FUND II SERIES INTERESTS OF THE SALI MULTI-SERIES FUND, LP; WELLS FARGO BANK, NATIONAL ASSOCIATION, as securities intermediary for VICOF II TRUST, VIDA LONGEVITY FUND, LP, LIFE ASSETS TRUST II S.A. DELAWARE TRUST, VIDAQUANT SUBFUND DELAWARE TRUST, and VIDA INSURANCE FUND II SERIES INTERESTS OF THE SALI MULTI-SERIES FUND, LP; DLP MASTER TRUST; DLP MASTER TRUST II; GWG DLP MASTER TRUST LIFE FUNDING TRUST; PF PARTICIPATION FUNDING TRUST; and PALM BEACH SETTLEMENT COMPANY,

                                     Plaintiffs,

    v.

JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.),

                                     Defendant.

---

i

EFG BANK AG, CAYMAN BRANCH; and WELLS
FARGO BANK, NATIONAL ASSOCIATION, as
securities intermediary for EFG BANK AG,
CAYMAN BRANCH,

                                        Plaintiffs,

          v.

JOHN HANCOCK LIFE INSURANCE COMPANY
(U.S.A.),
                              Defendant.

---

YURIY DAVYDOV, on behalf of himself and others
similarly situated,

                                        Plaintiff,

          -against-

JOHN HANCOCK LIFE INSURANCE COMPANY
OF NEW YORK and JOHN HANCOCK LIFE
INSURANCE COMPANY (U.S.A.)

                              Defendant.

Civil Action No.    18-cv-09825-AKH

**DEFENDANT JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.) AND
DEFENDANT JOHN HANCOCK LIFE INSURANCE COMPANY OF NEW YORK'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... iv

INDEX OF DECLARATIONS AND EXHIBITS ........................................ xi

PRELIMINARY STATEMENT ..................................................................... 1

BACKGROUND ............................................................................................... 4

    A.    Procedural Background ......................................................... 4

    B.    Universal Life Insurance ...................................................... 5

    C.    Relevant Contractual Provisions ......................................... 6

    D.    The COI Redetermination ..................................................... 8

    E.    Review of the COI Redetermination by the New York Department of Financial Services ("NYDFS") ......................................... 9

    F.    Plaintiffs' Complaints and Expert Testimony ................... 11

ARGUMENT ................................................................................................... 13

I.    LEGAL STANDARD ......................................................................... 13

II.    PLAINTIFFS' EXPRESS BREACH CLAIMS ARE INCONSISTENT WITH THE PLAIN LANGUAGE OF THE POLICIES, WHICH THE COURT SHOULD INTERPRET AS A MATTER OF LAW. ......................................... 14

    A.    Applicable Law for Breach of Contract Claims ............... 14

    B.    The Allegedly Breached Provisions of the Policies Must Be Interpreted Using the Plain Meaning of the Contractual Language ................... 17

    C.    The Plaintiffs' Criticism of the Kinds of Factors Used in the Redetermination Fail as a Matter of Law ......................... 20

        1.    Plaintiffs Cannot Prove That the COI Redetermination Was Based on Factors Other Than Those Referenced in the Contract ........................... 20

        2.    Plaintiffs Cannot Prove That John Hancock Ignored Contractual Factors During the Redetermination ......................... 23

i

D.     Plaintiffs' Criticisms of John Hancock's Expectations of Future Experience Fail to Establish an Express Breach of Contract as a Matter of Law ............... 25

    1.    There Is No Dispute That the Expectations of Future Experience Used in the COI Redetermination Were John Hancock's Expectations of Future Experience .................................................................................. 25

    2.    John Hancock's Use of Modified Original Pricing Assumptions to Limit COI Increases Did Not Breach the Policy Contracts ..................... 27

E.     Plaintiffs' Claim That John Hancock Unfairly Discriminated Within Policy Classes Fails as a Matter of Law ..................................................................... 29

    1.    John Hancock Did Not Breach the 03PERUL Form's Terms Because It Is Undisputed That the Redetermination Adjusted COI Rates on a Uniform Basis for All Policies on Insureds Sharing the Same Sex, Issue Age, Premium Class, and Policy Duration ................................................ 30

    2.    John Hancock Did Not Breach the 06PERFUL Form's Terms Because It Did Not Discriminate Within Classes of Lives Insured, Much Less Do So Unfairly ........................................................................................... 31

    3.    There Is No Evidence That Policies Owned by Investors Were Treated Differently in the Redetermination Than Policies Owned by the Original Policyholders .............................................................................. 39

    4.    There Is No Dispute John Hancock's Decision to Use Quinquennial Age Classes for the Redetermination Was a Good Faith Exercise of the Discretion Afforded Under the Policy Language ...................................... 39

F.     To The Extent Plaintiffs Contend John Hancock Failed to Lower COI Rates, That Claim Fails as a Matter of Law ................................................................ 40

III.    PLAINTIFFS' CLAIMS FOR CONTRACTUAL BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING FAIL AS A MATTER OF LAW ............................................................................................................................... 41

A.     Plaintiffs' Implied Duty Claims Fail as a Matter of Law Because It Is Undisputed That John Hancock Acted in Good Faith in the Redetermination 41

B.     Each of Plaintiffs' Implied Covenant Claims Fail for Additional Reasons ..... 44

    1.    Plaintiffs Impermissibly Seek to Add New Affirmative Duties to the Policy Contracts ................................................................................... 45

    2.    The Implied Covenant of Good Faith and Fair Dealing Does Not Bar Charging "Excessive" COI Rates ............................................................ 45

      3.     The Undisputed Evidence Shows that John Hancock Did Not Force Plaintiffs to Lapse Their Policies ................................................................. 47

      4.     Plaintiffs' Claim That John Hancock Should Have Endured Lower Projected Profit Than The Contract Required Fails as a Matter of Law .. 49

IV.    SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' CLAIM FOR TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ............................................................................................ 50

V.     SUMMARY JUDGMENT SHOULD BE ENTERED ON PLAINTIFFS' CONVERSION CLAIMS ........................................................................... 52

     A.    New York and Massachusetts Law Apply to the Conversion Claims Brought by Plaintiffs ..................................................................................... 52

     B.    Plaintiffs' Conversion Claims Fail Because They Had No Right to Possess Funds Deducted in Compliance with the Contracts .......................... 56

     C.    Plaintiffs' Conversion Claims are Also Duplicative of Their Breach of Contract Claims .................................................................................. 57

VI.    SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' DUPLICATIVE DECLARATORY JUDGMENT CLAIM ............................ 58

VII.   SUMMARY JUDGMENT SHOULD BE GRANTED ON DAVYDOV'S CLAIMS ..... 59

Appendix Table 1 ....................................................................................... 63

Appendix Table 2 ....................................................................................... 65

Appendix Table 3 ....................................................................................... 68

Appendix Table 4 ....................................................................................... 70

Appendix Table 5 ....................................................................................... 72

Appendix Table 6 ....................................................................................... 78

Appendix Table 7 ....................................................................................... 80

Appendix Table 8 ....................................................................................... 82

Appendix Table 9 ....................................................................................... 83

Appendix Table 10 ..................................................................................... 84

## **TABLE OF AUTHORITIES**

**Cases**

*21st Century Ins. Co. v. Superior Court*,
   47 Cal. 4th 511 (2009) ............................................................................................... 45

*99 Wall Dev., Inc. v. Allied World Specialty Ins. Co.*,
   2021 WL 4460638 (S.D.N.Y. Sept. 29, 2021) ........................................................... 36

*Abbit v. ING USA Annuity & Life Ins. Co.*,
   252 F. Supp. 3d 999 (S.D. Cal. 2017) ........................................................................ 45

*Aegis Ins. Servs., Inc. v. 7 World Trade Co.*,
   865 F. Supp. 2d 370 (S.D.N.Y. 2011) ........................................................................ 36

*Allstate Ins. Co. v. Vitality Physicians Grp. Prac. P.C.*,
   537 F. Supp. 3d 533 (S.D.N.Y. 2021) .................................................................. 31, 33

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 248 (1986) ............................................................................................ 13

*Bajwa v. United States Life Ins. Co.*,
   2021 WL 2661836 (E.D. Cal. June 29, 2021) ............................................................ 16

*Baldwin v. AAA N. California, Nevada & Utah Ins. Exch.*,
   1 Cal. App. 5th 545 (Ct. App. 2016) .......................................................................... 46

*Bank of West v. Superior Court*,
   2 Cal. 4th 1254 (1992) ................................................................................................ 32

*Barkhordar v. President & Fellows of Harvard Coll.*,
   544 F. Supp. 3d 203 (D. Mass. 2021) ......................................................................... 57

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*,
   5 Cal. 4th 854 (1993) .................................................................................................. 19

*Behren v. Warren Gorham & Lamont, Inc.*,
   808 N.Y.S.2d 157 (1st Dep't 2005) ............................................................................ 43

*Brighton Trs. v. Transamerica Life Ins. Co.*,
   2019 WL 6315541 (C.D. Cal. Aug. 28, 2019) ........................................................... 61

*Brighton Trustees v. Transamerica Life Insurance Co.*,
   2019 WL 5784925 (C.D. Cal. Nov. 4, 2019) .............................................................. 51

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Associates*,
   182 N.J. 210 (2005) .................................................................................................... 49

*Bus. Exposure R Educ. Grp. Assocs., LLC v. Pershing Square Cap. Mgmt., L.P.*,
   549 F. Supp. 3d 318 (S.D.N.Y. 2021) ........................................................................ 26

iv

*Cable First Constr. Inc. v. Lepetiuk Eng'g Corp.*,
   2021 WL 276707 (S.D.N.Y. Jan. 27, 2021) .................................................. 58

*Callahan v. Glob. Eagle Entm't Inc.*,
   2019 WL 2325903 (S.D.N.Y. May 30, 2019) ........................................ 20, 30, 31

*Cates Constr., Inc. v. Talbot Partners*,
   21 Cal. 4th 28 (1999) .............................................................................. 52

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................ 13

*Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*,
   90 Cal. App. 4th 335 (Ct. App. July 30, 2001) ....................................... 42

*Chigirinskiy v. Panchenkova*,
   2015 WL 1454646 (S.D.N.Y. Mar. 31, 2015) .......................................... 55

*CIBC Bank and Trust Co (Cayman) Ltd v. Banco Cent do Brasil*,
   886 F. Supp. 1105 (S.D.N.Y. 1995) ........................................................ 46

*CJI Trading LLC v. JPMorgan Chase Bank, N.A.*,
   2021 WL 2036678 (S.D.N.Y. May 21, 2021) .......................................... 46

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
   976 F.3d 239 (2d Cir. 2020) ................................................................... 45

*Concordia Gen. Contr. Co., Inc. v. Preferred Mut. Ins. Co.*,
   46 N.Y.S.3d 146 (2d Dep't 2017) ........................................................... 19

*Consol. Rest. Operations, Inc. v. Westport Ins. Corp.*,
   167 N.Y.S.3d 15 (1st Dep't 2022) .......................................................... 19

*Cooney v. Osgood Mach.*,
   81 N.Y.2d 66 (1993) ............................................................................... 55

*Counts v. Meriwether*,
   2015 WL 9594469 (C.D. Cal. Dec. 30, 2015) ......................................... 36

*Credit Suisse Lending Tr. USA v. Transamerica Life Ins. Co.*,
   2020 WL 4042899 (C.D. Cal. July 13, 2020) ..................................... 54, 55

*EFG Bank AG v. Transamerica Life Ins. Co.*,
   2020 WL 1849493 (C.D. Cal. Apr. 13, 2020) ......................................... 51

*EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*,
   309 F. Supp. 3d 89 ................................................................................. 51

*EFG Bank AG, Cayman Branch v. Transamerica Life Ins. Co.*,
   2017 WL 3017596, at *9 (C.D. Cal. July 10, 2017) ................................. 42

v

*EFG Bank, AG, Cayman Branch v. AXA Equitable Life Ins. Co.*,
   309 F. Supp. 3d 89 (S.D.N.Y. 2018)................................................................ 58

*Elhouty v. Lincoln Ben. Life Co.*,
   121 F. Supp. 3d 989 (E.D. Cal. 2015)........................................................ 20, 21

*Eucasia Sch. Worldwide, Inc. v. DW Aug. Co.*,
   218 Cal. App. 4th 176 (Ct. App. 2013)............................................................ 20

*Financial Indemnity Co. v. Messick*,
   2022 WL 2079225 (E.D. Cal. June 9, 2022) .................................................. 16

*First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*,
   52 F. Supp. 3d 625 (S.D.N.Y. 2014).............................................................. 15

*Fleisher v. Phoenix Life Ins. Co.*,
   18 F. Supp. 3d 456 (S.D.N.Y. 2014).............................................................. 37

*Frontier Oil Corp. v. RLI Ins. Co.*,
   153 Cal.App.4th 1436 (2007) ........................................................................ 16

*G8 Holdings, Inc. v. Deutsche Bank Securities, Inc.*,
   2018 WL 11226748 (S.D.N.Y. Apr. 19, 2018)................................................ 57

*GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*,
   449 F.3d 377 (2d Cir. 2006).......................................................................... 14

*Hancock v. Americo Fin. Life & Annuity Ins. Co.*,
   378 F. Supp. 3d  413 (E.D.N.C. 2019)........................................................... 49

*Hanks v. Voya Ret. Ins. & Annuity Co.*,
   492 F. Supp. 3d 232 (S.D.N.Y. 2020)............................................................ 15

*Harlen Assocs. v. Inc. Vill. of Mineola*,
   273 F.3d 494 (2d Cir. 2001).......................................................................... 13

*In re Allstate Ins. Co.,
   (Stolarz),* 81 N.Y.2d 219 (1993) ................................................................... 14

*In re AXA Equitable Life Ins. Co. COI Litig.*,
   2022 WL 976266 (S.D.N.Y. Mar. 31, 2022) .................................................. 61

*In re Brauer*,
   452 Mass. 56 (Mass. 2008) ........................................................................... 56

*In re Estates of Covert*,
   97 N.Y.2d 68 (2001) ..................................................................................... 18

*In re Estates of Covert*,
   97 N.Y.2d at 76.............................................................................................. 18

vi

*In re Ins. Installment Fee Cases*,
   211 Cal. App. 4th 1395 (Ct. App. 2012)................................................................. 19

*In re Sept. 11 Litig.*,
   328 F. Supp. 3d 178 (S.D.N.Y. 2018)..................................................................... 20

*In re Sept. 11 Litig.*,
   328 F. Supp. 3d at 184 (S.D.N.Y. 2018).................................................................. 20

*Integrated Constr. Enterprises, Inc. v. GN Erectors, Inc.*,
   2020 WL 614991 (S.D.N.Y. Feb. 10, 2020)............................................................ 56

*Jaramillo v. Weyerhaeuser Co.*,
   536 F.3d 140 (2d Cir. 2008)................................................................................... 60

*Jeffers v. Am. Univ. of Antigua*,
   3 N.Y.S.3d 335 (1st Dep't 2015)............................................................................ 56

*JMP Sec. LLP v. Altair Nanotechnologies Inc.*,
   880 F. Supp. 2d 1029 (N.D. Cal. 2012).................................................................. 53

*Karoun Dairies, Inc. v. Karlacti, Inc.*,
   2014 WL 3340917 (S.D. Cal. July 8, 2014)............................................................ 16

*Kearney v. Salomon Smith Barney, Inc.*,
   39 Cal. 4th 95 (2006)............................................................................................. 54

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941)............................................................................................... 14

*Kuroda v. SPJS Holdings, L.L.C.*,
   971 A.2d 872 (Del. Ch. 2009)........................................................................... 54, 56

*Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*,
   184 Cal. App. 3d 1479 (Ct. App. 1986).................................................................. 18

*Litzler v. CC Invs., L.D.C.*,
   411 F. Supp. 2d 411 (S.D.N.Y. 2006)..................................................................... 13

*LSH CO v. Transamerica Life Ins. Co.*,
   2020 WL 5991627 (C.D. Cal. Sept. 15, 2020) ....................................................... 51

*Madera Group, LLC v. Mitsui Sumitomo Ins. USA, Inc.*,
   545 F. Supp. 3d 820 (C.D. Cal. 2021) .................................................................... 14

*Markov v. Katt*,
   109 N.Y.S.3d 295  (1st Dep't 2019)........................................................................ 18

*Marx & Co., Inc. v. Diners' Club Inc.*,
   550 F.2d 505 (2d Cir. 1977).................................................................................... 36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)................................................................................................ 13

*Mirpad, LLC v. California Ins. Guarantee Assn.*,
132 Cal. App. 4th 1058 (Ct. App. 2005)................................................................ 34

*N. Am. Photon Infotech Ltd. v. ZoomInfo LLC*,
2021 WL 4482208, at *5 (S.D.N.Y. Sept. 30, 2021)............................................ 42

*Nat'l Life & Accident Ins. Co. v. Edwards*,
119 Cal. App. 3d 326 (2d Dist. 1981).................................................................... 42

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Monarch Payroll, Inc.*,
2016 WL 634083 (S.D.N.Y. Feb. 17, 2016)......................................................... 28

*Nemec v. Shrader*,
991 A.2d 1120 (Del. 2010) .................................................................................... 44

*New York Univ. v. Galderma Lab'ys, Inc.*,
2013 WL 12202520, at *2 (S.D.N.Y. Nov. 1, 2013)............................................ 35

*Oasis West Realty, LLC v. Goldman*,
51 Cal. 4th 811 (2011)........................................................................................... 18

*Pappas v. Tzolis*,
20 N.Y.3d 228 (2012)............................................................................................ 56

*Rac Associates v. R.E. Moulton, Inc*,
2011 WL 3533221 (Mass. Super. Feb. 01, 2011)................................................. 54

*Roberts v. Los Angeles County Bar Assn.*,
105 Cal. App.4th 604 (2003).................................................................................. 28

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*,
769 F.3d 807 (2d Cir. 2014)................................................................................... 27

*Secondary Life Three LLC v. Transamerica Life Ins. Co.*,
2021 WL 5827105 ................................................................................................. 16

*Smith v. NBC Universal*,
524 F. Supp. 2d 315 (S.D.N.Y. 2007).................................................................... 28

*State Farm Gen. Ins. Co. v. Mintarsih*,
175 Cal. App. 4th 274 (Ct. App. 2009).................................................................. 18

*Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.*,
14 Cal. App. 4th 637 (1993) .................................................................................. 15

*Technicon Elecs. Corp. v. Am. Home Assur. Co.*,
533 N.Y.S.2d 91 (2d Dep't 1988).......................................................................... 34

viii

*Travelers Prop. Cas. Co. of Am. v. KLA-Tencor Corp.*,
    45 Cal. App. 5th 156 (Ct. App. 2020)..................................................................... 18

*Travelers Property Cas. Co. of America v. KLA-Tencor Corp.*,
    45 Cal. App. 5th 156 (Ct. App. 2020)..................................................................... 18

*U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*,
    2014 WL 2199428 (S.D.N.Y. May 23, 2014) ......................................................... 37

*U.S. Fid. & Guar. Co. v. Annunziata*,
    67 N.Y.2d 229 (1986) ........................................................................................... 18

*Union Carbide Corp. v. Affiliated FM Ins. Co.*,
    891 N.Y.S.2d 347 (2009) ...................................................................................... 19

*Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    25 N.Y.3d 675 (2015) ........................................................................................... 19

*Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*,
    87 F.3d 604 (2d Cir. 1996)..................................................................................... 14

*Virgin Atlantic Airways Ltd. v. British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001)................................................................................... 13

*Voris v. Lampert*,
    7 Cal. 5th 1141 (2019) .......................................................................................... 54

*Wash. Mut. Bank, FA v. Superior Court*,
    24 Cal. 4th 906 (2001) .......................................................................................... 14

*Washington Mut. Bank, FA v. Superior Ct.*,
    24 Cal. 4th 906 (2001) .......................................................................................... 53

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000).................................................................................... 13

*Wilson v. Amerada Hess Corp.*,
    168 N.J. 236 (2001) .............................................................................................. 44

*Zilg v. Prentice-Hall, Inc.*,
    717 F.2d 671 (2d Cir. 1983)............................................................................. 26, 44

**Statutes**

28 U.S.C. § 1404................................................................................................... 14

Cal. Ins. Code § 790.03 ......................................................................................... 39

**Other Authorities**

2 Witkin, Summary 11th Insurance § 41 (2022)........................................................ 15

ASOP 1 § 2.10 ...................................................................................................... 36

Conflict of Laws § 192 (1971).................................................................................................. 15

**Rules**

Cal. Civ. Code § 1646.......................................................................................................... 16

Fed. R. Civ. P. 41(b) ............................................................................................................ 61

Fed. R. Civ. P. 56(a) ............................................................................................................ 13

x

## INDEX OF DECLARATIONS AND EXHIBITS

**Declaration of John F. LaSalle**

Exhibit 6 to the October 20, 2020 deposition of Tony Teta bearing
Bates stamps JH_LEONARD_000000498 through JH_LEONARD_000000549…...  Ex. A

Excerpts from the transcript of the July 21, 2022 hearing…………………………  Ex. B

Excerpts from the transcript of the July 6, 2022 deposition of Plaintiff's
actuarial expert, Larry Stern…..……………………………………………………  Ex. C

Excerpts from the transcript of the July 7, 2022 deposition of Plaintiff's
actuarial expert, Larry Stern…..……………………………………………………  Ex. D

Exhibit 90 to the November 17, 2021 deposition of Daniel Pena bearing
Bates stamps VIDA-JH-0001106371 through VIDA-JH 000106405…...…………  Ex. E

Excerpts from Wells Fargo & Company's 2021 Annual Report………………………  Ex. F

Excerpts from the transcript of the November 23, 2021 deposition of EAA's
Rule 30(b)(6) designee, Ingo Wichelhaus……………………………………………  Ex. G

Excerpts from EFG International's 2020 Annual Report…………………………….  Ex. H

Excerpts from the transcript of the August 25, 2021 deposition of EFG's
Rule 30(b)(6) designee, Tobias Schmelz…………………………………………...  Ex. I

Excerpts from the transcript of the September 17, 2021
deposition of Daniel Young…………………………………………………………  Ex. J

Expert Report of John Hancock's actuarial expert, Timothy Pfeifer,
dated May 19, 2022…………………………………………………………………...  Ex. K

Excerpts from EFG's First Amended Responses and Objections to
John Hancock Life Insurance Company (U.S.A.)'s First Set of Interrogatories,
dated May 4, 2021……………………………………………………………………  Ex. L

Expert Report of John Hancock's damages expert, Bruce Deal,
dated May 19, 2022…………………………………………………………………...  Ex. M

Expert Report of Plaintiffs' actuarial expert, Larry Stern,
dated February 24, 2022……………………………………………………………  Ex. N

Expert Report of John Hancock's regulatory expert, Neil Rector,
dated May 19, 2022…………………………………………………………………...  Ex. O

John Hancock's 03PERUL policy form bearing Bates stamps
JH_LEONARD_000011149 through JH_LEONARD_000011172…………………….. Ex. P

John Hancock's 06PERFUL policy form bearing Bates stamps
JH_LEONARD_000175093 through JH_LEONARD_000175116………………….. Ex. Q

Excerpts from the transcript of the November 9, 2021 deposition of John Hancock's
Rule 30(b)(6) designee, Faisel Gulamhussein………………………………………... Ex. R

Excerpts from the transcript of the August 27, 2021 deposition of
Tobias Schmelz………………………………………………………………………. Ex. S

Excerpts from the transcript of the September 1, 2021 deposition of Vida's
Rule 30(b)(6) designee, Adam Meltzer………………………………………………. Ex. T

Excerpts from the transcript of the November 1, 2021 deposition of
Fred Tavan……………………………………………………………………………. Ex. U

Annual Policy Statement for policy number 1202699, dated June 27, 2018 bearing
Bates stamps EFG-JH-000047849 through EFG-JH-000047860……………………. Ex. V

Annual Policy Statement for policy number 1202700, dated June 27, 2018 bearing
Bates stamps EFG-JH-000048855 through EFG-JH-000048866……………………. Ex. W

Excerpts from the transcript of the November 11, 2021 deposition of
Faisel Gulamhussein…………………………………………………………………... Ex. X

Excerpts from the transcript of the November 16, 2021 deposition of
John Hancock's Rule 30(b)(6) designee, Zahir Bhanji………………………………. Ex. Y

Exhibit 605 to the June 28, 2022 deposition of John Hancock's regulatory expert,
Neil Rector, bearing Bates stamp JH_LEONARD_000001513………………………. Ex. Z

Email exchange regarding a conversation between John Hancock and the NYDFS,
dated January 11, 2018 bearing Bates stamps JH_LEONARD_000387820 through    Ex.
JH_LEONARD_000387821…………………………………………………………    AA

Exhibit 44 to the October 20, 2020 deposition of Tony Teta bearing Bates stamps    Ex.
JH_LEONARD_000001549 through JH_LEONARD_000001553…………………..    BB

Excerpts from the transcript of the June 24, 2022 deposition of Plaintiffs'    Ex.
regulatory expert, Gregory Serio………………………………………………………...    CC

Exhibit 601 to the June 28, 2022 deposition of John Hancock's regulatory expert,    Ex.
Neil Rector, bearing Bates stamp JH_LEONARD_000001589………………………    DD

Excerpts from the transcript of the June 28, 2022 deposition of Plaintiffs' damages expert, Donald Solow…………………………………………………… Ex. EE

Document entitled "Performance UL Impact of Change in Corporate Tax," dated January 25, 2018 bearing Bates stamps JH_LEONARD_000334671 through JH_LEONARD_000334674……………………………………………………….. Ex. FF

Exhibit D to the report of Plaintiffs' actuarial expert, Larry Stern, dated February 24, 2022……………………………………………………………… Ex. GG

**Declaration of Greg D. King**

Filed without exhibits

## PRELIMINARY STATEMENT

Plaintiffs are several funds and one individual that own approximately 100 John Hancock universal life insurance policies that received a cost of insurance rate increase beginning in 2018. As this Court is aware, numerous cases have been filed and resolved, including a class action settlement that was approved by this Court in May 2022.  Plaintiffs did not participate in the settlement.  Plaintiffs allege the COI increase breached the policy contracts and bring ancillary tort claims.[1]

The policies are universal life insurance policies with non-guaranteed "cost of insurance" ("COI") rates that John Hancock is contractually permitted to change based on its expectations of future experience.  Consistent with its contractual rights, John Hancock determined that its expectations of future experience had changed and increased COI rates on the policies to reflect John Hancock's changed expectations (the "Redetermination").

It is undisputed that John Hancock's expectations of future experience changed and that John Hancock's actuaries, according to Plaintiffs' own actuarial expert, acted in ***good faith***. Summary judgment is appropriate because Plaintiffs' expert's criticisms of the Redetermination do not, as a matter of law, give rise to a breach of contract.

First, Plaintiffs contend it was improper for John Hancock to consider its projected "profit" as part of the Redetermination.  But it is undisputed that John Hancock did not increase its overall projected profit (*i.e.* present value of future cashflows or "PVFC") on any of the products at issue relative to its projected profits at pricing.  Plaintiffs agree that overall the COI

---

[1] "Plaintiffs" refers to the plaintiffs in *VICOF II Trust et al. v. John Hancock Life Insurance Company of New York*, 19-cv-11093 (S.D.N.Y.).  "Davydov" refers to the individual plaintiff in *Davydov v. John Hancock Life Insurance Company of New York and John Hancock Life Insurance Company* (U.S.A.), 18-cv-09825 (S.D.N.Y.).

increase did not increase projected cash flows from the pricing baseline.  Given these undisputed facts, Plaintiffs cannot show that John Hancock breached the contract terms, which do not mention profit.

Second, Plaintiffs complain that John Hancock ignored factors referenced in the policy language, but the undisputed evidence shows that John Hancock did consider those factors and exercised its discretion not to use them to calculate COI increases. Their inclusion would have resulted in *higher* COI rate increases.

Third, Plaintiffs claim that John Hancock "unfairly discriminate[d]" against certain policyholders by targeting "investor-owned policies" for greater increases and failing to make identical COI rate percentage changes for all policyholders of a particular product.  This argument is also divorced from the actual terms of the contract.  John Hancock imposed different increases by product depending on the specific criteria set forth in the contract: sex, issue age, and risk class.  All policies with these same characteristics received the same percentage increase in COI rates.  Given that John Hancock adjusted COI rates according to the criteria in the contract, Plaintiffs' accusations, even if true, cannot as a matter of law give rise to a claim for breach of contract.

Fourth, Plaintiffs' second-guessing of John Hancock's expectations of future experience has no basis in the contractual language.  The policy language provides that COI rates will be based on John Hancock's expectations of future experience.  It is undisputed that the Redetermination *was* based on John Hancock's expectations of future experience.  Plaintiffs contend instead that John Hancock's expectations should have been different, but that does not, as a matter of law, constitute an express breach.

Plaintiffs' ancillary claims should also be dismissed.  The implied covenant of good faith and fair dealing prohibits John Hancock from exercising its contractual discretion in bad faith but Plaintiffs' actuarial expert testified that he believes John Hancock acted in good faith in the Redetermination.  Courts—including the Second Circuit—consistently hold that even proof of negligence fails to establish a breach of the implied covenant.  That is all Plaintiffs have tried (unsuccessfully) to prove here, and judgment should be entered for John Hancock.

Plaintiffs' tort claims fare no better.  Their claim for tortious breach of the implied covenant of good faith and fair dealing does not apply to claims by institutional owners who acquired their interests in the policies from prior holders, and it is inapplicable where, as here, Plaintiffs do not allege an unpaid death benefit.  Their conversion claim fails because John Hancock was authorized by the contracts to make the deductions that Plaintiffs contend were converted.  Moreover, the conversion claims are improperly duplicative of the contract claims.  Plaintiffs' claim for declaratory judgment fails for the same reasons as the contract claims and because it is duplicative.

Judgment should be entered on the claims by Davydov, an individual plaintiff who tried to represent a class and did not participate in the class settlement, for the same reasons or, in the alternative, for failure to prosecute.

At bottom, Plaintiffs' expert disagrees with certain actuarial steps that John Hancock took while also recognizing that reasonable actuaries can disagree.  As a matter of law, however, disagreement among actuaries or even Plaintiffs' actuarial expert's belief that he would have done things differently does not give rise to a claim for breach of contract. [2]  The policy contract

---

[2] At the last status conference, John Hancock discussed its intention to seek summary judgment on discrete portions of Plaintiffs' express contract claims and all of Plaintiffs' non-contract

is unambiguous and John Hancock's COI increase complied with the terms of the contract. Summary judgment is thus appropriate.

## **BACKGROUND**

### A.   **Procedural Background**

In May 2018, John Hancock announced a redetermination of COI rates on a block of 1500 Performance UL policies.  SUMF ¶ 1.[3]  In the months following, various policyholders sued John Hancock individually and on behalf of putative classes in state and federal court.  John Hancock settled the *Leonard* class action in May 2022 and subsequently settled the claims of certain other federal plaintiffs.  This motion is directed at the two federal cases for which summary judgment motions are due: *VICOF II Trust et al. v. John Hancock Life Insurance Company of New York*, 19-cv-11093 (S.D.N.Y.) ("*VICOF*")[4] and *Davydov v. John Hancock Life Insurance Company of New York and John Hancock Life Insurance Company (U.S.A.),* 18-cv-09825 (S.D.N.Y.) ("*Davydov*").

---

claims.  The Court instructed John Hancock to "move on whatever you want.  Include everything in your motion you want to include."  Declaration of John LaSalle, Ex. B, July 21, 2022 Hrg. Tr. at 13:1-2.  In light of the Court's guidance, the concession of Plaintiffs' experts at deposition, and consideration of the issues to be tried, it was clear that there are no disputed material facts and that John Hancock is entitled to judgment as a matter of law on each of Plaintiffs' claims.

[3] In support of its Motion for Summary Judgment, as required by Local Rule 56.1(a), John Hancock submits a Local Rule 56.1 Statement of Undisputed Material Facts, referred to herein as "SUMF."  John Hancock also submits additional background evidence, appended to the Declaration of John LaSalle, dated September 13, 2022.  John Hancock provides these additional background materials solely for context but does not proffer them, at this point, as material facts necessary for the adjudication of John Hancock's Motion for Summary Judgment.

[4] On December 1, 2021, two matters, originally filed in the Central District of California and later transferred to this Court, were consolidated with the *VICOF* matter: *VICOF II Trust et al. v. John Hancock Life Insurance Company (U.S.A.)*, 20-cv-4256 (S.D.N.Y.) and *EFG Bank AG and Wells Fargo Bank, N.A. v. John Hancock Life Insurance Company (U.S.A.)*, 20-cv-4258 (S.D.N.Y.).  19-cv-11093-AKH, Dkt. No. 121 ("Consolidation Order").

None of Plaintiffs are the original owners of the policies.  Plaintiffs acquired their interests in the policies from prior holders.  Plaintiffs are sophisticated institutional owners who manage life insurance policies with face amounts reflecting millions of dollars in death benefits. SUMF ¶ 2.  They have no insurable interest in the lives of the insureds.[5]  SUMF ¶ 3.  Their interest is only transactional.  As a general matter, institutional owners rarely lapse policies and instead keep the policies in force until the insured passes away.  SUMF ¶ 4.

The policies identified in the exhibits to the SACC and the Davydov policy are referred to as the "Policies."

### B.   Universal Life Insurance

The Policies are universal life ("UL") policies, life insurance policies with adjustable premiums. SUMF ¶ 5.  Any premiums paid by the policyholder are credited to a policy's Account Value or Policy Value (terminology varies between policy form, "Account Value" is used herein to refer to both terms), which earns interest.  Each month, John Hancock deducts a set of charges (referred to as the monthly deduction), including the cost of insurance ("COI") charge, from the Account Value.  SUMF ¶¶ 8-9.  The policy will remain in force and provide

---

[5] An insurable interest is "an interest based upon a reasonable expectation of pecuniary advantage through the continued life, health, or bodily safety of another person and consequent loss by reason of that person's death or disability or a substantial interest engendered by love and affection in the case of individuals closely related by blood or law."  Cal. Ins. Code § 10110.1(a); *see also* N.Y. Ins. Law § 3205(a)(1)(A)-(B) (defining "insurable interest" as "a substantial interest engendered by love and affection" "in the case of persons closely related by blood or by law," or in other cases, "a lawful and substantial economic interest in the continued life, health or bodily safety of the person insured, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the insured."); *Jimenez v. Protective Life Ins. Co.*, 8 Cal. App. 4th 528, 536 (Ct. App. 1992) ("The law is clear that a person taking out a policy of insurance upon the life of another must have an insurable interest in the life of the other person. Otherwise, the policy is a mere wager on the life of the person insured, and the policy is void as against public policy.") (citation omitted).

coverage so long as the Surrender Value (the Account Value minus certain charges) is sufficient to cover the monthly deduction.  If the Surrender Value is insufficient, the policyholder has a period of time (a grace period) to make the necessary payment.  The policy will terminate if such payment is not received by the end of the grace period. SUMF ¶ 11.

In calculating the COI charge, John Hancock multiplies the COI rate by the Net Amount at Risk.  SUMF ¶ 12.  The COI rates for each product vary according to the insured's issue age, gender, risk class, and years since issue.  SUMF ¶ 13.

The COI rate is a nonguaranteed element that the insurer can change after issuance. Determining COI rates is a complex process that includes actuarial discretion and judgment.  The Actuarial Standards of Practice and the experts for John Hancock and Plaintiffs recognize that two actuaries, both exercising reasonable actuarial judgment, may arrive at different conclusions. As explained by Defendants' actuarial expert, Timothy J. Pfeifer:

> The process of setting COI rates scales is a complex process that involves: establishing assumptions, actuarial judgment, and the consideration of experience data, company profit goals, and competitive objectives.  Two actuaries, both exercising reasonable actuarial judgment, may well arrive at different COI rate scales. Such an occurrence is not unusual and is specifically recognized in ASOP 1 – Introductory Actuarial Standard of Practice, Section 2.10.

Ex. K, Pfeifer Rep. ¶ 15.  Plaintiffs' actuarial expert, Larry Stern, agrees that ███████████ ████████████████████████████████ SUMF ¶ 15.

## C.    Relevant Contractual Provisions

The Policies were each written on one of two policy forms, 03PERUL and 06PERFUL. Each Policy was issued as one of the six following products: (i) Performance UL Core; (ii) Performance UL Core Re-Price; (iii) Performance UL 2006; (iv) Performance UL 2007; (v) Performance UL 2008; and (iv) Performance UL 2008 Re-Price.  SUMF ¶¶ 6-7.

6

The Policies were issued in the following states: California, Florida, New Jersey, New York, Michigan, Illinois, Delaware, Arizona, Pennsylvania, Maryland, Nevada, Georgia, Texas, Kentucky, Massachusetts, North Carolina, Minnesota, Kansas, and Ohio.  SUMF ¶ 20.

Both policy forms state that the COI Charge will be calculated using a non-guaranteed COI rate, referred to as the "Applied Monthly Rate" in the 03PERUL Form and the "Cost of Insurance Rate" in the 06PERFUL Form (collectively referenced herein as, "COI rates").  SUMF ¶ 10.

The 03PERUL Form, on which the PerfUL Core and PerfUL Core Re-Price policies were written, states:

> The Applied Monthly Rates are the actual rates used to calculate the Cost of Insurance Charge. We will determine the Applied Monthly Rates to be used for this policy. **The Applied Monthly Rates will be based on our expectations of future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements.**[6]  The Applied Monthly Rates for the portion of Net Amount at Risk attributed to the Basic Sum Insured and for the portion of Net Amount at Risk attributed to the Additional Sum Insured, if any, will never be greater than the Maximum Monthly Rates shown in Section 2 divided by 1,000. On the Date of Issue and any Processing Date thereafter, the portions of Net Amount at Risk attributed to each of the Basic Sum Insured and Additional Sum Insured are based on the proportion of each to Total Sum Insured. They will be reviewed at least once every 5 Policy Years. **Any change in the Applied Monthly Rates will be made on a uniform basis for Insureds of the same sex, Issue Age, and premium class, including smoker status, and whose policies have been in force for the same length of time.**

---

[6] In this brief, John Hancock refers to its "expectations of future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirement" (03PERFUL form) and its "expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions" (06PERFUL form) as either John Hancock's "expectations of future experience" or, more concisely, John Hancock's "Expectations."

7

SUMF ¶ 16 (emphasis added).

The 06PERFUL Form, on which the PerfUL 2006, PerfUL 2007, PerfUL 2008, and

PerfUL 2008 Re-Price policies were written, states:

> The rates for the Cost of Insurance Charge, as of the Policy Date and subsequently for each increase in Total Face Amount, are based on the Life Insured's sex, if applicable, Age, Risk Classification and duration that the coverage has been in force. The Cost of Insurance Charge for a specific Policy Month is the charge for the Net Amount at Risk, including any Additional Ratings and any Supplementary Benefit riders which are part of the policy. **The charge for the Net Amount at Risk is an amount equal to the per dollar cost of insurance rate for that month multiplied by the Net Amount at Risk, and will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions.** The Maximum Monthly Rates at any age are shown in Section 2 as a rate per $1,000 of Net Amount at Risk. To get the maximum rate per dollar, the rate shown must be divided by 1,000. Each Cost of Insurance Charge is deducted in advance of the applicable insurance coverage for which we are at risk. The Cost of Insurance calculation will reflect any adjustment for the Minimum Death Benefit. **We review our Cost of Insurance rates from time to time, and may re-determine Cost of Insurance rates at that time on a basis that does not discriminate unfairly within any class of lives insured.**

SUMF ¶ 18 (emphasis added).

Plaintiffs do not allege that the redetermined COI rates exceed the maximum COI rates.

### D.    The COI Redetermination

John Hancock reviewed COI rates for the Performance UL policies and documented its

methodology in an April 2018 memorandum entitled "PerfUL Inforce Readjustment" (the

"Redetermination Memo").  SUMF ¶ 22.  John Hancock determined that its Expectations had

deteriorated significantly since the Performance UL policies were priced for certain groups of

insureds.  SUMF ¶ 23.  John Hancock determined that the largest changes in its Expectations were associated with mortality and lapse.[7]  SUMF ¶ 24.

John Hancock compared the PVFC calculated using (i) the original pricing assumptions (and modified original pricing assumptions, discussed below) and (ii) updated current assumptions.  SUMF ¶ 25. The PVFCs were calculated for each product using groups of policies (or "policy classes") consisting of insureds with the same sex, the same risk class, and issue ages within five-year age bands.  SUMF ¶ 26.

John Hancock determined that the policy classes with issue ages 60 and younger did not demonstrate a material deterioration relative to its Expectations at pricing.  SUMF ¶ 27.  John Hancock determined that the policy classes with issue ages above 60 demonstrated material deterioration relative to John Hancock's Expectations at pricing.  SUMF ¶ 28.

**E.    Review of the COI Redetermination by the New York Department of Financial Services ("NYDFS")**

John Hancock provided notice to NYDFS on October 12, 2017 of its contemplated COI rate redetermination.  SUMF ¶ 29.  NYDFS raised questions about certain mortality and lapse and surrender rate assumptions used in original pricing.  SUMF ¶ 30.  John Hancock disagreed and continues to disagree with the position taken by the NYDFS regarding the original pricing. In response to the regulator's position, John Hancock, for purposes of the Redetermination methodology, adopted a set of modifications to the original pricing mortality and lapse and surrender rate assumptions (the "Modified Original Pricing Assumptions").  SUMF ¶ 31. The

---

[7] Lapses refer to the termination of a policy following the grace period for insufficient funding. Surrenders refer to the termination of a policy following a policyholder's decision to terminate coverage in exchange for the policy's surrender value.  For ease of reference, John Hancock uses the term "lapse" here to cover both lapses and surrenders.

Modified Original Pricing Assumptions were generally more conservative than the original pricing assumptions.  SUMF ¶ 32.  NYDFS has never expressed any objections to John Hancock's use of the Modified Original Pricing Assumptions.

John Hancock incorporated the Modified Original Pricing Assumptions so that they effectively reset the baseline for the Redetermination.  The PVFC calculated using the Modified Original Pricing Assumptions were significantly lower than the PVFC calculated using the original pricing assumptions.  As a result, the difference in PVFC under the pricing view and current view for each product was significantly decreased, which resulted in lower COI increases.  SUMF ¶ 33.  John Hancock also ensured that no policyholder would be made worse off by the use of the Modified Original Pricing Assumptions by implementing the *lower* of (i) the increased COI rates calculated using the original pricing assumptions and (ii) increased COI rates calculated using the Modified Original Pricing Assumptions.  SUMF ¶¶ 35-36.  Overall, the effect of incorporating the Modified Original Pricing Assumptions reduced the net present value of the COI Increase by approximately one half ███████████  SUMF ¶ 37.  In addition, John Hancock further limited COI rate increases to 75%.  SUMF ¶ 38.

John Hancock engaged with NYDFS over a period of five months during which John Hancock shared information supporting a contemplated redetermination.  SUMF ¶ 47. On March 9, 2018, NYDFS wrote to John Hancock:

> The New York Insurance Law and 11 NYCRR 48 (Insurance Regulation 210) require that changes to Non-Guaranteed Elements ("NGEs") be based only on reasonable assumptions as to investment income, mortality, persistency, and expenses; be purely prospective and not seek to recoup past losses; not increase the insurer's profit margins at any duration; and be applied on a basis equitable to all policyholders of a given class.

> Based upon a complete review of the submission and in reliance upon representations made by John Hancock related thereto, **the Department is satisfied that the proposed changes do not violate any New York State statutes or regulations**.

SUMF ¶ 48 (emphasis added).

John Hancock increased the COI rates so that the redetermined PVFC did not exceed the aggregate PVFC for any product calculated using either the original pricing assumptions or the Modified Original Pricing Assumptions.  SUMF 34.[8]  John Hancock ultimately exercised its discretion to adjust COI rates on approximately 1500 policies.  SUMF ¶ 39.

John Hancock's actuarial expert opined that John Hancock's methodology for the Redetermination was common in the industry, and that "[t]he precision of model construction, assumption development, and thought process are on par with or exceed COI redetermination that I have reviewed in my career."  Pfeifer Rep. ¶¶ 47-51.

### F.       Plaintiffs' Complaints and Expert Testimony

After the close of fact discovery, Plaintiffs filed the SACC on May 2, 2022.  Plaintiffs alleged that John Hancock's "breaches were conscious, deliberate, and unreasonable acts," and that John Hancock "attempt[ed]" in "bad faith" to force Plaintiffs "either to (a) pay exorbitant premiums that Defendants know would no longer justify the ultimate death benefits (and, therefore, reduce the value of the ultimate death benefits) or (b) lapse or surrender their Performance Policies, thereby forfeiting the premiums they have paid to date…."  SACC ¶ 66. Plaintiffs seek, among other things, punitive damages.  SACC ¶ 68.

---

[8] Specifically, for each product, the aggregate PVFC for policies issue age 61+ calculated using current assumptions and readjusted COI rates did not exceed either (i) the aggregate PVFC for policies 61+ calculated using the original COI rates and original pricing assumptions or (ii) the aggregate PVFC for policies 61+ calculated using the original COI rates and Modified Original Pricing Assumptions.  SUMF ¶ 34.

11

Two months later, Plaintiffs' actuarial expert, Larry N. Stern, was deposed.  In his report, Mr. Stern states that he reviewed numerous documents produced in this matter, transcripts of 40 days of deposition testimony taken in this matter and in related matters, pleadings and other filings, and written discovery and disclosures.  Ex. GG, Stern Rep. Exhibit D.  Mr. Stern testified in no uncertain terms that, far from operating in bad faith, John Hancock operated in **good faith**:



Ex. D, Stern Dep. (July 7, 2022) Tr. 255:18-256:1 (emphasis added); SUMF ¶ 49.

Mr. Stern testified that John Hancock's actuaries neither committed any material violations of the Actuarial Standards of Practice nor should be reported to the Actuarial Board for Counseling and Discipline:



Ex. D, Stern Dep. (July 7, 2022) Tr. 254:11-17 ; SUMF ¶ 49.



Ex. D, Stern Dep. (July 7, 2022) Tr. 253:10-13; SUMF ¶ 49.

12

In short, despite the SACC's allegations that John Hancock acted in bad faith, Plaintiffs' own actuarial expert testified that John Hancock acted in good faith.

## ARGUMENT

### I.   LEGAL STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quotation omitted).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (internal quotation marks omitted).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Id.*  In opposing summary judgment, "the non-moving party must raise more than just 'metaphysical doubt as to the material facts.'" *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 414 (S.D.N.Y. 2006) (Hellerstein, J.) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Mere speculation and conjecture is insufficient to preclude the granting of the motion."  *Id.* (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)).

13

## II.   PLAINTIFFS' EXPRESS BREACH CLAIMS ARE INCONSISTENT WITH THE PLAIN LANGUAGE OF THE POLICIES, WHICH THE COURT SHOULD INTERPRET AS A MATTER OF LAW.

### A.   Applicable Law for Breach of Contract Claims

The choice of law rules of both New York and California apply in this consolidated action because two of the cases were filed in California and two were filed in New York.  "A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state."  *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 382 (2d Cir. 2006) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941), *inter alia*).  Where, as here, a case was transferred from another federal court pursuant to 28 U.S.C. § 1404, the substantive law of the state in which the transferor court sits applies, which includes the state's choice of law rules.  *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 607 (2d Cir. 1996).  New York choice of law rules will govern the policies at-issue in *VICOF et al. v. John Hancock New York*, Case No. 19-cv-11093 and *Davydov* ("New York Actions"), since they were initially filed in the Southern District of New York.  The other two cases—*VICOF et al. v. JHUSA*, Case No. 19-cv-10244, and *EFG v. JHUSA*, 19-cv-01696 (collectively, "California Actions")—were initially filed in the Central District of California and transferred to this Court.  Thus, California choice of law rules govern the policies at issue in those cases.

Under both New York and California choice of law rules, the first step is to determine whether there is an actual conflict of law between the jurisdictions.  *In re Allstate Ins. Co., (Stolarz)*, 81 N.Y.2d 219, 223 (1993); *Madera Group, LLC v. Mitsui Sumitomo Ins. USA, Inc.*, 545 F. Supp. 3d 820, 831 (C.D. Cal. 2021) (citing *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 919-20 (2001)).  An actual conflict exists if application of a jurisdiction's law would affect the outcome of that issue at trial.  *First Hill Partners, LLC v. BlueCrest Capital*

*Mgmt. Ltd.*, 52 F. Supp. 3d 625, 632–33 (S.D.N.Y. 2014); *Madera*, 545 F. Supp. 3d at 832 ("A difference between the laws of two states is material when it would lead to a different result in the matter at issue.") (citing *Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.*, 14 Cal. App. 4th 637, 645 (1993)).  In the absence of an actual conflict, the law of the forum in which the case was filed will apply.  *First Hill Partners*, 52 F. Supp. 3d at 633.

California and New York both refer to the Restatement (Second) of Conflict of Laws to determine the applicable law for contract claims.  *See* 2 Witkin, Summary 11th Insurance § 41 (2022) ("California generally follows the Restatement 2d of Conflict of Laws in resolving choice of law questions."); *Hanks v. Voya Ret. Ins. & Annuity Co.*, 492 F. Supp. 3d 232, 240 (S.D.N.Y. 2020) (applying Second Restatement approach, pursuant to New York law).  In the absence of a contractual choice of law clause, Section 192 of the Restatement specifically provides that life insurance policies be governed by the law of the state in which the policy was issued. Restatement (Second) of Conflict of Laws § 192 (1971).

For the New York Actions, the Second Restatement test points to the application of New York law.  All of the policies at issue in the New York Actions were delivered in New York. Thus, there is no actual conflict and New York law applies to the eight policies at issue in the New York Actions.

The policies at-issue in the California Actions divide into two groups, according to whether they contain a choice of law provision.  California courts will apply the law of the jurisdiction designated in a contractual choice of law clause, as long it would not violate a "*fundamental* policy" of California.  *Washington Mut. Bank*, 24 Cal. 4th at 916-17 (emphasis in original).  Under this rule, courts have consistently enforced choice of law provisions in insurance policies.  *See, e.g.*, *Bajwa v. United States Life Ins. Co.*, 2021 WL 2661836 at *5-7

15

(E.D. Cal. June 29, 2021).  Here, 58 of the Policies in the California Actions contain clauses designating the state of delivery as the "[g]overning law".[9]  Therefore, these policies are governed by the law of the state of delivery.[10]

The Policies filed in the California Actions without a choice of law provision require additional analysis.  Although California generally follows the Second Restatement test for contract claims, Cal. Civ. Code § 1646 dictates the choice of law analysis for issues of contract interpretation in particular.  *See Karoun Dairies, Inc. v. Karlacti, Inc.*, 2014 WL 3340917, at *10 (S.D. Cal. July 8, 2014) (citing *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal.App.4th 1436 (2007)).  Section 1646 requires courts to apply the law "of the place where [the contract] is to be performed," or the law of "the place where it is made" if the contract does not specify the location of performance.  Because life insurance contracts require performance by both the insurer and the policyholder, courts generally apply the law of the state where the policy was "made," which is the state of delivery.  *See, e.g.*, *Financial Indemnity Co. v. Messick*, 2022 WL 2079225, slip op., at *2-3 (E.D. Cal. June 9, 2022); *Secondary Life Three LLC v. Transamerica Life Ins. Co.*, 2021 WL 5827105, slip op., at *6 (N.D. Iowa Dec. 8, 2021) (applying California choice of law rules).  Thus, for life insurance policies, Cal. Civ. Code § 1646 and Section 192 of the Second Restatement would result in the same law being applied for all contract-related issues for a given policy: the state of delivery.

---

[9] The 06PERFUL policy form contains a choice of law clause.  SUMF ¶ 21.  This language is, thus, present in all of the Policies issued on that form, which include a number of products at issue in this litigation, including PerfUL 06, PerfUL 07, PerfUL 08, and PerfUL 08 Reprice. Ex. K, Pfeifer Rep. ¶ 25.

[10] The Policies this applies to were issued in the following states: Arizona, California, Florida, Georgia, Illinois, Kansas, Kentucky, Maryland, Michigan, Minnesota, New Jersey, Nevada, Pennsylvania, and Texas.  SUMF ¶ 21.

California choice of law rules provide that out-of-state law is to be applied only when a true conflict exists such that the outcome of Plaintiffs' breach of contract claim would materially differ under California law as opposed to law of the state of delivery.[11]  The choice of law analysis is only relevant to the twenty-one Policies delivered outside of California (the "California-Filed Potential Conflict Policies").  As discussed below, California law is consistent with the law of New York and the other relevant states in requiring that Plaintiffs' claims be dismissed as a matter of law, and therefore the Court would apply California law to the California-Filed Potential Conflict Policies because no conflict exists.

Although John Hancock believes that no conflict exists between California law and the law of other states of delivery, to the extent the Court concludes that California law does *not* support dismissal for the California-Filed Potential Conflict Policies, there would exist a true conflict between the law of California and the other states of issue because the other states' laws *do* require dismissal here.  Under such circumstances the Court would need to apply the law of the state of issuance, as briefed herein and in the attached appendices collecting the relevant states' law.

**B.**     **The Allegedly Breached Provisions of the Policies Must Be Interpreted Using the Plain Meaning of the Contractual Language**

To determine whether they have been breached, the contracts must be interpreted using the plain meaning of the contractual language.  The elements of a breach of contract claim are: [1] "the existence of a contract," [2] "the plaintiff's performance thereunder," [3] "the

---

[11] There are 43 policies in the California Actions that do not contain choice of law provisions. These policies were delivered in issued in nine different states: California (22 policies), Delaware (3), Florida (8), Illinois (1), Massachusetts (1), Michigan (3), New Jersey (3), North Carolina (1), and Ohio (1).

defendant's breach thereof," and [4] "resulting damages."  *Markov v. Katt*, 109 N.Y.S.3d 295 (1st Dep't 2019) (New York law); *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (California law) (citation omitted).

"Insurance policies are, in essence, creatures of contract, and accordingly, subject to principles of contract interpretation."  *In re Estates of Covert*, 97 N.Y.2d 68, 76 (2001); *State Farm Gen. Ins. Co. v. Mintarsih*, 175 Cal. App. 4th 274, 282 (Ct. App. 2009) ("We interpret an insurance policy using the same rules of interpretation applicable to other contracts.") (citation omitted).  Insurance contracts must be construed in accordance with the plain language of the policy.  *In re Estates of Covert*, 97 N.Y.2d at 76 ("It is unquestionably the rule that contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous the terms are to be taken and understood in their plain, ordinary and proper sense") (citations and quotations omitted); *Travelers Property Cas. Co. of America v. KLA-Tencor Corp.*, 45 Cal. App. 5th 156, 163 (Ct. App. 2020) (stating that the parties' intended meaning "is to be inferred, if possible, solely from the written provisions of the contract") (citations omitted); *see* Appendix 1.

If the provisions of an insurance contract are clear and unambiguous, then "courts should refrain from rewriting the agreement," *U.S. Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 232 (1986) (citations and internal quotation marks omitted), and "cannot insert in the contract language which one of the parties now wishes were there," *Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*, 184 Cal. App. 3d 1479, 1486 (Ct. App. 1986).  *See* Appendix 2.  A provision in an insurance policy is ambiguous only if it is susceptible to two or more *reasonable* interpretations. *Travelers Prop. Cas. Co. of Am. v. KLA-Tencor Corp.*, 45 Cal. App. 5th 156, 163 (Ct. App. 2020) ("A policy provision will be considered ambiguous when it is capable of two or more

constructions, both of which are reasonable.") (citations and quotations omitted); *Concordia Gen. Contr. Co., Inc. v. Preferred Mut. Ins. Co.*, 46 N.Y.S.3d 146 (2d Dep't 2017); *see* Appendix 3.  Policy provisions "are not ambiguous merely because the parties interpret them differently."  *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 N.Y.3d 675, 680 (2015) (citations and quotations omitted); *In re Ins. Installment Fee Cases*, 211 Cal. App. 4th 1395, 1409 (Ct. App. 2012) (An insurance policy "is not ambiguous merely because the parties (or judges) disagree about its meaning.") (citations and quotations omitted).

Contractual silence alone will not create an ambiguity.  *Union Carbide Corp. v. Affiliated FM Ins. Co.*, 891 N.Y.S.2d 347, 349 (2009), *aff'd as modified,* 16 N.Y.3d 419 (2011) ("ambiguity does not arise from silence, but from what was written so blindly and imperfectly that its meaning is doubtful") (citations and internal quotation marks omitted); *Levi Strauss*, 184 Cal.App.3d at 1486 ("Courts will not add a term about which a contract is silent.") (citation omitted).  A term in an insurance policy is not ambiguous simply because it is undefined. *Consol. Rest. Operations, Inc. v. Westport Ins. Corp.*, 167 N.Y.S.3d 15, 20–21 (1st Dep't 2022) ("An ambiguity does not arise from an undefined term in a policy merely because the parties dispute the meaning of that term.") (citation and quotations omitted); *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 866 (1993) ("We recently rejected the view that the lack of a policy definition necessarily creates ambiguity.") (citations omitted); *see* Appendix 4.  Likewise, a policy provision is not ambiguous because it is worded broadly or grants a party discretion.  *See, e.g.*, *Hanks*, 492 F. Supp. 3d at 243 (holding the phrase "on a class basis" in cost-of-insurance provision conferred discretion on insurer "adjust the COI Rate to account for costs not uniquely affected by [referenced] characteristics").

19

A "court should not interpret a contract in a manner that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *Callahan v. Glob. Eagle Entm't Inc.*, 2019 WL 2325903, at *3 (S.D.N.Y. May 30, 2019) (citations and internal quotation marks omitted); *see also In re Sept. 11 Litig.*, 328 F. Supp. 3d 178, 184 (S.D.N.Y. 2018) (Hellerstein, J.) ("words should be given the meanings ordinarily ascribed to them and absurd results should be avoided"); *Eucasia Sch. Worldwide, Inc. v. DW Aug. Co.*, 218 Cal. App. 4th 176, 182 (Ct. App. 2013) ("Interpretation of a contract must be fair and reasonable, not leading to absurd conclusions.") (quotations omitted).  Instead, "the meaning of particular language found in insurance policies should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." *In re Sept. 11 Litig.*, 328 F. Supp. 3d at 184 (S.D.N.Y. 2018); *see also Elhouty v. Lincoln Ben. Life Co.*, 121 F. Supp. 3d 989, 994–95 (E.D. Cal. 2015), *aff'd sub nom.*, 886 F.3d 752 (9th Cir. 2018) (applying California law) ("Even when interpreting insurance policies, a court must look to the common understanding of the language, with an eye to reasonableness and context.") (citation omitted).

C.   **The Plaintiffs' Criticism of the Kinds of Factors Used in the Redetermination Fail as a Matter of Law**

1.   **Plaintiffs Cannot Prove That the COI Redetermination Was Based on Factors Other Than Those Referenced in the Contract**

Plaintiffs assert that John Hancock breached the contacts by considering projected profit as part of the Redetermination.  As a matter of law, Plaintiffs cannot prove that John Hancock's alleged consideration of PVFC (the unit of profit discussed in the Redetermination Memo) breached the Policies' contractual terms.

20

There is no dispute that consideration of PVFC for a product when redetermining COI rates can be appropriate.  PVFC is a function of expectations of future experience, not itself an expectation of future experience.  Plaintiffs' actuarial expert, Mr. Stern, testified that, in his view, ███████████████████████████████████████████████ ██████████████████████████████████████ Ex. D, Stern Dep. (July 7, 2022) Tr. 321:23-323:5.  This is because, as Mr. Stern explained, ████████████████████ ███████████████████████████████████████████████████ ████████████████ Mr. Stern explained, █████████████████████████████████████ ███████████████████████ *Id.* at 322:22-23.

Mr. Stern testified that ██████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████ *Id.* at 319:7-320:21.[12]  There is no evidence that John Hancock increased COI rates because of an expected decline in PVFC independent of the Expectations referenced in the policy.

It is undisputed that John Hancock did not increase its PVFC for any at-issue PERFUL product through the Redetermination relative to the PVFC using original pricing assumptions and Modified Original Pricing Assumptions.  *Id.* at 275:17-25 █████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████

---

[12] The parties disagree about whether John Hancock may consider factors that are not expressly identified in the COI provision when redetermining rates.  The Court need not resolve that disagreement in order to grant summary judgment in John Hancock's favor.

████████████████████████████████████████████████████

███████ SUMF ¶ 50.

Plaintiffs nonetheless contend that John Hancock breached the policy contracts by allegedly attempting to increase its expected cash flows in certain *durations*—i.e., any one-year period—on certain policies, but this fails as a matter of law. *E.g.*, SACC ¶¶ 6, 48; Ex. N, Stern Rep. ¶ 106. Plaintiffs claim that █████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ *E.g.*, Ex. N, Stern Rep. ¶¶ 250-258.

However, the policy language does not prohibit John Hancock from either recouping past losses or increasing its duration-by-duration expected cash flows when redetermining COI rates. Mr. Stern acknowledged that ███████████████████████████████████

████████████████████████████████████████████████

Ex. D, Stern Dep. (July 7, 2022) Tr. 276:1-277:4.

Second, it is undisputed that for purposes of the Redetermination, John Hancock did not increase the PVFC for any at-issue product relative to pricing. SUMF ¶ 50. Even if doing so amounted to a breach of contract (and it does not) there is no evidentiary basis for a jury to conclude that John Hancock recouped past losses in the Redetermination when the redetermined PVFC for each product did not exceed the PVFC calculated using either the original pricing assumptions or the Modified Original Pricing Assumptions.

2. **Plaintiffs Cannot Prove That John Hancock Ignored Contractual Factors During the Redetermination**

Plaintiffs assert that John Hancock breached by failing to consider expectations of future experience regarding "'tax assumptions,' 'investment earnings,' 'expense experience,' and 'capital and reserve requirements.'"  SACC at ¶ 46.  The undisputed facts establish that John Hancock considered each of these factors in the Redetermination.  Further, calculating COI rate increases accounting for the deterioration in expectations of future tax, investment earnings, and capital and reserve requirements (something John Hancock was not contractually obliged to do) would have led to a *larger* COI increase than the one John Hancock implemented.  Moreover, John Hancock chose to apply additional constraints on the size of the COI Rate increases.  Plaintiffs do not even attempt to argue that those constraints lowered the COI Rate increases by less than the aggregate impact of the factors that Plaintiffs allege were not properly considered.

First, there is no evidence that John Hancock failed to consider expectations regarding tax, investment earnings, expenses and capital and reserves.  Each of these factors was considered:

- **Investment earnings:** Ex. A, JH_LEONARD_000000498 at -509-510, including a table showing the expected investment return assumption using the integrated asset liability model as of June 30, 2017 and description of investment return assumptions, including discretionary adjustments that favor policyholders;

- **Tax:** Ex. A, JH_LEONARD_000000498 at -505, stating that income taxes are excluded for the analysis to the favor of policyholders; Ex. A, JH_LEONARD_000000498 -510, documenting premium tax assumptions; Ex. FF, JH_LEONARD_000334671 at -672 documenting impact of changes in expected taxes, concluding such changes were "adverse to Performance UL, and reflecting [those changes] would lead to higher rate increases";

- **Expense:** Ex. A, JH_LEONARD_000000498 at -510-11, documenting original and readjustment assumptions;

23

- **Capital and reserves:** Mr. Gulamhussein testified that had reserves been included in the Redetermination, the COI rate increase would have been higher.  John Hancock decided, as a matter of management discretion, to not include that factor in the redetermination.[13]

SUMF ¶¶ 59-62.  Plaintiffs point to no evidence to prove that including these factors in the calculation of the redetermined COI rate would have been favorable to them, and the only evidence in the record is to the contrary.  *See also* Ex. K, Pfeifer Rep. at ¶¶ 55, 71, 177 and 183 (each of the allegedly not considered factors would have supported a higher COI).

Second, John Hancock exercised actuarial judgment in several ways that resulted in limiting the amount of the COI Increase for Plaintiffs' Policies, including (i) calculating COI rate increases using the Modified Original Pricing Assumptions; (ii) limiting the COI rate increases to 75%; and (iii) not increasing COI rates when the COI rate increase percentage would have been less than 5%.  Ex. R, Gulamhussein 30(b)(6) Dep. (Nov. 9, 2021) Tr. 128:1-12; *see also* Ex. A, Teta Dep. Ex. 6 (Redetermination Memo) at -500 (describing same); Ex. K, Pfeifer Rep. ¶¶ 178-180.  There is no evidence that COI rates fully reflecting the allegedly ignored factors would have been lower than the actual redetermined COI rates that John Hancock set after applying discretionary reductions it was not contractually obligated to apply.

---

[13] Ex. R, Gulamhussein 30(b)(6) Dep. (Nov. 9, 2021) Tr. 170:15-171:17;  *see also id.* at 174:23-175:2 ("As mentioned earlier, the increase in reserves would have led to higher rate increases for policyholders.  And we applied discretion to not include that as part of the readjustment"); Ex. X, Gulamhussein Dep. (Nov. 11, 2021) Tr. 77:17-24 ("So as part of the Performance Universal Life readjustment in particular, reserves was a factor that was considered as part of the readjustment.  I believe that was appropriate.  Ultimately the rates as reflected in the readjustment and actually charged to policyholders did not have an explicit reserve component attached to them."); *id.* at 78:1-15, 79:18-80:17.

**D.**     **Plaintiffs' Criticisms of John Hancock's Expectations of Future Experience Fail to Establish an Express Breach of Contract as a Matter of Law**

The Policies' express contractual terms require COI rates to be based on John Hancock's expectations of future experience.  The undisputed evidence shows that the expectations of future experience used in the COI Redetermination were in fact John Hancock's expectations of future experience.  Furthermore, there is no evidence that the Modified Original Pricing Assumptions used in the Redetermination to limit the size of the COI increases breached the contractual language or were in any way detrimental to policyholders.  Indeed, the undisputed evidence is that John Hancock's use of the Modified Original Pricing assumptions resulted in lower, not higher, COI increases.  SUMF ¶¶ 33, 35.

**1.**     **There Is No Dispute That the Expectations of Future Experience Used in the COI Redetermination Were John Hancock's Expectations of Future Experience**

Both policy forms at issue in this action state that the COI will be determined based on John Hancock's expectations as to future experience.  SUMF ¶ 16 (03PERUL Form) ("The Applied Monthly Rates will be based on ***our expectations*** of future investment earnings, persistency, mortality, expense and reinsurance costs and future tax, reserve and capital requirements.") (emphasis added); SUMF ¶ 18 (06PERFUL Form) ("The charge for the Net Amount at Risk is an amount equal to the per dollar cost of insurance rate for that month multiplied by the Net Amount at Risk, and will be based on ***our expectations*** of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions.") (emphasis added).  The term "our" is defined in the Policies to "refer only to the Company".  SUMF ¶¶ 17, 19.  John Hancock undisputedly used its own expectations of future

experience.  SUMF ¶ 46.  As discussed in Section III.A below, even Plaintiffs' actuarial expert agrees that John Hancock selected the assumptions for use in the Redetermination in good faith.

Rather than dispute that John Hancock used its own expectations of future experience, Plaintiffs seek to graft an additional and nonexistent requirement onto the contract and object that John Hancock's own expectations *should have been* different—that they were "actuarially unreasonable."  Plaintiffs' argument, even if true, does not establish a breach of the contract's terms.  The policy gives John Hancock the discretion to determine its own Expectations.  *See Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671, 679-82 (2d Cir. 1983) (reversing judgment for plaintiff, holding contract "expressly leaves to [defendant's] discretion" decisions the contract allowed defendant "to determine").[14]  The law imposes limitations on how John Hancock may exercise that discretion through the implied covenant of good faith and fair dealing, addressed in Section III, below.  *See, e.g.*, *Bus. Exposure R Educ. Grp. Assocs., LLC v. Pershing Square Cap. Mgmt., L.P.*, 549 F. Supp. 3d 318, 329 (S.D.N.Y. 2021) (dismissing claim for breach of contract to pay a success fee because "the Fee Agreement gave *Pershing* discretion.") (emphasis in original).[15]  Any qualms Plaintiffs have with how John Hancock exercised its discretion arise as a breach of the implied covenant, not the express contractual terms.  *See id.* at 330-34 (holding that defendant's exercise of discretion was subject to the implied covenant of good faith and fair dealing, but the covenant was not breached because "a party bringing a claim for breach of the

---

[14] Similarly, the policy states, "We will *determine* the Applied Monthly Rates to be used for this policy" in the PERUL03 form and that John Hancock "may re-*determine* Cost of Insurance rates" in the PERFUL06 form, in addition to referencing "*our* expectations."  SUMF ¶¶ 16, 18.
[15] *See also Abbit v. ING USA Annuity & Life Ins. Co.*, 252 F. Supp. 3d 999, 1011 (S.D. Cal. 2017), *aff'd*, 774 F. App'x 351 (9th Cir. 2019) ("The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.") (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal.4th 342, 373 (1992)).

implied covenant 'must show substantially more than evidence that the defendant's actions were negligent or inept.'") (quoting *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014)).  As explained below, Plaintiffs' critiques of John Hancock's Expectations fail to state a claim for breach of the implied covenant as well.  *Infra* Section III.

### 2.     John Hancock's Use of Modified Original Pricing Assumptions to Limit COI Increases Did Not Breach the Policy Contracts

In the Redetermination, John Hancock in its discretion used Modified Original Pricing Assumptions as one way of reducing the COI increases to below the level to which John Hancock believed it was entitled.  The Modified Original Pricing Assumptions were generally more conservative than the original pricing assumptions and therefore led to lower COI increases.  SUMF ¶ 32.  Plaintiffs contend, however, that by using Modified Original Pricing assumptions to reduce the COI increases below the level to which John Hancock believed it was entitled, John Hancock breached the express terms of the policies.  As a matter of law, this argument fails because it lacks basis in the contractual language and relies on a contractual interpretation that transforms Plaintiffs' policies from policies with non-guaranteed COI rates into policies with *guaranteed* COI rates.  Furthermore, John Hancock's use of the Modified Original Pricing Assumptions caused no harm to Plaintiffs.

It is undisputed that John Hancock's use of the Modified Original Pricing Assumptions limited the size of the COI rate increases.  The express policy language does not prohibit John Hancock from exercising its discretion to *limit* COI rate increases by using revised original pricing assumptions that result in a lower COI increase to policyholders than if John Hancock used its original pricing assumptions.  This alone is fatal to Plaintiffs' claim that John Hancock's use of the Modified Original Pricing Assumptions breached the express terms of the policies.

27

Furthermore, there is no evidence that use of the Modified Original Pricing Assumptions caused Plaintiffs any harm.  *See Markov*, 109 N.Y.S.3d at 295 (affirming dismissal of breach of contract claim on summary judgment because there were no damages resulting from the breach); *Smith v. NBC Universal*, 524 F. Supp. 2d 315, 326–30 (S.D.N.Y. 2007) (applying California law) ("Actual damage as opposed to mere nominal damage is [an] essential element of a cause of action for breach of contract," granting summary judgment for failure to demonstrate damages) (quoting *Roberts v. Los Angeles County Bar Assn.*, 105 Cal. App.4th 604, 617 (2003)).  Mr. Stern testified multiple times at his deposition that ███████████████████████ ████████████████████████████████████ Ex. C, Stern Dep. (July 6, 2022) Tr. 86:25-87:10, 87:14-19, 91:1-7.

Finally, Plaintiffs' argument reads out of the policy contract John Hancock's right to redetermine COI rates and has the absurd effect of rendering guaranteed an element of Plaintiffs' policies that is expressly *non*-guaranteed.  As Plaintiffs' actuarial expert admitted, Plaintiffs' argument is that ████████████████████████████████████ ████████████████████████████████████.  This means, according to Plaintiffs, ████████████████████████████████ ████████████████████████████.  *See* Ex. D, Stern. Dep. (July 7, 2022) Tr. 273:17-275:10; *see also* Ex. N, Stern Rep. ¶¶ 75, 78.  There no such limitation anywhere in the Policies.  Plaintiffs' interpretation has no basis in the contractual language and would result in an absurd transformation of non-guaranteed elements into guaranteed elements. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Monarch Payroll, Inc.*, 2016 WL 634083, at *10 (S.D.N.Y. Feb. 17, 2016) (rejecting "absurd and commercially unreasonable" interpretation); *Callahan v. Glob. Eagle Entm't Inc.*, 2019 WL 2325903, at *3 (S.D.N.Y. May 30, 2019) (same).

28

**E.**   **Plaintiffs' Claim That John Hancock Unfairly Discriminated Within Policy Classes Fails as a Matter of Law**

Plaintiffs claim that the COI Redetermination was unfairly discriminatory because it: (i) did not apply identical COI rate percentage increases on every policy within the same product (*see* SACC ¶ 37; Ex. N, Stern Rep. ¶¶ 231-37); (ii) improperly "targeted" investor-owned policies for higher increases (*see* SACC ¶¶ 4, 37-38; Ex. N, Stern Rep. ¶¶ 108, 228-29, 248); and (iii) used policy classes that were smaller than those used at original pricing (*see* Ex. N, Stern Rep. ¶¶ 242-45).  The undisputed facts and plain language of the policies establish that these claims fail as a matter of law.

The plain language in both policy forms does not prohibit John Hancock from changing COI rates in ways that have different effects on policyholders of policies for which the insureds have different underwriting characteristics (issue age, sex, and risk class).  The policy language that Plaintiffs contend was breached reads:

> ***03PERUL Form***: Any change in the Applied Monthly Rates for the Basic Sum Insured or the Additional Sum will be made on a uniform basis for insureds of the same sex, Issue Age, and premium class, including smoker status, and whose policies have been in force for the same length of time.  SUMF ¶ 16.

> ***06PERFUL Form***:  We review our Cost of Insurance rates from time to time, and may re-determine Cost of Insurance rates at that time on a basis that does not discriminate unfairly within any class of lives insured.  SUMF ¶ 18.

As set forth below, Plaintiffs' claims that John Hancock breached these policy terms fail as a matter of law.  Plaintiffs' claim for 03PERUL Policies fails because John Hancock undisputedly did exactly what the contract language requires: it changed COI rates on a uniform basis for all insureds who were issued policies written on the 03PERUL form and who share the same sex, issue age, premium class, and policy duration.   SUMF ¶ 56.  The outcome of the

claim based on the 06PERFUL Policies is the same because Plaintiffs cannot prove John

Hancock discriminated within classes of policies, much less did so "unfairly."  Furthermore, it is

undisputed that, for policies within the same product, policies owned by investors and non-

investors insuring lives of the same sex, issue age, and risk class were treated identically.

> **1.    John Hancock Did Not Breach the 03PERUL Form's Terms Because It Is Undisputed That the Redetermination Adjusted COI Rates on a Uniform Basis for All Policies on Insureds Sharing the Same Sex, Issue Age, Premium Class, and Policy Duration**

The 03PERUL form language provides that John Hancock must apply any COI rate

changes "on a uniform basis" to all insureds who share the same (i) sex, (ii) Issue Age,

(iii) premium class, and (iv) length of time with a policy inforce.  *See* SUMF ¶ 16.  In other

words, so long as policies on insureds sharing these four characteristics are subjected to the same

COI rate changes, this contractual provision has not been breached.  *Id.*

The undisputed facts compel the conclusion that John Hancock did not breach the

03PERUL Form's "uniform basis" provision.  There is no dispute that the Redetermination

grouped policies according to the insured's sex, risk class, and issue age and differentiated COI

adjustments on that basis.  SUMF ¶¶ 26, 56.  Every policy written on the 03PERUL form that

shared each of those characteristics was subjected to the same COI rate change.  SUMF ¶ 56.

Thus, there was no breach as a matter of law.

Plaintiffs argue John Hancock breached the 03PERUL Form's language because the

Redetermination did not implement identical COI rate changes for all policies written for a given

insurance product.  In other words, Plaintiffs assert that John Hancock lacked discretion to adjust

COI rates so that insureds under the issue age of 60, for example, saw different COI rate

adjustments than insureds over the issue age of 80—even when the insurer's changes in

Expectations for these groups differed.  This construction cannot be reconciled with the actual language of the policies.  The 03PERUL form expressly states that rate changes will be "uniform" only for insureds who share particular characteristics, specifically "sex," "Issue Age," "premium class," and the "length of time" a policy has been in force.  *Id.*  There is no dispute that the Redetermination made COI rate changes on a uniform basis for all policyholders "of the same sex, Issue Age, and premium class, including smoker status, and whose policies have been in force for the same length of time."  *Id.*  This is all the contract required, and summary judgment should accordingly be granted on the 03PERUL Policies.

**2.    John Hancock Did Not Breach the 06PERFUL Form's Terms Because It Did Not Discriminate Within Classes of Lives Insured, Much Less Do So Unfairly**

The 06PERFUL language grants John Hancock discretion to discriminate among insureds when redetermining COI rates, and it constrains that discretion only by prohibiting "unfair" discrimination "within any class of lives insured."  SUMF ¶ 18.  Thus, to prove a breach of this provision, Plaintiffs must prove both: (1) John Hancock applied different COI rate adjustments to policies within a given class of lives insured; *and* (2) such differential pricing was "unfair." Plaintiffs cannot prove either point.

While the terms "unfair" and "within any class of lives insured" are not specifically defined in the 06PERFUL policies, that does not render them ambiguous.  *See, e.g.*, *Hanks*, 492 F. Supp. 3d at 243-244 (holding the plain meaning of the terms "on a class basis" and "on a uniform basis" in a cost-of-insurance provision "not ambiguous" and construing them as a matter of law); *see generally* Appendix 4.  Instead, undefined policy terms are to be interpreted according to their ordinary and plain meaning. *Allstate Ins. Co. v. Vitality Physicians Grp. Prac. P.C.*, 537 F. Supp. 3d 533, 556 (S.D.N.Y. 2021) ("contractual provisions are afforded their 'plain

31

and ordinary meaning' so long as they are unambiguous"); *Bank of West v. Superior Court*, 2 Cal. 4th 1254, 1265 (1992) (considering dictionary definitions of "unfair competition," where it was undefined in the insurance policy at issue).  Plaintiffs' claims fail because the undisputed evidence shows that John Hancock did not breach the plain meaning of the 06PERFUL Policies' terms.

### a.   The 06PERFUL Form Unambiguously Grants John Hancock Discretion to Determine Policy Classes for Redeterminations

Most fundamentally, Plaintiffs cannot prove that John Hancock applied different COI rate adjustments to policies "within any class of lives insured."  The term "class," used in the insurance context, has been held to mean a "group of insureds with the same characteristics, established for rate-making purposes."  *Hanks*, 492 F. Supp. 3d at 243 (quoting Harvey W. Rubin, Dictionary of Insurance Terms at 87 (4th ed. 2000)).  As the court in *Hanks* recognized, there is "discretion inherent in such a definition" of the term "class" that comports with the structure and purpose of a universal life insurance policy.  *Id.*  This affords the insurer "greater flexibility in addressing varying situations over the course of the decades (an actual lifetime) that the Policy is in-force."  *Id.*  For purposes of policies issued on the 06PERFUL form, John Hancock exercised its discretion to create policy classes for the Redetermination according to the product issued on the form, and the insureds' issue age, sex, and risk class.  There is no dispute that John Hancock applied uniform COI rate adjustments within the classes of lives insured that it used in the Redetermination.  This alone is dispositive as to Plaintiffs' claim for alleged breach of the unfair discrimination provision.

> **b.** **_Plaintiffs' Interpretation of the 06PERFUL Form as Requiring a Single Class Is Unreasonable and Inconsistent with the Plain Policy Language_**

The crux of Plaintiffs' unfair discrimination claim is their contention that the policy language required John Hancock to apply an identical COI rate percentage increase on *all* policies within the same product. According to Mr. Stern, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Ex. N, Stern Rep. ¶ 237. Mr. Stern contends ███████

████████████████████████████████████ *See* Ex. C, Stern Dep. (July 6, 2022) Tr. 65:12-19 ("████████████████████████████████

████████████████████████.") (emphasis added); *see also id.* at 67:15-23, 67:24-10; Ex. N, Stern Rep. ¶ 235. Thus, even if John Hancock's Expectations for a given product only supported changing its COI Rates for female smokers, Plaintiffs contend that the John Hancock could only increase COI rates if it increased equally COI rates for *all* policyholders of that product.[16]

The plain language of the policy forecloses Plaintiffs' construction that there is only one supposedly appropriate class consisting of every policy within a product. The 06PERFUL form polices' language prohibits COI rate adjustments that "discriminate unfairly within any class of lives insured." SUMF ¶ 18. The phrase "within any class of lives insured" is inconsistent with Mr. Stern's notion that ████████████████████ *See* Ex. C, Stern Dep. (July 6, 2022) Tr.

---

[16] It bears noting that when an insurer has done what the Plaintiffs claim was required here—uniformly increase COI rates on all policyholders for a given product—the insurer was sued in class actions and by investors for *not* differentiating based on underwriting characteristics. *Hanks*, 492 F. Supp. 3d at 238-39. The court there rightly determined that the policy language gave the insurer discretion to take either approach. *Id.* at 244-47.

65:12-19.  Under Plaintiffs' reading, the policy need only prohibit rate changes that "discriminate unfairly"—the reference to "within any class of lives insured" is rendered superfluous.  It is a basic canon of contractual construction that a contract should not be read in a way that makes a term superfluous.  *Technicon Elecs. Corp. v. Am. Home Assur. Co.*, 533 N.Y.S.2d 91, 101 (2d Dep't 1988), *aff'd,* 74 N.Y.2d 66, 542 N.E.2d 1048 (1989) ("[A] policy's terms should not be assumed to be superfluous or to have been idly inserted") (citation and quotations omitted); *Mirpad, LLC v. California Ins. Guarantee Assn.*, 132 Cal. App. 4th 1058, 1072–73 (Ct. App. 2005) (rejecting trial court's finding that insurance policy language was ambiguous on the ground that it would render certain words superfluous).

Furthermore, the word "any," as used in the provision, indicates that it must be possible for there to be more than one "class."  *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/any (last visited Sep. 13, 2022) (defining "any" to mean "one, some, or all indiscriminately of whatever quantity").[17]  If there could only be one class, the policy would refer to "*the* class of lives insured" rather than "*any* class of lives insured."  Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/the (last visited Sep. 13, 2022) (defining "the" to mean "used as a function word to indicate that a following noun or noun equivalent is definite or has been previously specified by context or by circumstance")."

Mr. Stern contends that ███████████████████████████████████

████████████████████████████████████████████████████   Ex. N, Stern

---

[17] "Courts in insurance cases 'regularly' turn to general dictionary definitions in order to derive the ordinary and popular meaning of a term." *Discover Prop. & Cas. Ins. Co. v. Blair*, 2014 WL 4412339, at *9 (C.D. Cal. Aug. 26, 2014) (*quoting Scott v. Cont'l Ins. Co.,* 44 Cal.App.4th 24, 29–30 (1996)); *Porco v. Lexington Ins. Co.*, 679 F. Supp. 2d 432, 437–38 (S.D.N.Y. 2009) (citing Merriam-Webster dictionary to interpret plain meaning of insurance contract terms).

Rep. ¶ 233 (emphasis added) ("███████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████").  First and foremost,

there is no legal basis for Plaintiffs to contend that actuarial standards of practice are

incorporated into the policy language such that a violation of it would give rise to a breach of

contract claim.  Furthermore, it is undisputed that John Hancock used different actuarial

assumptions for individuals with different combinations of issue age, sex, and risk class.  SUMF

¶ 57.

     Notably, Mr. Stern ████████████████████████████████



████████████████████████████████████████████████

████████████ Mr. Stern acknowledges that, ███████████████████████

████████████████ Ex. C, Stern Dep. (July 6, 2022) Tr. 68:12-20.  Mr. Stern admits:

█████████████████████████████████████████████████

████████████████████ *Id.* at 68:21-69:6. █████████████████████

█████████████████████████████████████████████

███████████████████ *Id.* at 69:7-9.

     Mr. Stern's testimony on the meaning of the contractual term, "class" is inadmissible

because "experts cannot testify as to the interpretation of language in a contract," and therefore it

cannot create an issue of fact.  *See New York Univ. v. Galderma Lab'ys, Inc*., 2013 WL

12202520, at *2 (S.D.N.Y. Nov. 1, 2013) (Hellerstein, J.) ("These expert opinions are

impermissible, because, in support of or opposition to, summary judgment, parties must submit

or identify evidence that would be admissible and experts cannot testify as to the interpretation

of language in a contract.") (citing *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509-10

(2d Cir. 1977)).  Furthermore, the mere fact that Mr. Stern disagrees with John Hancock and its actuaries does not create a triable issue of fact.  *See, e.g.*, *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 865 F. Supp. 2d 370, 380 (S.D.N.Y. 2011) (Hellerstein, J.) ("The mere fact that a party has produced an expert opinion does not preclude granting summary judgment in favor of the other party."), *aff'd on other grounds sub nom.*, 737 F.3d 166 (2d Cir. 2013); *99 Wall Dev., Inc. v. Allied World Specialty Ins. Co.*, 2021 WL 4460638, at *6–8 (S.D.N.Y. Sept. 29, 2021) (rejecting plaintiff's claim that disagreement between parties' experts could not be resolved on summary judgment); *Counts v. Meriwether*, 2015 WL 9594469, at *9 (C.D. Cal. Dec. 30, 2015) (noting, "the existence of dueling experts does not necessarily present a triable issue of fact for the jury"). Indeed, actuarial standards expressly reject the idea that a disagreement between two actuaries means that one actuary must have violated standards.  *See* ASOP 1 § 2.10 ("Because actuarial practice commonly involves the estimation of uncertain events, there will often be a range of reasonable methods and assumptions, and two actuaries could follow a particular ASOP, both using reasonable methods and assumptions, and reach different but reasonable results.").  Mr. Stern's testimony, therefore, is insufficient to create a material dispute of fact sufficient to defeat summary judgment.

> ### c.   Even If All Policies Were a Single "Class," Plaintiffs Would Still Be Unable to Prove "Unfair" Discrimination

Plaintiffs' claims face yet another insurmountable obstacle:  Even if they were correct that all policies issued for a product were required to be the same class, they would also need to prove that John Hancock "discriminate[d] *unfairly*" within that single policy class.  SUMF ¶ 18. And here, in light of the undisputed facts that (i) the Redetermination differentiated COI rate changes according to three actuarial characteristics tied to mortality risk (sex, risk classification,

and issue age) (SUMF ¶ 58), and (ii) John Hancock's decision to classify insureds using those characteristics was ▮▮▮▮▮▮▮▮ (*see* Ex. C, Stern Dep. (July 6, 2022) Tr. 68:12-69:9), Plaintiffs cannot meet their burden of proving that any discrimination was "unfair."

When interpreting whether a COI rate change "discriminate[d] unfairly within any class of insureds," courts interpret the provision as barring "***discrimination that does not have a proper underwriting basis***." *U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*, 2014 WL 2199428, at *12 (S.D.N.Y. May 23, 2014) (McMahon, J.) (emphasis added). Judge McMahon's decisions in the *U.S. Bank* and *Fleischer* cases are instructive on this point. In those cases, the insurer sought to implement a COI rate change that discriminated among insureds on the basis of face amount. *See U.S. Bank*, 2014 WL 2199428, at *5; *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 463 (S.D.N.Y. 2014). The court denied the insurer's motion for summary judgment on the question of "unfair discrimination" because there was a genuine issue of material fact as to whether "face amount" was an appropriate basis for differentiating COI changes during a redetermination. *See Fleischer*, 18 F. Supp. 3d at 480; *U.S. Bank*, 2014 WL 2199428, at *12.[18] The court reasoned:

> Intuitively, it seems obvious that age would be an appropriate way to classify insureds in the life insurance context—the older a person is, the higher his risk of death. However, it is not so apparent that face value is an appropriate way to classify insureds; this factor is not clearly tied to life expectancy, and it seems more

[18] The *U.S. Bank* decision also denied summary judgment because the parties "failed to provide this Court with enough information" as to the relevant law in each of the different states of issuance, *see* 2014 WL 2199428, at *12. Attached as Appendix 5 is a table showing the relevant state insurance statutes governing unfair discrimination in life insurance in states where the Policies were issued. All of these statutes permit an insurer to charge different rates for policies insuring individuals in different classes or with different expectations of life. Plaintiffs do not contend that their Policies received COI rate adjustments that were different than rate adjustments for policies of "the same class and equal expectation of life" *E.g.*, Cal. Ins. Code § 790.03; *see* Appendix 5.

> closely associated with profitability. The parties' experts disagree
> about whether face amount and profitability are appropriate
> classification considerations under accepted actuarial standards.

*Fleischer*, 18 F. Supp. 3d at 480.

It is undisputed that John Hancock used sex, risk classification, and issue age to differentiate between COI rate increases within a product during the Redetermination.  SUMF ¶ 58; Ex. N, Stern Rep. ¶ 237.  Sex, risk classification (*e.g.*, smoker status), and issue age are undisputedly tied to expectation of life.  *See* Ex. K, Pfeifer Rep.¶ 18(a); Ex. N, Stern Rep.¶ 233



("▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇"); Ex. C, Stern Dep. (July 6, 2022) Tr. 130:24-132:12 ("▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇"); *id.* at 67:6-23 (testifying that ▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).  And it is undisputed that all policies covering insureds on the same product who shared the same sex, risk classification, and issue age were treated the same under the COI Redetermination.  SUMF ¶¶ 56-58.  Thus, the undisputed facts demonstrate that the Redetermination did not discriminate on any basis that lacks a proper underwriting basis in breach of the policy language, and therefore did not "unfairly" discriminate.

The *U.S. Bank* decision also denied summary judgment because the parties "failed to provide this Court with enough information" as to the relevant law in each of the different states of issuance, *see* 2014 WL 2199428, at *12.  Attached as Appendix 5 is a table showing the relevant state insurance statutes governing unfair discrimination in life insurance in states where the Policies were issued.  All of these statutes permit an insurer to charge different rates for policies insuring individuals in different classes or with different expectations of life.  Plaintiffs

do not contend that their Policies received COI rate adjustments that were different than rate adjustments for policies of "the same class and equal expectation of life."  *E.g.*, Cal. Ins. Code § 790.03; *see* Appendix 5.

> **3.     There Is No Evidence That Policies Owned by Investors Were Treated Differently in the Redetermination Than Policies Owned by the Original Policyholders**

Plaintiffs and Mr. Stern also attack the Redetermination as discriminatory because, they claim, it improperly "targeted" investor-owned policies for higher increases (*see* SACC ¶¶ 4, 37-38; Ex. N, Stern Rep. ¶¶ 108, 228-29, 248).  But this claim, too, fails as a matter of law.  It is undisputed that for each product, John Hancock's COI rate adjustments were identical for policies with the same issue age, sex, and risk class (SUMF ¶ 56), regardless of whether the policyholder was an investor lacking insurable interest in the insured or an original owner with some familial or business relationship with the insured.  Plaintiffs' and their expert's allegations are insufficient to generate a genuine issue of material fact.

> **4.     There Is No Dispute John Hancock's Decision to Use Quinquennial Age Classes for the Redetermination Was a Good Faith Exercise of the Discretion Afforded Under the Policy Language**

Plaintiffs and Mr. Stern also maintain that the COI Redetermination was unfairly discriminatory because John Hancock "███████████████████████████████████ ████████████████████████████████," which "████████████████████████████████ ████████████████████████████████████████████████████████████████."  Ex. N, Stern Rep. ¶¶ 244-45.  This position is again not supported by the text of the policies and therefore fails.  Plaintiffs can point to no language in the policies that requires John Hancock to implement a COI redetermination using the same age groupings that were used at original pricing.  The policies do not specify how John Hancock must use age groupings when creating

39

policy classes, and thus place that decision within John Hancock's discretion.  *See Hanks*, 492 F. Supp. 3d at 243 (noting that the "discretion inherent" in definition of "class" aligns with the "parties' intent as expressed in the Policy," including because "a universal life insurance policy[] differentiates itself from traditional whole and term life insurance products through its flexibility over time").

John Hancock's actuaries determined that using five-year, as opposed to ten-year, issue age bands was warranted under the circumstances because "there is a significant amount of business at these older issue ages," and increasing the granularity of the groupings would "increase precision at these ages."  SUMF ¶ 40.  Nothing in the record establishes a genuine issue of material fact as to whether John Hancock's use of five-year issue age bands in the COI Redetermination constituted a breach of the policies.

### F.   To The Extent Plaintiffs Contend John Hancock Failed to Lower COI Rates, That Claim Fails as a Matter of Law

In the SACC, Plaintiffs claim that John Hancock breached the express terms of the policy contracts "by failing to lower cost of insurance rates."  SACC ¶ 51(c).  If the claim is that John Hancock failed to lower COI rates *during* the Redetermination—*i.e.*, that rates should have decreased rather than increased—there is no evidence supporting such a claim, Plaintiffs did not pursue the claim in discovery, and it should be dismissed as a matter of law.  *E.g.*, Ex. EE, Solow Dep. Tr. 168:4-10 ("████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████.").

## III.   PLAINTIFFS' CLAIMS FOR CONTRACTUAL BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING FAIL AS A MATTER OF LAW

Plaintiffs cannot prove that John Hancock breached the implied covenant of good faith and fair dealing in exercising the discretion granted to it in the Policies.[19]  The evidentiary record undisputedly demonstrates that John Hancock acted in good faith in its Redetermination process. ***Even Plaintiffs' own actuarial expert testified he believes John Hancock acted in good faith in the Redetermination***.  The record cannot support the showing of bad faith and improper motive that the law requires to prove a breach of the covenant of good faith and fair dealing.  Plaintiffs' theories further fail for additional, independently sufficient reasons, including because they purport to create new obligations not based on the terms of the contract.

### A.   Plaintiffs' Implied Duty Claims Fail as a Matter of Law Because It Is Undisputed That John Hancock Acted in Good Faith in the Redetermination

The implied covenant of good faith and fair dealing is read into every contract granting a party discretion, but "[t]he covenant will be breached only in a narrow range of cases."[20]  *Sec. Plans, Inc.*, 769 F.3d at 817 (applying New York law).  To establish a breach, "[a] plaintiff must

---

[19] Plaintiffs have brought a claim for breach of the implied covenant of good faith and fair dealing with respect to Policies issued in Arizona, California, Delaware, Florida, Kansas, Kentucky, Massachusetts, Minnesota, Nevada, New Jersey, New York, and North Carolina. SACC ¶ 54.  Paragraph 54 of the SACC also identifies Connecticut but there are no longer any policies issued in Connecticut at issue in this case.

[20] The implied covenant of good faith and fair dealings arises from the policy contracts and therefore the choice of law analysis in Section II.A. *supra* applies to Plaintiffs' claim for contractual breach of the implied covenant.  *See Patel v. New York Life Ins. Co.*, 2012 WL 1883529, at *3 (S.D.N.Y. May 21, 2012) ("Though Plaintiff raises both a claim for breach of contract and a claim for breach of the duty of good faith and fair dealing, New York law holds that breach of the implied duty of good faith is merely a breach of the underlying contract. As such, breaches of that duty must be considered together with the breach of contract claim for choice of law purposes.") (citations and quotations omitted); *Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 462 (1992) (holding that choice of law provision in contract applies to implied covenant claims).

show substantially more than evidence that the defendant's actions were negligent or inept." *Id.*

(holding that defendants' actuaries' exercise of discretion determining allegedly "excessive"

claims reserves was "insufficient to support a claim under the implied covenant"); *Nat'l Life &*

*Accident Ins. Co. v. Edwards*, 119 Cal. App. 3d 326, 339 (2d Dist. 1981) (dismissing implied

covenant claim on summary judgment due to lack of evidence of "more than negligent conduct

on the part of the insurer"); *see* Appendix 6. Summary judgment is appropriate when Plaintiffs

have failed to marshal sufficient evidence to demonstrate "that the conduct of the defendant,

whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure

or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad

judgment or negligence but rather by a conscious and deliberate act." *Chateau Chamberay*

*Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 346 *as modified on denial*

*of reh'g* (Ct. App. July 30, 2001) (affirming grant of summary judgment on implied covenant

claim against insurer); *see also N. Am. Photon Infotech Ltd. v. ZoomInfo LLC*, 2021 WL

4482208, at *5 (S.D.N.Y. Sept. 30, 2021) (granting summary judgment on implied covenant

claim and holding plaintiff must show "substantially more than evidence that the defendant's

actions were negligent or inept."). The law is the same in the context of actions concerning COI

increases: Plaintiffs must prove with competent evidence "facts showing a failure or refusal to

discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or

negligence, but rather by a conscious and deliberate act." *EFG Bank AG, Cayman Branch v.*

*Transamerica Life Ins. Co.*, 2017 WL 3017596, at *9 (C.D. Cal. July 10, 2017) (applying

California law) (quotation omitted).

There is no dispute that John Hancock acted with good faith in the Redetermination. At

his deposition, Plaintiffs' actuarial expert, Mr. Stern, was asked, "████████████████████



" Mr. Stern answered, "

." Ex. D, Stern

Dep. (July 7, 2022) Tr. 255:18-256:1 (emphasis added); *see also Behren v. Warren Gorham &*

*Lamont, Inc.*, 808 N.Y.S.2d 157, 158 (1st Dep't 2005) (affirming summary judgment where

plaintiff testified alleged breach was due to defendant's ineptitude).  Mr. Stern further testified

that

Ex. D, Stern Dep. (July 7, 2022) Tr.

226:24-227:3; *see also N. Am. Photon Infotech*, 2021 WL 4482208, at *5 ("If a party "ha[s] a

genuine and colorable business justification for its decision, then its actions ... will not have

violated the implied covenant.") (quoting *Sec. Plans*, 769 F.3d 807, 820).  Furthermore, when

asked, "

" Mr. Stern answered,

"

" Ex. D, Stern Dep. (July 7, 2022) Tr. 254:11-17.  Mr. Stern

also testified that

*Id.* at 253:15-25.

It is insufficient for Plaintiffs to show that John Hancock's Redetermination was

economically motivated.  "The implied covenant does not undermine a party's general right to

act on its own interests in a way that may incidentally lessen the other party's expected benefit."

*Sec. Plans, Inc.*, 769 F.3d at 817 (quotations omitted); *see also Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010) ("A party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party."). "Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance" to an implied covenant claim. *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251 (2001) (applying New Jersey law and collecting cases in accord in Illinois, South Carolina, Colorado, New York, and Arkansas).

The Second Circuit's decision in *Zilg v. Prentice-Hall, Inc.* is instructive here. In that case, the contract at issue provided (as here) that the defendant would "determine" details concerning publication and promotion of plaintiff's book. 717 F.2d at 674. Reversing the district court's judgment for plaintiff, the Second Circuit held that it was improper to read into the contract a standard of performance greater than the implied covenant of good faith and fair dealing. *Id.* at 676. The court explained, "the clause empowering the publisher to decide in its discretion upon the number of volumes printed and the level of promotional expenditures must also be given some content. If a trier of fact is free to determine whether such decisions are sound or valid, the publisher's ability to rely upon its own experience and judgment in marketing books will be seriously hampered." *Id.* at 680. The Court of Appeals rejected reading the contract "as empowering a trier of fact to second guess a publisher's judgments as to the soundness of the decisions made." *Id.* at 681. It is likewise improper here to ask a jury to second-guess John Hancock's judgements in the Redetermination when they were undisputedly undertaken in good faith.

### B.    Each of Plaintiffs' Implied Covenant Claims Fail for Additional Reasons

Plaintiffs' claims fail for additional reasons independent of the absence of bad faith.

44

### 1.   Plaintiffs Impermissibly Seek to Add New Affirmative Duties to the Policy Contracts

The implied covenant cannot be used to expand the terms of the contract or create new obligations.  Plaintiffs allege that John Hancock breached the implied covenant by "failing to provide any meaningful disclosures about the cost of insurance rate increases."  SACC ¶ 57(g).  Putting aside what a "meaningful" disclosure is, Plaintiffs cannot impose a disclosure obligation that has no basis in the express terms of the contract.  The allegedly breached policy does not require John Hancock to provide policyholders with "meaningful disclosures about the cost of insurance rate increases."  *Id.*  The law is clear that "the covenant of good faith and fair dealing does not give rise to new, affirmative duties on contracting parties."  *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 248 (2d Cir. 2020) (applying New York law) (citations omitted); *Abbit v. ING USA Annuity & Life Ins. Co.*, 252 F. Supp. 3d 999, 1010–11 (S.D. Cal. 2017), *aff'd*, 774 F. App'x 351 (9th Cir. 2019); *21st Century Ins. Co. v. Superior Court*, 47 Cal. 4th 511, 527 (2009) ("[C]ourts cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.") (citation and quotation omitted); *see* Appendix 7.[21]

### 2.   The Implied Covenant of Good Faith and Fair Dealing Does Not Bar Charging "Excessive" COI Rates

Plaintiffs' claim for breach of the implied covenant because John Hancock purportedly charged "excessive" COI rates post-Redetermination also fails because the implied covenant cannot forbid conduct that the policy language expressly allows.  The law is clear that "although

---

[21] *See also Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004); *Alhassid v. Bank of Am., N.A.*, 2015 WL 11216719, at \*2 (S.D. Fla. Jan. 21, 2015); *Blondell v. Littlepage*, 413 Md. 96, 114 (2010).

the obligation of good faith is implied in every contract, it is the terms of the contract which govern the rights and obligations of the parties.  The parties' contractual rights and liabilities may not be varied, nor their terms eviscerated, by a claim that one party has exercised a contractual right but has failed to do so in good faith." *CIBC Bank and Trust Co (Cayman) Ltd v. Banco Cent do Brasil*, 886 F. Supp. 1105, 1118 (S.D.N.Y. 1995) (quotations omitted*); see also Baldwin v. AAA N. California, Nevada & Utah Ins. Exch.*, 1 Cal. App. 5th 545, 558 (Ct. App. 2016), *as modified* (July 13, 2016) (holding principle "that courts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power" applies equally in the insurance context) (citations and quotations omitted).

Plaintiffs contend that John Hancock charged "excessive cost of insurance rates," but they do not explain why the rates are purportedly excessive (*i.e.*, in excess of what?).  SACC ¶ 57(b).  If Plaintiffs contend that rates are excessive because they breach the express terms of the policy, that claim fails for the reasons stated above.  *See supra* § II; SACC ¶ 51(c) (alleging *express* breach by "imposing excessive cost of insurance rates").

To the extent Plaintiffs contend that John Hancock charged "excessive" COI rates that are expressly *permitted* by the contract but are allegedly "excessive" under the implied covenant, that claim fails as a matter of law.  "A defendant does not breach its duty of good faith and fair dealing by exercising its rights under the contract." *CJI Trading LLC v. JPMorgan Chase Bank, N.A.*, 2021 WL 2036678, at *4 (S.D.N.Y. May 21, 2021) (Hellerstein, J.) (citations and quotations omitted).

### 3. The Undisputed Evidence Shows that John Hancock Did Not Force Plaintiffs to Lapse Their Policies

Plaintiffs claim that John Hancock breached the implied covenant of good faith and fair dealing by allegedly "attempting to force Plaintiffs" to "either (a) pay exorbitant premiums that John Hancock knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their Performance Policies, thereby forfeiting the premiums they have paid to date." SACC ¶ 57(f). This claim fails as a matter of law because there is no evidence supporting the claim that John Hancock intended to trigger shock lapses, the Policies did not lapse, and the undisputed evidence contradicts Plaintiffs' claim.

First, there is no evidence that John Hancock attempted to trigger shock lapses. No fact witness testified that John Hancock intended to trigger shock lapses. The Redetermination Memo explained that John Hancock did not expect an increase in lapse rates. The actuaries who worked on the Redetermination believed that there "continues to be significant value in the policies and policyholders are better off not lapsing" because "[i]t is generally more economical to maintain the readjusted policy than to purchase a new policy." SUMF ¶ 51. For that reason, John Hancock did not assume shock lapses would occur following the Redetermination. Ex. D, Stern Dep. (July 7, 2022) Tr. 228:1-3; *see* Ex. K, Pfeifer Rep. ¶ 322.

Because John Hancock believed that the policies still had significant value, John Hancock did not assume in its Redetermination that there would be *any* increase in lapse or surrender rates following the COI adjustment. *See* Ex. K, Pfeifer Rep. ¶ 201. Plaintiffs' actuarial expert criticized John Hancock for ███████████████████████████████ ███████ Ex. D, Stern Dep. (July 7, 2022) Tr. 228:1-3; *see* Ex. K, Pfeifer Rep. ¶ 322. But it is an undisputed fact that, as set forth in Mr. Pfeiffer's expert report, of the approximately 1500

47

policies affected by the Redetermination, only 33 policies (none owned by Plaintiffs) lapsed or surrendered during the time from January 2018 through September 2019.  Ex. K, Pfeifer Rep. ¶ 201.  There is no evidence that any of those lapses or surrenders were caused by the shock of a COI rate increase.

Second, it is undisputed that the alleged breach did not occur.  Plaintiffs' Policies have not lapsed or been surrendered.  SUMF ¶ 52.

Nor is there evidence that the post-redetermination COI rates on the Policies no longer justify the ultimate death benefits or became worthless as a result of the Redetermination.  *E.g.*, Ex. EE, Solow Dep. Tr. 166:3-9 ("█████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████.").[22]  Indeed, Plaintiffs successfully bought and sold multiple policies to and from other investors after the COI increase, indicating the Policies are far from worthless.  SUMF ¶ 64.  Plaintiffs cannot prove that John Hancock breached the implied covenant by forcing Plaintiffs to lapse policies when it is undisputed that no such breach occurred.

Plaintiffs cannot save their claim by alleging that John Hancock "attempted" the alleged breach.  An alleged "attempt" to breach the policies' implied covenant of good faith and fair dealing fails to allege, much less prove, a breach of contract.  *E.g.*, *Hancock v. Americo Fin. Life*

---

[22] Not only is there no evidence that the Policies were rendered "worthless," Plaintiffs in fact refused to answer an interrogatory about the value of the Policies, objecting "This Interrogatory, which seeks information regarding EFG's valuation of the Policies, plainly seeks irrelevant information, including information entirely unrelated to the COI Rate Increases; EFG is not currently seeking damages based on diminution in value of the Policies and EFG's valuations of the Policies are not at issue in this case."  Ex. L, EFG's Response to Rog. 15, first amended responses).

*& Annuity Ins. Co.*, 378 F. Supp. 3d  413, 432 (E.D.N.C. 2019), *aff'd*, 799 F. App'x 179 (4th Cir.

2020) (no breach of implied covenant claim where "plaintiff does not allege whether his own

policy has lapsed"); *see also Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center

Associates*, 182 N.J. 210, 225 (2005) ("The party claiming a breach of the covenant of good faith

and fair dealing must provide evidence sufficient to support a conclusion that the party alleged to

have acted in bad faith has engaged in some conduct *that denied the benefit of the bargain*

originally intended by the parties.") (citations and quotations omitted, emphasis added).

Plaintiffs' shock lapse theory is furthermore contradicted by their allegation that John

Hancock targeted investors for COI increases.  It is undisputed that investor-owned policies

"███████████████████████████."  Ex. N, Stern Rep. ¶ 204; *see also* Ex. K, Pfeifer Rep. ¶

326; Ex. D, Stern Dep. (July 7, 2022) Tr. 230:19-24 (███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████) (emphasis added).  This low lapse rate is precisely why Plaintiffs

contend John Hancock would target investor-owned policies.  It is nonsensical for Plaintiffs to

claim that John Hancock targeted investor-owned policies because they never lapse, yet did so

expecting to trigger lapses.

### 4. Plaintiffs' Claim That John Hancock Should Have Endured Lower Projected Profit Than The Contract Required Fails as a Matter of Law

Plaintiffs claim that John Hancock breached the implied duty by "increasing the cost of

insurance rates in an attempt to achieve John Hancock's original expected profitability for the

Performance Policies at the policyholders' expense."  SACC ¶ 57(e).  Thus, Plaintiffs contend

that the implied covenant required John Hancock to endure greater losses than the contract

required rather than adjust COI rates when its Expectations deteriorated.  This claim fails as a matter of law.

First, as stated (*supra* §§ II, III.B.2), the contract expressly permits John Hancock to adjust cost of insurance rates, and therefore expressly permits the allegedly breaching conduct.  Second, Plaintiffs' claim improperly seeks to impose a new affirmative obligation on John Hancock endure greater losses rather than increase COI rates.  *Supra* § III.B.1.  And third, the law does not imply a duty to act selflessly.  *Sec. Plans, Inc.*, 769 F.3d at 817 ("The implied covenant does not undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit.") (citations and quotations omitted).

## IV.    SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' CLAIM FOR TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Plaintiffs have asserted a cause of action for breach of the implied covenant of good faith and fair dealing-tortious breach for policies issued in California.  John Hancock should be granted summary judgment for this claim because, under California law, Plaintiffs cannot establish at least two of the required elements of this cause of action.  Specifically, Plaintiffs have no evidence of an unpaid covered loss (a death benefit that was due and unreasonably withheld) for any of the policies purportedly owned by Plaintiffs issued in California.  Nor do Plaintiffs, as investors who have acquired the Policies from other policyholders, have the type of "special relationship" with John Hancock as required for this cause of action under California law.

John Hancock has not withheld insurance policy death benefits due under any *VICOF* policy issued in California.  SUMF ¶ 54.  This undisputed fact is sufficient to dispense with this cause of action. "[A]n insured cannot maintain a claim for tortious breach of the implied

covenant of good faith and fair dealing absent a covered loss. That is, because the essence of the

tort of the implied covenant of good faith and fair dealing is focused on the prompt payment of

benefits due under the insurance policy, **there is no cause of action for breach of the covenant**

**when no benefits are due**." *EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309

F. Supp. 3d 89, 95 (emphasis added, internal citations and quotation marks omitted).

Nor are Plaintiffs' allegations concerning reduction in policy account values sufficient to

constitute a covered loss.  *Id.* at 95-96; *see also LSH CO v. Transamerica Life Ins. Co.,* 2020 WL

5991627, at *7 (C.D. Cal. Sept. 15, 2020) ("[T]o the extent that Plaintiffs have alleged that

Defendant charged excessive MDRs in an attempt to reduce Plaintiffs' Accumulation Values and

the accrual of interest on their accounts, this Court finds that those allegations are insufficient to

state a claim for breach of the implied covenant sounding in tort for failure to establish denial of

an insurance benefit.") (quotation omitted).

Plaintiffs, as institutional investors in the California policies, lack the special relationship

between insurer and insured.  As institutional investors who purchased policies for monetary

gain (as opposed to peace of mind), the law does not provide special protections that would

elevate a contractual breach claim into a tort claim.  They are not in need of the special

protections that this claim provides to insureds.  *See EFG Bank*, 309 F. Supp. 3d at 96 (declining

to extend tort claim to institutional investors based in part on absence of a "special

relationship"); *EFG Bank AG v. Transamerica Life Ins. Co.*, 2020 WL 1849493, at *6 (C.D. Cal.

Apr. 13, 2020) (same).

The same reasoning makes clear that under California law there are no punitive damages

available to Plaintiffs.  *See Brighton Trustees v. Transamerica Life Insurance Co.*, 2019 WL

5784925, at *4 (C.D. Cal. Nov. 4, 2019) ("[T]o the extent plaintiffs' tortious breach claim

51

depends on allegations that Transamerica has withheld plaintiffs' accumulation values and related accrual of interest, plaintiffs' claim arises less from the relationship between plaintiffs as insureds and Transamerica as insurer than it does from the relationship between plaintiffs and Transamerica as a bank (or similar financial institution).") (citation and quotations omitted); *see also Cates Constr., Inc. v. Talbot Partners*, 21 Cal. 4th 28, 53 (1999) (rejecting extension of tortious breach of the implied covenant to performance bond context because the latter "bears no indicia of adhesion or disparate bargaining power that might support tort recovery by an obligee" and holding punitive damages were unavailable).

## V.     SUMMARY JUDGMENT SHOULD BE ENTERED ON PLAINTIFFS' CONVERSION CLAIMS

In their Second Amended Complaint, Plaintiffs claim, "[b]y increasing cost of insurance rates and making Monthly Deductions in unauthorized amounts from the Policy Values of Plaintiffs' Policies," Defendants converted these funds.  SACC ¶ 72.  The Court should enter summary judgment because the claims fail as a matter of law for two independently sufficient reasons (1) Plaintiffs had no right to possess additional funds because the COI Redetermination complied with the policy contracts; and (2) Plaintiffs' claims are duplicative of their breach of contract claims.

### A.     New York and Massachusetts Law Apply to the Conversion Claims Brought by Plaintiffs

As explained above, the claims are analyzed using the choice of law rules of New York and California, the states in which the consolidated actions were originally filed.[23]

---

[23] "Under New York choice of law rules, tort claims are outside the scope of contractual choice of law provisions," so the policies' choice-of-law clauses (which all choose New York law) do not apply to these claims.  *Grund v. Delaware Charter Guarantee & Tr. Co.*, 788 F. Supp. 2d 226, 243–44 (S.D.N.Y. 2011).

California's choice of law analysis will apply to the claims against JHUSA originally filed in California.  As noted above, some of the at-issue policies have choice of law clauses. Under California law, "[t]he scope of a contract's choice-of-law clause is determined by the body of law identified in the agreement, unless the agreement specifies a different scope," which includes whether the choice of law applies to tort claims based on the contract.  *JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) (citing *Washington Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 916 n.3 (2001)).   For policies that choose the law of California, Illinois, Kansas, Minnesota, New Jersey, and Nevada, those states' laws will also apply to any tort claims "arising from or related to" the agreement, including Plaintiffs' conversion claims.  *See* Appendix 8.  For Policies that choose the law of Arizona, Florida, Georgia, Kentucky, Maryland, Michigan, Pennsylvania, and Texas, the choice of law clause does not apply to tort claims related to the agreement.  *See* Appendix 9.

For claims brought on Policies where the contractually chosen governing law does not apply to tort claims, as well as the Policies that do not contain choice of law clauses, the Court must conduct a separate choice-of-law analysis.  California applies a three-step "governmental interest" test to tort claims:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be the more impaired if its law were not applied.

*Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107-08 (2006) (citations and quotations omitted).

The states with potential interest in applying their law to the conversion claims against JHUSA are Delaware, where the plaintiff entities reside (SACC ¶¶ 11-21), or Massachusetts, the state in which Defendant JHUSA has its principal place of business. *Credit Suisse Lending Tr. USA v. Transamerica Life Ins. Co.*, 2020 WL 4042899, at *16–17 (C.D. Cal. July 13, 2020). There is an actual conflict between California law and the law of Delaware and Massachusetts regarding conversion. In both Delaware and Massachusetts, a plaintiff cannot bring a claim for conversion along with a contract claim unless the plaintiff can show that "the defendant violated an independent legal duty, apart from the duty imposed by contract." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009); *see also Rac Associates v. R.E. Moulton, Inc*, 2011 WL 3533221 (Mass. Super. Feb. 01, 2011); *see* Appendix 10.[24]  California law, however, does not categorically bar a conversion claim for money due under a contract, if the money is a "specific sum capable of identification." *Voris v. Lampert*, 7 Cal. 5th 1141, 1151 (2019) (citation omitted). As noted above, the laws of Illinois, Kansas, Minnesota, New Jersey, and Nevada govern torts that arise under policies with choice-of-law provisions that choose the laws of those states.

Because there is an actual conflict of law between California law and the laws of other states with an interest in the conversion claims against JHUSA, the Court should proceed to the second and third steps of California's governmental interest test to examine the states' interests

---

[24] New York follows the same rule, so there is no conflict for the claims filed against JHNY. *Jeffers v. Am. Univ. of Antigua*, 3 N.Y.S.3d 335 (1st Dep't 2015).

in the application of its law in the case and determine which state's law would be most impaired were its law not applied.  *See Kearney*, 39 Cal. 4th at 107-08.

In a recent case involving a COI redetermination by an Iowa-based insurer, the Central District of California conducted a full choice of law analysis applying California's choice of law rules, and concluded that Delaware, the location of the plaintiff entities that owned the insurance policies, and Iowa, the location of the insurer, both had "interest in having the Court apply their respective law regarding conversion."  *Credit Suisse Lending Tr. USA v. Transamerica Life Ins. Co.*, 2020 WL 4042899, at *16–17 (C.D. Cal. July 13, 2020).  At the third stage of the analysis, the court in *Credit Suisse* found that the impairment on Iowa's interests would be greater and therefore applied Iowa law.  *Id.*  Following this well-reasoned decision, the Court should hold that the law of Massachusetts, where JHUSA's principal place of business is located, applies to the conversion claims against JHUSA.[25]

With respect to the claims against JHNY originally filed in this Court, New York applies an interest analysis to choice of law for tort claims.  *Grund*, 788 F. Supp. 2d at 244 (quoting *Cooney v. Osgood Mach.*, 81 N.Y.2d 66, 72 (1993)); *Chigirinskiy v. Panchenkova*, 2015 WL 1454646, at *5 (S.D.N.Y. Mar. 31, 2015) ("Conversion is plainly a conduct-regulating tort."). New York law considers a conversion tort to have occurred in the plaintiff's state of residence. *Grund*, 788 F. Supp. 2d at 244.  As explained above, there is no material difference between Delaware and New York law regarding the conversion claims brought against JHNY and therefore because there is no conflict, the law of the forum—New York—applies to the conversion claims against JHNY.  *Jeffers v. Am. Univ. of Antigua*, 3 N.Y.S.3d 335 (1st Dep't

---

[25] Since there is no material conflict between Massachusetts and Delaware law, the outcome would be the same if the Court concluded that Delaware law applied.

2015) ("A cause of action for conversion cannot be predicated on a mere breach of contract")
(citations and quotations omitted); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del.
Ch. 2009) (To state a claim for conversion, defendant must have "violated an independent legal
duty, apart from the duty imposed by contract."); *Integrated Constr. Enterprises, Inc. v. GN
Erectors, Inc.*, 2020 WL 614991, at *4 (S.D.N.Y. Feb. 10, 2020) ("Absent an actual conflict, 'a
New York court will dispense with choice of law analysis; and if New York law is among the
relevant choices, New York courts are free to apply it.'") (citations and quotations omitted).

### B.    Plaintiffs' Conversion Claims Fail Because They Had No Right to Possess Funds Deducted in Compliance with the Contracts

To prove a claim for conversion under the laws of Massachusetts and New York,
Plaintiffs must prove that (1) they had a right of possession of the property that was allegedly
converted and (2) the defendant disposed of the property in a manner inconsistent with the
plaintiff's rights. *In re Brauer*, 452 Mass. 56, 67 (Mass. 2008) (holding that under
Massachusetts law, "[t]he elements of conversion require that a defendant be proved to have
intentionally or wrongfully exercised acts of ownership, control or dominion over personal
property to which he has no right of possession at the time.") (citations and quotations omitted);
*Pappas v. Tzolis*, 20 N.Y.3d 228, 234 (2012) (holding that under New York law, "Two key
elements of conversion are (1) plaintiff's possessory right or interest in the property and (2)
defendant's dominion over the property or interference with it, in derogation of plaintiff's
rights[.]") (quotation omitted).[26]  For the reasons discussed above in Section IV, John Hancock

---

[26] Conversion under Delaware and California law have the same elements. *See Goodrich v. E.F.
Hutton Group, Inc.*, 542 A.2d 1200, 1203 (Del. Ch. 1988) ("Generally, the necessary elements
for a conversion under Delaware law are that a plaintiff had a property interest in the converted
goods; that the plaintiff had a right to possession of the goods; and that the plaintiff sustained
damages."); *Voris v. Lampert*, 7 Cal. 5th 1141, 1150 (2019) ("As it has developed in California,

was contractually entitled to possess the allegedly converted property (*i.e.*, the account value).

Therefore, Plaintiffs had no right to possess that property and Defendants could not have

disposed of it in a manner inconsistent with those rights.  The Court should therefore enter

summary judgment for Defendants on the conversion claims.

### C. <u>Plaintiffs' Conversion Claims are Also Duplicative of Their Breach of Contract Claims</u>

Under the laws of New York and Massachusetts, "[a] cause of action for conversion

cannot be predicated on a mere breach of contract."  *Jeffers,* 3 N.Y.S.3d at 335 (citations and

quotations omitted); *see also G8 Holdings, Inc. v. Deutsche Bank Securities, Inc.*, 2018 WL

11226748, at *5 (S.D.N.Y. Apr. 19, 2018) (Hellerstein, J.) ("Under New York law, when a valid

agreement governs the subject matter of a dispute between parties, claims arising from that

dispute are contractual; attempts to repackage them as sounding in fraud, conversion, and other

torts . . . are generally precluded, unless based on a duty independent of the contract.") (citation

and quotations omitted); *Barkhordar v. President & Fellows of Harvard Coll.*, 544 F. Supp. 3d

203, 215–16 (D. Mass. 2021) ("[T]he court finds the relationship between the parties is governed

by contract and, for the reasons applicable to Plaintiffs' unjust enrichment claim, Plaintiffs'

conversion claim fails."); *Rac Assocs*, 2011 WL 3533221 (for a claim that "arises out of the

failure to pay sums due on a contract for services[,]" holding that "while an action for contract

does lie in the circumstances of this case, an action for conversion does not"); *see* Appendix 10.[27]

---

the tort comprises three elements: (a) plaintiff's ownership or right to possession of personal
property, (b) defendant's disposition of property in a manner inconsistent with plaintiff's
property rights, and (c) resulting damages.") (quotation omitted).
[27] Delaware is in accord.  *Kuroda*, 971 A.2d at 889 ("[T]o assert a tort claim along with a
contract claim, the plaintiff must generally allege that the defendant violated an independent
legal duty, apart from the duty imposed by contract.").

The SACC repeats in the conversion claim the same allegations regarding breach of contract.[28] Plaintiffs' damages expert did not identify any way in which Plaintiffs were harmed separate from the alleged breach of contract.  SUMF ¶ 55.  Plaintiffs do not claim that Defendants breached any independent legal duty and set forth no distinct calculation of damages for the conversion claims.  John Hancock is entitled to summary judgment because "plaintiffs' conversion claims allege no facts independent of the facts supporting their breach of contract claims."  *Jeffers*, 3 N.Y.S.3d at 335.

## VI.   SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' DUPLICATIVE DECLARATORY JUDGMENT CLAIM

John Hancock is entitled to summary judgment with respect to Plaintiffs' claim for declaratory relief because this claim is duplicative of their breach of contract claim.  *Cable First Constr. Inc. v. Lepetiuk Eng'g Corp.*, 2021 WL 276707, at *3 (S.D.N.Y. Jan. 27, 2021) (Hellerstein, J.) (dismissing declaratory judgment claim as duplicative where plaintiff "sought the same relief through its of breach of contract claim"); *EFG Bank, AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 99 (S.D.N.Y. 2018) (dismissing claim for declaratory relief as duplicative of plaintiffs' breach of contract claim asserting that COI rate increase was improper).

---

[28] *See, e.g.*, SACC ¶ 70 ("Plaintiffs had a property interest in, and the right to immediate possession of, the funds Defendants deducted from their Policy Values *in excess of the amounts permitted by the terms of the Performance Policies* due to Defendants' wrongful increases in cost of insurance rates.") (emphasis added); *id.* ¶ 75 ("Defendants intended to cause damage to the Plaintiffs by increasing cost of insurance rates and deducting more from Plaintiffs' Policy Values *than was authorized by the Performance Policies*.").

**VII.    SUMMARY JUDGMENT SHOULD BE GRANTED ON DAVYDOV'S CLAIMS**

John Hancock is entitled to summary judgement on Davydov's claims for the same

reasons John Hancock is entitled to summary judgment on the claims brought by Plaintiffs.

First, Davydov claims a breach of contract on the grounds that John Hancock "materially

breached the terms and provisions of the Policies" because it "considered impermissible factors"

and attempted to "recoup past losses" which resulted in "increasing the Cost of Insurance in a

way that is not permitted under the Policies."  Davydov Compl. ¶¶ 94-102.  This argument fails

for the reasons stated in Section III, above, excluding sub-sections E and F, which do not pertain

to allegations raised by Davydov.

Second, Davydov claims a breach of the implied covenant of good faith and fair dealing

on the grounds that John Hancock exercised its discretion under the policy in bad faith by: 1)

recouping past losses; 2) misrepresenting the reasons for the increase; 3) intending the increases

to force surrenders; 4) negating the value of what were intended to be guaranteed interest rates;

and 5) increasing COI Rates in a way that was intended to benefit John Hancock at the expense

of Davydov.  Davydov Compl. ¶¶ 108-109.  This argument fails for the reasons stated in Section

IV, above, as well as Section III.C.

In support of his assertion that John Hancock intended its Redetermination to force

surrenders, Davydov also alleges that John Hancock "sent letters to . . . policyholders directing

them to contact a designated company hotline with any questions about the Cost of Insurance

increases, rather than directing the policyholders to the agents with whom they had dealt for

many years."  Davydov Compl. ¶ 11.  But the letter to which Davydov refers on its face

disproves that allegation.  That letter specifically encouraged Davydov to consider the value of

their policies before surrendering and "encourage[d] [Davydov] to seek advice from [his] financial advisor."  SUMF ¶ 67.

Davydov also alleges that John Hancock "created obstacles that preclude policyholders from obtaining the information they need to evaluate their options," allegedly because "[p]olicyholders often must make multiple calls or remain on hold for extended periods of time to contact [John Hancock's] representatives" to obtain information about their options, and because "policyholders are often given confusing or conflicting answers to their questions." Davydov Compl. ¶ 68.  Davydov's failure to prosecute his claims, however, has meant that he has not sought—let alone obtained—any evidence that proves his allegations.  The absence of any evidence to prove his claims warrants summary judgment. *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) ("When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.")

Davydov also contends that John Hancock breached the implied covenant of good faith and fair dealing by "negating the value of what were intended to be guaranteed interest rates."  Davydov Compl. ¶ 109(d).  The Davydov policy has a "Guaranteed Interest Account Annual Rate" of "Not less than 3%".  SUMF ¶ 65.  That claim fails as a matter of law because it is undisputed that, since issuance, John Hancock has applied a credited interest rate of greater than the minimum guaranteed credited interest rate of 3% on the Davydov policy.  SUMF ¶ 66. Furthermore, the policy provides that the insurer may determine COI rates based on its future expectations of "investment earnings." SUMF ¶ 18.  "Courts have held that policies with similar language "cannot give rise to a breach of contract claim premised on a purported attempt to circumvent minimum guaranteed interest rates."  *In re AXA Equitable Life Ins. Co. COI Litig.*,

2022 WL 976266, at *14 (S.D.N.Y. Mar. 31, 2022) (quoting *Brighton Trs. v. Transamerica Life Ins. Co.*, 2019 WL 6315541, at *10 (C.D. Cal. Aug. 28, 2019)).

Third, Davydov seeks declaratory relief on the grounds that John Hancock "breached the express and implied terms of the policies and acted unlawfully by increasing the Cost of Insurance on certain Universal Life Policies."  Davydov Compl. ¶¶ 115.  Davydov's declaratory judgment claim fails for the same reason the Plaintiffs' declaratory judgment claims fail: because it is duplicative of his breach of contract claims.  *See* Section VI *supra*.

In the alternative, the Court should dismiss the Davydov Action for failure to prosecute. *See* Fed. R. Civ. P. 41(b).  Despite his claim having been pending for 4 years, Davydov has chosen not to (i) request any discovery of John Hancock; (ii) ask any questions of John Hancock's witnesses at depositions noticed pursuant to the January 19, 2021 Deposition Coordination Protocol (20-cv-05032, Dkt. No. 31); and (iii) submit any expert reports in support of his claims.  And as the Court recently acknowledged, Davydov failed to appear at the most recent status conference.  *See* 20-cv-05032, Dkt. No. 60 ("A status conference was held on July 21, 2022. Plaintiff did not appear. Plaintiff is advised that failure to appear and participate in future proceedings will be cause for dismissal for failure to prosecute.").  Given that Davydov has not evidenced any intent to prosecute his claims, nor developed the necessary discovery to proves his claims at trial, his claims should be dismissed for failure to prosecute.

Dated: September 13, 2022

/s/  John F. LaSalle

Alan B. Vickery
John F. LaSalle III
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Tel.: (212) 446-2300
Fax: (212) 446-2350

Jack Wilson
Joseph F. Kroetsch
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.: (914) 749 8200
Fax: (914) 749-8300

*Attorneys for Defendants John Hancock Life Insurance Company of New York and John Hancock Life Insurance Company (U.S.A.)*

**Appendix Table 1**

| State | Case |
|---|---|
| **Insurance contracts must be construed in accordance with the plain language of the policy.** *See* **Section II.B.** | |
| Arizona | *Thomas v. Liberty Mut. Ins. Co.*, 173 Ariz. 322, 325 (1992) ("in construing a term in an insurance policy that on its face is not ambiguous, we must interpret it according to its ordinary meaning and effect") (citations omitted). |
| California | *State Farm Gen. Ins. Co. v. Mintarsih,* 175 Cal. App. 4th 274, 283 (2009) ("If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs.") (internal citations and quotations omitted). |
| Delaware | *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 905 (Del. 2021) ("If the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning.") (citations and quotations omitted). |
| Florida | *First Call 24/7, Inc. v. Citizens Prop. Ins. Corp.*, 333 So. 3d 1180, 1182 (Fla. 1st DCA 2022) ("A guiding principle that the Florida Supreme Court has consistently applied is that insurance contracts must be construed in accordance with the plain language of the policy.") (citations, internal quotation marks, and alterations in original omitted). |
| Georgia | *Padgett v. Georgia Farm Bureau Mut. Ins. Co.*, 276 Ga. App. 796, 797 (2005) ("In Georgia, '[w]here the terms and conditions of an insurance contract are clear and unambiguous, [such terms] must be given their literal meaning.'") (citation omitted). |
| Illinois | *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 108, 607 N.E.2d 1204, 1212 (1992) ("If the words in the policy are unambiguous, a court must afford them their plain, ordinary, and popular meaning.") (citations and emphasis omitted). |
| Kansas | *Marshall v. Kansas Med. Mut. Ins. Co.*, 276 Kan. 97, 111 (2003) ("If the language in an insurance policy is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense and according to the sense and meaning of the terms used.") (citation omitted). |
| Kentucky | *Nationwide Mut. Ins. Co. v. Nolan*, 10 S.W.3d 129, 131 (Ky. 1999) ("The words employed in insurance policies, if clear and unambiguous, should be given their plain and ordinary meaning.") (citations omitted). |
| Maryland | *Connors v. Gov't Employees Ins. Co.*, 442 Md. 466, 480 (2015) ("We give the words of insurance contracts their customary, ordinary, and accepted meaning") (citation omitted). |
| Massachusetts | *Cody v. Conn. Gen. Life Ins. Co.*, 387 Mass. 142, 146–47 (1982) ("Like all contracts, insurance contracts are to be construed according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed.") (citation ad quotation omitted). |

| | |
|---|---|
| Michigan | *Kirsch v. Aspen Am. Ins. Co.*, 507 F. Supp. 3d 835, 838 (E.D. Mich. 2020) ("Terms in an insurance policy must be given their plain meaning and the court cannot create an ambiguity where none exists.") (citation omitted). |
| Minnesota | *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013) ("An insurance policy must be construed as a whole, and unambiguous language must be given its plain and ordinary meaning.") (citation and quotation omitted). |
| Nevada | *Probuilders Specialty Ins. Co. v. Double M. Const.*, 116 F. Supp. 3d 1173, 1178–79 (D. Nev. 2015) ("Courts interpret terms according to the policy's definitions, and read undefined terms to mean their plain, ordinary, and popular meanings.") (citation and quotations omitted) |
| New Jersey | *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008)) ("In attempting to discern the meaning of a provision in an insurance contract, the plain language is ordinarily the most direct route.") (citation omitted). |
| New York | *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) ("When the provisions are unambiguous and understandable, courts are to enforce them as written."). (citations omitted) |
| North Carolina | *C.D. Spangler Const. Co. v. Indus. Crankshaft & Eng'g Co., Inc.*, 326 N.C. 133, 152 (1990) ("In construing the ordinary and plain meaning of disputed terms, this Court has used standard, nonlegal dictionaries as a guide.") (citations and internal quotations omitted) |
| Ohio | *Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St. 3d 635, 638 (1992) ("Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.") (citation omitted). |
| Pennsylvania | *Penn Psychiatric Ctr., Inc v. U.S. Liab. Ins. Co.*, 257 A.3d 1241 (Pa. Super. Ct. 2021) ("Courts must construe the terms of an insurance policy as written and may not modify the plain meaning of the words under the guise of interpreting the policy.") (citations, internal quotations, and alterations in original omitted). |
| Texas | *Weitzman v. Allstate Vehicle & Prop., Ins. Co.*, CV H-21-1871, 2022 WL 1078619, slip op., at *2 (S.D. Tex. Apr. 11, 2022) ("Under Texas law, insurance contracts are interpreted under the general rules of contract construction, 'and words and phrases contained therein should be given their plain and ordinary meaning.'") (quoting *Aggreko, L.L.C. v. Chartis Specialty Ins. Co.*, 942 F.3d 682, 688 (5th Cir. 2019)). |

**Appendix Table 2**

| State | Case |
|---|---|
| **Courts should refrain from rewriting the agreement and cannot insert in the contract language which one of the parties now wishes were there.  _See_ Section II.B.** ||
| Arizona | _Employers Mut. Cas. Co. v. DGG & CAR, Inc._, 218 Ariz. 262, 267 (2008) ("When 'the provisions of the contract are plain and unambiguous upon their face, they must be applied as written, and the court will not pervert or do violence to the language used, or expand it beyond its plain and ordinary meaning or add something to the contract which the parties have not put there.'") (quoting _D.M.A.F.B. Fed. Credit Union v. Employers Mut. Liab. Ins. Co._, 96 Ariz. 399, 403 (1964)). |
| California | _Levi Strauss & Co. v. Aetna Cas. & Sur. Co._, 184 Cal. App. 3d 1479, 1486 (1986) (If the language in an insurance policy is unambiguous, courts cannot insert in the contract language which one of the parties now wishes were there."). |
| Delaware | _O'Brien v. Progressive N. Ins. Co._, 785 A.2d 281, 288 (Del. 2001) ("The Delaware courts should not destroy or twist policy language under the guise of construing it. Creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented.") (citations and quotations omitted). |
| Florida | _State Farm Fire & Cas. Ins. Co. v. Wilson_, 330 So. 3d 67, 72 (Fla. 2d DCA 2021) ("[W]e are not empowered to rewrite an insurance policy to relieve one party from the apparent hardship of an improvident bargain") (citing _Green v. Life & Health of Am._, 704 So. 2d 1386, 1391 (Fla. 1998) |
| Georgia | _Auto-Owners Ins. Co. v. Neisler_, 334 Ga. App. 284, 286 (2015) ("if the language is unambiguous, the court "simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning") (citation omitted). |
| Illinois | _Kasongo v. Am. Gen. Life Ins. Co._, 479 F. Supp. 3d 754, 795 (N.D. Ill. Aug. 13, 2020) (A "court will neither add language or matters to a contract about which the instrument itself is silent, nor add words or terms to an agreement to change the plain meaning of the parties as expressed in the agreement.'") (quoting _Sheehy v. Sheehy,_ 702 N.E.2d 200, 204 (Ill. App. Ct. 1998)). |
| Kansas | _O'Bryan v. Columbia Ins. Group_, 274 Kan. 572, 576 (2002) ("If an insurance policy's language is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense. In such case, there is no need for judicial interpretation or the application of rules of liberal construction. The court shall not make another contract for the parties and must enforce the contract as made.") (citations omitted). |
| Kentucky | _Principal Life Ins. Co. v. Doctors Vision Ctr. I, PLLC_, 5:12-CV-00125-JHM, 2014 WL 6751201, at *7 (W.D. Ky. Dec. 1, 2014) ("The Kentucky Court of Appeals likewise has stated, we are simply unwilling to torture words to import ambiguity into a contract where the ordinary meaning leaves no room for ambiguity.") (citations and quotations omitted). |

| Maryland | *Chang v. Brethren Mut. Ins. Co.,* 168 Md. App. 534, 548 (2006) ("When the language is unambiguous, we shall give effect to its plain meaning and not construe the contract any further.") (citation omitted). |
|---|---|
| Massachusetts | *Siebe, Inc. v. Louis M. Gerson Co.,* 74 Mass. App. Ct. 544, 549 (2009)("If the terms are found to be unambiguous, however, the task of judicial construction is at an end and the parties are bound by the plain and ordinary meaning of the terms of the contract.") (citation and quotations omitted). |
| Michigan | *Heat Controller, Inc. v. Westchester Fire Ins. Co.*, No. 11-14923, 2012 WL 4378566, at *2 (E.D. Mich. Sept. 25, 2012) ("Where the policy language is clear and unambiguous, a court must enforce the terms as written and not rewrite the plain contract language.") (citation omitted). |
| Minnesota | *Elm Creek Courthome Ass'n, Inc. v. State Farm Fire & Cas. Co.*, 971 N.W.2d 731, 736–37 (Minn. Ct. App. 2022), *review denied* (May 17, 2022) ("If the language is 'clear and unambiguous,' we 'enforce the agreement of the parties as expressed' in the contract. In other words, we do not 'rewrite, modify, or limit' the effect of an unambiguous provision 'by a strained construction.'") (quoting *Storms, Inc. v. Mathy Constr. Co.*, 883 N.W.2d 772, 776 (Minn. 2016)). |
| Nevada | *Fed. Ins. Co. v. Coast Converters*, 130 Nev. 960, 966 (2014) ("This court 'will not rewrite contract provisions that are otherwise unambiguous ... [or] increase an obligation to the insured where such was intentionally and unambiguously limited by the parties.'") (quoting *Farmers Ins. Grp. v. Stonik ex rel. Stonik*, 110 Nev. 64, 67, 867 P.2d 389, 391 (1994)). |
| New Jersey | *Oxford Realty Group Cedar v. Travelers Excess & Surplus Lines Co.*, 229 N.J. 196, 207 (2017) ("If the language is clear, that is the end of the inquiry. Thus, in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability or write a better policy for the insured than the one purchased.") (citations and quotations omitted). |
| New York | *U.S. Fidelity & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 232 (1986) ("courts should refrain from rewriting the agreement") (citations omitted). |
| North Carolina | *Digh v. Nationwide Mut. Fire Ins. Co.,* 187 N.C. App. 725, 727 (2007) ("[I]t is the duty of the court to construe an insurance policy as it is written, not to rewrite it and thus make a new contract for the parties.") (quoting *Allstate Ins. Co. v. Shelby Mut. Ins. Co.*, 269 N.C. 341, 346 (1967)) (internal quotation marks omitted). |
| Ohio | *Williams-Diggins v. Permanent Gen. Assurance Corp.*, 157 N.E.3d 220, 227 (Ohio Ct. App. 2020) (refusing to read in term regarding "sales tax and fees" into insurance policy because doing so would entail "rewrit[ing] the Policy for the parties, something this court may not do") (citation omitted). |
| Pennsylvania | *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011) (applying Pennsylvania law) ("Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language. Courts should not distort the meaning of the language or strain to find an ambiguity.") (quoting and then citing, *inter alia, Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 606 (1999)) (internal quotations omitted). |

| Texas | *Balfour Beatty Constr., LLC v. Liberty Mut. Ins. Co.*, 366 F. Supp. 3d 836, 840 (S.D. Tex. 2018), *aff'd sub nom.*, 968 F.3d 504 (5th Cir. 2020) ("For more than a century the Supreme Court of Texas has held that in construing insurance policies where the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction.") (quoting *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006)) (internal quotations omitted). |
| --- | --- |

**Appendix Table 3**

| State | Case |
|---|---|
| A provision in an insurance policy is ambiguous only if it is susceptible to two or more reasonable interpretations. *See* Section II.B. | |
| Arizona | *Young v. Owners Ins. Co.*, 562 F. Supp. 3d 250, 255 (D. Ariz. 2021) ("Under Arizona law, language in a contract is ambiguous only when it can reasonably be construed to have more than one meaning.  That is, language is not ambiguous just because it is vague or general, but because it lends itself to two or more contradictory meanings.") (citations and internal quotation marks omitted). |
| California | *Scheenstra v. California Dairies, Inc.,* 213 Cal. App. 4th 370, 390 (2013) ("If the court determines there is no ambiguity—that is, the language is reasonably susceptible to only one interpretation—then the judicial inquiry into meaning is finished and the clear and explicit meaning governs.") (citations omitted). |
| Delaware | *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001) ("a contract is only ambiguous when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings") (citation omitted). |
| Florida | *First Call 24/7, Inc. v. Citizens Prop. Ins. Corp.*, 333 So. 3d 1180, 1186 (Fla. 1st DCA 2022) ("A true ambiguity does not exist merely because a contract can possibly be interpreted in more than one manner.") (citations and internal quotation marks omitted). |
| Georgia | *Bhd. Mut. Ins. Co. v. Richardson,* 363 Ga. App. 98, 100 (2022) ("A word or phrase is ambiguous only when it is of uncertain meaning, and may be fairly understood in more ways than one so that it involves a choice between two or more constructions of the contract.") (citation omitted). |
| Illinois | *State Farm Mut. Auto. Ins. Co. v. Elmore*, 181 N.E.3d 865, 871 (Ill. 2020) ("A policy term is not ambiguous because the term is not defined within the policy or because the parties can suggest creative possibilities for its meaning.") (citation omitted). |
| Kansas | *Am. Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 1059 (2008) ("Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning") (citation omitted). |
| Kentucky | *Davis v. Kentucky Farm Bureau Mut. Ins. Co.*, 495 S.W.3d 159, 162 (Ky. Ct. App. 2016) ("The mere fact that a party attempts to muddy the water and create some question of interpretation does not necessarily create an ambiguity.") (citation, internal quotation marks, and alterations omitted). |
| Maryland | *W. F. Gebhardt & Co. v. Am. Eur. Ins. Co.,* 250 Md. App. 652, 667 (2021) ("Merely because a term cannot be precisely defined so as to make clear its application in all varying factual situations does not mean that it is ambiguous. Furthermore, simply because a party can point to several slightly different dictionary definitions of a word does not render that term ambiguous. Instead, |

| | |
|---|---|
| | each of those meanings must be reasonable in context.") (citations and quotations omitted). |
| Massachusetts | *Sullivan v. Southland Life Ins. Co.,* 67 Mass. App. Ct. 439, 443 (2006) ("A term [in an insurance policy] is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one....An ambiguity is not created simply because a controversy exists between the parties.") (citation and quotations omitted; alterations and ellipses in original). |
| Michigan | *Wasik v. Auto Club Ins. Ass'n*, 355848, No. 355848, 2022 WL 1814084, at *2 (Mich. Ct. App. June 2, 2022) ("a provision is not ambiguous if 'it is not susceptible to more than one interpretation and does not conflict with any other provision.'") (quoting *Coates v. Bastian Bros. Inc.*, 276 Mich.App. 498, 510 (2007)). |
| Minnesota | *Bd. of Regents of Univ. of Minnesota v. Royal Ins. Co. of Am.*, 517 N.W.2d 888, 892 (Minn. 1994) ("Because a word has more than one meaning does not mean it is ambiguous. The sense of a word depends on how it is being used; only if more than one meaning applies within that context does ambiguity arise.") |
| Nevada | *Great-W. Life & Annuity Ins. Co. v. Am. Econ. Ins. Co.*, 2:11-CV-02082-APG, 2015 WL 128704, at *3 (D. Nev. Jan. 9, 2015) ("A provision in an insurance policy is ambiguous only if it is reasonably susceptible to more than one interpretation.") (citation and quotations omitted). |
| New Jersey | *Marshall v. Raritan Valley Disposal*, A-2919-10T4, 2012 WL 787371, at *5 (N.J. Super. Ct. App. Div. Mar. 13, 2012) ("An ambiguity exists only if the terms are reasonably susceptible to at least two interpretations.") (citing *Schor v. FMS Fin. Corp.,* 357 N.J. Super. 185, 191 (App.Div.2002)) |
| New York | Lend Lease (U.S.) Const. LMB Inc. v. Zurich Am. Ins. Co., *136 A.D.3d 52, 59 (N.Y. App Div. 2015) ("The test for ambiguity is whether the language of the insurance contract is susceptible of two reasonable interpretations. That one party to the agreement may attach a particular, subjective meaning to a term that differs from the term's plain meaning does not render the term ambiguous. Nor does the lack of a definition, in and of itself, render a word ambiguous.") (citations omitted).* |
| North Carolina | *Nautilus Ins. Co. v. Philips Med. Sys. Nederland B.V.*, 549 F. Supp. 3d 449, 455 (W.D.N.C. 2021) ("A provision in an insurance policy will be deemed ambiguous only if it is 'fairly and reasonably susceptible to [different] constructions for which the parties contend.'") (quoting *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348 (1970)). |
| Ohio | *Lager v. Miller-Gonzalez*, 120 Ohio St. 3d 47, 50, 896 N.E.2d 666, 669 (2008) ("Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation.") (citation omitted). |
| Pennsylvania | *Windows v. Erie Ins. Exch.*, 161 A.3d 953, 957 (Pa. Super. Ct. 2017) ("The 'reasonably' qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable.") (citation omitted). |

| Texas | *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003) ("An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations.") (citation omitted). |
|---|---|

**Appendix Table 4**

| State | Case |
|---|---|
| **The presence of an undefined term or word in an insurance policy does not in and of itself make the policy ambiguous.  *See* Section II.B.** | |
| Arizona | *Farmers Ins. Exch. v. Loesche*, 17 Ariz. App. 421, 423 (1972) ("Where [] undefined terms are given their ordinary meaning and exclusion of benefits results, language will not be treated as ambiguous.") (citation omitted). |
| California | *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 866 (1993) ("We recently rejected the view that the lack of a policy definition necessarily creates ambiguity.") (citations omitted). |
| Delaware | *E.I. du Pont de Nemours & Co v. Admiral Ins. Co.*, 711 A.2d 45, 58–62 (Del. Super. Ct. 1995) ("[Term] is not specifically defined in the policy . . . . Unless the language itself has two reasonable meanings, I cannot find ambiguity . . . . My obligation is to determine whether the term [] is ambiguous . . . without relying on extrinsic evidence . . . . I find the term "sudden" has only one reasonable meaning in the policy context here."). (emphasis omitted). |
| Florida | *Botee v. So. Fidelity Ins. Co.*, 162 So.3d 183, 186 (Fla. Dist. Ct. App. 2015) ("When a term in an insurance policy is undefined, it should be given its plain and ordinary meaning, and courts may look to legal and non-legal dictionary definitions to determine such a meaning."). |
| Georgia | *Pomerance v. Berkshire Life Ins. Co. of Am.*, 288 Ga. App. 491, 493 (2007) ("If a term is undefined in the insurance policy, we look to dictionaries to supply the commonly accepted meaning of the term.") (citation omitted). |
| Illinois | *W. Bend Mut. Ins. Co. v. Krishna Schaumburg Tan, Inc.*, 2021 IL 125978, ¶ 38 (2021) ("When a term is not defined in an insurance policy, we afford that term its plain, ordinary, and popular meaning, i.e., we look to its dictionary definition.") (citations omitted). |
| Kansas | *Harmon v. Safeco Ins. Co. of Am.*, 24 Kan. App. 2d 810, 816 (1998) ("Under Kansas law, the fact that an insurance policy does not define each term within it does not somehow make an undefined term ambiguous.") (citation omitted). |
| Kentucky | *Marshall v. Ky. Farm Bureau Mut. Ins. Co.*, 618 S.W.3d 499, 502 (Ky. Ct. App. 2020) ("Because the term service is not defined in the policy, we must afford it its ordinary meaning, if that meaning is not ambiguous.") (citation omitted and quotations omitted). |
| Maryland | *W. F. Gebhardt & Co. v. Am. Eur. Ins. Co.,* 250 Md. App. 652, 667 (2021) ("Merely because a term cannot be precisely defined so as to make clear its application in all varying factual situations does not mean that it is ambiguous.") (citation and internal quotation marks omitted). |

| Massachusetts | *Verveine Corp v. Strathmore Ins. Co.*, 489 Mass. 534, 539 n.9 (2022) ("Undefined terms may still be unambiguous, just as a term may remain ambiguous despite the insurer's attempt to define it."). |
|---|---|
| Michigan | *McGrath v. Allstate Ins. Co.,* 290 Mich. App. 434, 439 (2010) ("An insurance contract is not ambiguous merely because a term is not defined in the contract. Any terms not defined in the contract should be given their plain and ordinary meaning.") (citations omitted). |
| Minnesota | *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 480 N.W.2d 368, 375 (Minn. Ct. App. 1992) ("Because [a term] is not defined in the policy itself, the term must be given its ordinary, everyday meaning . . . . The existence of multiple dictionary definitions of the word [] does not prove the word is ambiguous.") (citations omitted). |
| Nevada | *Fourth St. Place v. Travelers Indem. Co.*, 127 Nev. 957, 969 (2011) ("although policy did not define 'workmanship,' . . . when the Policy at issue is read as a whole, the term 'workmanship' is not ambiguous."). |
| New Jersey | *Mac Prop. Grp. LLC & The Cake Boutique LLC v. Selective Fire & Cas. Ins. Co.,* 473 N.J. Super. 1, 17 (App. Div. 2022) ("an insurer could have included a definition [] in its policy, but the term was not ambiguous simply because a definition was missing, since any ordinary reasonable person understands its meaning"). (quotations omitted). |
| New York | *Consol. Rest. Operations, Inc. v. Westport Ins. Corp.*, 167 N.Y.S.3d 15, 20–21 (1st Dept. 2022) ("An ambiguity does not arise from an undefined term in a policy merely because the parties dispute the meaning of that term.") (citation, internal quotation marks and alterations omitted). |
| North Carolina | *N.C. Farm Bureau Mut. Ins. Co. v. Martin By & Through Martin*, 376 N.C. 280, 286 (2020) ("Where a policy defines a term, that definition is to be used. If no definition is given, nontechnical words are to be given their meaning in ordinary speech") (citation omitted). |
| Ohio | *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,* 73 Ohio St. 3d 107, 108 (1995) ("The mere absence of a definition in an insurance contract does not make the meaning of the term ambiguous . . . . A court must give undefined words used in an insurance contract their plain and ordinary meaning.") (citations omitted). |
| Pennsylvania | *Burton v. Republic Ins. Co.*, 845 A.2d 889, 894 (Pa. Super. Ct. 2004) ("we cannot conclude that an isolated phrase is ambiguous simply because Appellee failed to define it specifically in the policy"). |
| Texas | *Sw. Royalties Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016) ("When a statute contains a term that is undefined [] the term is typically given its ordinary meaning . . . . If an undefined term has multiple common meanings, it is not necessarily ambiguous.") (citations omitted). |

**Appendix Table 5**

**State Statutes Regarding Unfair Discrimination**

| State | Statute |
|---|---|
| Arizona | Ariz. Rev. Stat. Ann. § 20-448<br>"A person shall not make or permit any unfair discrimination between individuals of **the same class and equal expectation of life** in the rates charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable or in any other of the terms and conditions of the contract." (emphasis added). |
| California | Cal. Ins. Code § 790.03<br>"The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance . . . . Making or permitting any unfair discrimination between individuals of **the same class and equal expectation of life** in the rates charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the contract." (emphasis added).<br><br>Cal. Ins. Code § 10144<br>"No insurer issuing, providing, or administering any contract of individual or group insurance providing life, annuity, or disability benefits applied for and issued on or after January 1, 1984, shall refuse to insure, or refuse to continue to insure, or limit the amount, extent, or kind of coverage available to an individual, or charge a different rate for the same coverage solely because of a physical or mental impairment, except where the refusal, limitation or rate differential is based on sound actuarial principles or is related to actual and reasonably anticipated experience." |
| Delaware | Del. Code Ann. tit. 18 § 2304<br>"No person shall make or permit any unfair discrimination between individuals of **the same class and equal expectation of life** in the rates charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such contract." (emphasis added).<br><br>18 Del. Admin. Code § 1217-3.0<br>"The following are hereby identified as acts or practices in life and health insurance and annuities which constitute unfair discrimination between individuals of the same class: Refusing to insure, or refusing to continue to insure, or limiting the amount, extent or kind of coverage available to an individual, or **charging a different rate for the same coverage solely because of a physical or mental impairment, except where the refusal, limitation or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience.**" (emphasis added). |

| | |
|---|---|
| Florida | **Fla. Stat. § 626.9541**<br>"The following are defined as unfair methods of competition and unfair or deceptive acts or practices: . . . . Knowingly making or permitting unfair discrimination between individuals of **the same actuarially supportable class and equal expectation of life**, in the rates charged for a life insurance or annuity contract, in the dividends or other benefits payable thereon, or in any other term or condition of such contract." (emphasis added). |
| Georgia | **Ga. Code Title 33. Insurance § 33-6-4**<br>"The following acts or practices are deemed unfair methods of competition and unfair and deceptive acts or practices in the business of insurance: . . . Making or permitting any unfair discrimination between individuals of **the same class, same policy amount, and equal expectation of life** in the rates charged for any contract of life insurance or of life annuity, in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the contract." (emphasis added). |
| Illinois | **215 Ill. Comp. Stat. 5/236**<br>"No life company doing business in this State shall make or permit any distinction or discrimination in favor of individuals among insured persons of the **same class and equal expectation of life** in the issuance of its policies, in the amount of payment of premiums or rates charged for policies of insurance, in the amount of any dividends or other benefits payable thereon, or in any other of the terms and conditions of the contracts it makes." (emphasis added). |
| Kansas | **Kan. Stat. Ann. § 40-2404**<br>"Unfair discrimination [is] [m]aking or permitting any unfair discrimination between individuals of **the same class and equal expectation of life in t**he rates charged for any contract of life insurance or life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such contract." (emphasis added).<br><br>**Kan. Stat. Ann. § 40-2,109**<br>"No insurance company shall charge unfair discriminatory premiums, policy fees or rates for, or refuse to provide, any policy or contract of life insurance, life annuity or policy containing disability coverage for a **person solely because the applicant therefor has a mental or physical handicap unless the rate differential, or refusal to provide, is based on sound actuarial principles or is related to actual or reasonably anticipated experience**." (emphasis added). |
| Kentucky | **Ky. Rev. Stat. Ann. §304.12-080**<br>"No insurer shall make or permit any unfair discrimination between individuals of **the same class and equal expectation of life** in the rates charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such contract, except that in determining the class, consideration may be given to the nature of the risk, plan of insurance, the actual or expected expense of conducting the business or any other relevant factor." (emphasis added). |

| | |
|---|---|
| Maryland | **Md. Code. Ann. Ins. § 27-208**<br>"A person may not make or allow unfair discrimination between individuals of **the same class and equal expectation of life** in: (i) the rates charged for a contract of life insurance or an annuity contract; (ii) the dividends or other benefits payable on a contract of life insurance or an annuity contract; or (iii) any of the other terms or conditions of a contract of life insurance or an annuity contract." (emphasis added). |
| Massachusetts | **Mass. Gen. Laws ch. 176D § 3(7)**<br>"Unfair discrimination [is] making or **permitting any unfair discrimination between individuals of the same class and equal expectation of life** in the rates charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such contract." (emphasis added).<br><br>**Mass. Gen. Laws ch. 175 § 193T**<br>"No insurance company offering for sale policies of life, accident, health, disability, or sickness insurance, or any other policy of insurance, shall make any distinction or discrimination as to the issuance of such policy or the rates or premiums charged therefor **solely on the basis of the insured's blindness or partial blindness, intellectual disability or physical impairment, except where such distinction or discrimination is based on sound actuarial principles or is related to actual experience**." (emphasis added). |
| Michigan | **Mich. Comp. Laws Ann. § 500.2019**<br>"The following are defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance: Making or permitting any unfair discrimination between **individuals of the same class and equal expectation of life** in the rates charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such contract." (emphasis added).<br><br>**Mich. Comp. Laws Ann. § 500.2027**<br>"Charging a different rate for the same coverage based on sex, marital status, age, residence, location of risk, disability, or lawful occupation of the risk unless the **rate differential is based on sound actuarial principles, a reasonable classification system, and is related to the actual and credible loss statistics or reasonably anticipated experience in the case of new coverages**. This subdivision shall not apply if the rate has previously been approved by the commissioner." (emphasis added). |

| | |
|---|---|
| Minnesota | **Minn. Stat. § 72A.20**<br>"[No person shall] [m]ak[e] or permit[] any unfair discrimination between individuals **of the same class and equal expectation of life** in the rates charged for any contract of life insurance or of annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such contract or in making or permitting the rejection of an individual's application for life insurance coverage, as well as the determination of the rate class for such individual, on the basis of a disability, shall constitute an unfair method of competition and an unfair and deceptive act or practice, unless the claims experience and actuarial projections and other data establish significant and substantial differences in class rates because of the disability . . . . No life or health insurance company doing business in this state shall engage in any selection or underwriting process unless the insurance company establishes beforehand substantial data, actuarial projections, or claims experience which support the underwriting standards used by the insurance company. The data, projections, or claims experience used to support the selection or underwriting process is not limited to only that of the company. The experience, projections, or data of other companies or a rate service organization may be used as well." |
| Nevada | **Nev. Rev. Stat. § 686A.100**<br>"No person may make or permit any unfair discrimination between persons of **the same class and equal expectation of life** in the rates charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such contract." |
| New Jersey | **N.J. Rev. Stat. § 17B:30-12**<br>"No person shall make or permit any unfair discrimination between individuals of **the same class and equal expectation of life** in the rates charged for any policy of life insurance or contract of annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such policy of life insurance or contract of annuity."<br><br>**N.J. Admin. Code § 11:4-20.2**<br>"The following are hereby identified as acts or practices which constitute unfair discrimination between individuals of the same class: [] Refusing to insure, or refusing to continue to insure, or limiting the amount, extent or kind of coverage available to an individual, or charging an individual a different rate for the same coverage **solely because of blindness, partial blindness or other physical or mental impairments, except where the refusal, limitation or rate differential is based on sound, actuarial principles or is related to actual or reasonably anticipated experience**." (emphasis added). |

| | |
|---|---|
| New York | **N.Y. Ins. Law § 4224**<br>"No life insurance company doing business in this state and no savings and insurance bank shall: (1) make or permit any unfair discrimination between individuals **of the same class and of equal expectation of life**, in the amount or payment or return of premiums, or rates charged for policies of life insurance or annuity contracts, or in the dividends or other benefits payable thereon, or in any of the terms and conditions thereof; (2) refuse to insure, refuse to continue to insure or limit the amount, extent or kind of coverage available to an individual, or charge a different rate for the same coverage solely because of the physical or mental disability, impairment or disease, or prior history thereof, of the insured or potential insured, except where the refusal, limitation or rate differential is permitted by law or regulation and is based on sound actuarial principles or is related to actual or reasonably anticipated experience." (emphasis added). |
| North Carolina | **N.C. Gen. Stat. § 56-63-15**<br>"Unfair Discrimination [is] [m]aking or permitting any unfair discrimination between individuals of **the same class and equal expectation of life in the rates** charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such contract." (emphasis added). |
| Ohio | **Ohio Rev. Code Ann. 3901.21**<br>"The following are hereby defined as unfair and deceptive acts or practices in the business of insurance: . . . Except as provided in section 3901.213 of the Revised Code, making or permitting any unfair discrimination among individuals of **the same class and equal expectation of life** in the rates charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such contract." (emphasis added).<br><br>**Ohio Rev. Code Ann. 3901.213**<br>"Nothing in [] section 3901.21 [] of the Revised Code shall be construed as prohibiting any of the following practices: . . . In the case of any contract of life insurance or life annuity, paying bonuses to policyholders or otherwise abating their premiums in whole or in part out of surplus accumulated from nonparticipating insurance, provided that any such bonuses or abatement of premiums shall be fair and equitable to policyholders and in the best interests of the company and its policyholders." |
| Pennsylvania | **40 Pa. Stat. § 1171.5**<br>"'Unfair methods of competition' and 'unfair or deceptive acts or practices' in the business of insurance means . . . making or permitting any unfair discrimination between individuals of **the same class and equal expectation of life** in the rates charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such contract." (emphasis omitted and emphasis added in second instance). |

| | |
|---|---|
| Texas | **Tex. Ins. Code. Ann. § 541.057**<br>"[I]t is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to make or permit with respect to a life insurance or life annuity contract an unfair discrimination between individuals of **the same class and equal life expectancy**." (emphasis added).<br><br>**Tex. Ins. Code. Ann. § 544.053**<br>"A person does not violate Section 544.052 [defining unfair discrimination] if the refusal to insure or to continue to insure, the limiting of the amount, extent, or kind of coverage, or the charging of an individual a rate that is different from the rate charged another individual for the same coverage is **based on sound actuarial principles**." (emphasis added).<br><br>**Tex. Admin. Code § 21.702**<br>"The following are hereby identified as acts or practices in life and health insurance which constitute unfair discrimination between individuals of the same class: [] refusing to insure, or refusing to continue to insure, or limiting the amount, extent, or kind of coverage available to an individual, or charging a different rate for the same coverage **solely because of a physical or mental impairment, except where the refusal, limitation, or rate differential is based on sound actuarial principles, including actual or reasonably anticipated experience**." (emphasis added). |

**Appendix Table 6**

| State | Case |
|---|---|
| **Proof of negligence fails to establish a breach of the implied covenant of good faith and fair dealing.** ***See*** **Section III.A.** | |
| Arizona | Arizona courts appear not to have addressed whether negligent conduct is sufficient to prove a contractual breach of the implied covenant of good faith and fair dealing.  There is, however, no reason to expect Arizona law would differ from that of other states. |
| California | *Nat'l Life & Accident Ins. Co. v. Edwards*, 119 Cal. App. 3d 326, 339 (Ct. App. 1981) (dismissing implied covenant claim on summary judgment due to lack of evidence of "more than negligent conduct on the part of the insurer."). |
| Delaware | *Superior Vision Services, Inc. v. ReliaStar Life Ins. Co.*, CIV.A. 1668-N, 2006 WL 2521426, at *5–6 (Del. Ch. Aug. 25, 2006) (The implied covenant "is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain.") (citations and quotations omitted). |
| Florida | *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1318-19 (M.D. Fla. 2000) ("To allege a breach of the implied covenant, the party must demonstrate a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.") (citing *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999)). |
| Kansas | Kansas courts appear not to have addressed whether negligent conduct is sufficient to prove a contractual breach of the implied covenant of good faith and fair dealing.  There is, however, no reason to expect Kansas law would differ from that of other states. |
| Kentucky | *PBI Bank, Inc. v. Signature Point Condominiums LLC*, 535 S.W.3d 700, 718 (Ky. Ct. App. 2016) ("the party asserting the violation must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.") (internal citations and quotations omitted). |
| Massachusetts | *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 238, 238 (1st Cir. 2013) (applying Massachusetts law) ("In order to prevail, the plaintiff must present [ ] evidence of bad faith or an absence of good faith. Lack of good faith carries an implication of a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will.") (citations and quotations omitted). |

| | |
|---|---|
| Minnesota | *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998) (granting summary judgment to defendants, because plaintiffs had only shown defendants made a mistake, whereas the requisite "'bad faith' is defined as a party's refusal to fulfill some duty or contractual obligation based on an ulterior motive, not an honest mistake regarding one's rights or duties") (citation omitted). |
| Nevada | *Hilton Hotels Corp. v. Butch Lewis Productions, Inc.*, 107 Nev. 226, 232, 808 (1991) ("Where the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing."). |
| New Jersey | *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251 (2001) ("[W]e state the test for determining whether the implied covenant of good faith and fair dealing has been breached as follows: a party exercising its right to use discretion in setting price under a contract breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract."). |
| New York | *Security Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817–18 (2d Cir. 2014) (stating that in order to show a breach of the implied covenant, a "plaintiff must show substantially more than evidence that the defendant's actions were negligent or inept.") (citing, *inter alia*, *Behren v. Warren Gorham & Lamont, Inc.*, 808 N.Y.S.2d 157, 158 (1st Dep't 2005)). |
| North Carolina | *Russell v. BSN Med., Inc.*, 721 F. Supp. 2d 465, 480 (W.D.N.C. 2010) (granting defendant summary judgment on implied covenant claim, after finding plaintiff's failure to cite evidence of defendant's motives prevented her from raising a triable issue of fact). |

**Appendix Table 7**

| State | Case |
|---|---|
| **The law is clear that the covenant of good faith and fair dealing does not give rise to new, affirmative duties on contracting parties**.  *See* **Section III.B.1.** | |
| Arizona | *Health Indus. Bus. Communications Council Inc. v. Animal Health Inst.*, 481 F. Supp. 3d 941, 960 (D. Ariz. 2020) ("[T]he implied covenant of good faith and fair dealing ensures that parties do not frustrate already-existing contract terms; it does not create new ones.") (citation and quotations omitted). |
| California | *Abbit v. ING USA Annuity & Life Ins. Co.*, 252 F. Supp. 3d 999, 1010 (S.D. Cal. 2017), *aff'd*, 774 Fed. Appx. 351 (9th Cir. 2019) ("The implied covenant of good faith and fair dealing 'cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.'") (quoting *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349-50 (2000)). |
| Delaware | *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004) ("[T]he court cannot read the contracts as also including an implied covenant to grant the plaintiff additional unspecified rights in the event that other transactions are undertaken. To do so would be to grant the plaintiffs, by judicial fiat, contractual protections that they failed to secure for themselves at the bargaining table.") (citations omitted). |
| Florida | *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 548 (Fla. 2012) ("A duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements.") (citation and quotations omitted). |
| Kansas | *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1359 (D. Kan. 1996), *aff'd,* 145 F.3d 1347 (10th Cir. 1998) ("[I]n order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, plaintiffs must (1) plead a cause of action for breach of contract, not a separate cause of action for breach of duty of good faith, and (2) point to a term in the contract which the defendant[ ] allegedly violated by failing to abide by the good faith spirit of that term.") (citation and quotations omitted). |
| Kentucky | *Hunt Enterprises, Inc. v. John Deere Indus. Equip. Co.*, 18 F. Supp. 2d 697, 700 (W.D. Ky. 1997), aff'd, 162 F.3d 1161 (6th Cir. 1998) ("Although it is recognized that implied in each contract is a covenant of 'good faith and fair dealing,' such a covenant does not preclude a party from enforcing the terms of the contract.... It is not 'inequitable' or a breach of good faith and fair dealing in a commercial setting for one party to act according to the express terms of a contract for which it bargained.") (quotation omitted). |
| Massachusetts | *Chokel v. Genzyme Corp.*, 449 Mass. 272, 276 (2007) ("The covenant does not supply terms that the parties were free to negotiate, but did not, nor does it create rights and duties not otherwise provided for in the contract.") (internal citations and quotations omitted). |

| Minnesota | *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 503 (Minn. 1995) ("In Minnesota, the implied covenant of good faith and fair dealing does not extend to actions beyond the scope of the underlying contract."). |
|---|---|
| Nevada | *Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1252 (D. Nev. 2016), *amended in part,* 3:13-CV-0445-LRH-VPC, 2016 WL 11722898 (D. Nev. Nov. 1, 2016) ("[A] breach of the implied covenants of good faith and fair dealing is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract.") (citation and quotations omitted). |
| New Jersey | *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Associates*, 182 N.J. 210, 231 (2005) ("[T]he covenant is to be interpreted narrowly, lest it 'become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by legally binding agreements."). |
| New York | *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 248 (2d Cir. 2020) ("[U]nder New York law, the covenant of good faith and fair dealing does not give rise to new, affirmative duties on contracting parties.") (citing, *inter alia*, *Vanlex Stores, Inc. v. BFP 300 Madison II LLC*, 887 N.Y.S.2d 576, 581 (1st Dep't 2009)). |
| North Carolina | *Great Am. Emu Co., LLC v. E.J. McKernan Co.*, 509 F. Supp. 3d 528, 544 (E.D.N.C. 2020) ("An implied duty of good faith in a contract is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise.") (citation and quotations omitted). |

**Appendix Table 8**

| State | Case |
|---|---|
| For Policies that choose the law of California, Illinois, Kansas, Minnesota, New Jersey, and Nevada, those states' laws will also apply to any tort claims "arising from or related to" the agreement, including the Investor Plaintiffs' conversion claims. *See* Section V.A. | |
| California | *Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 470 (1992) (applying contractual choice of law provision to any tort claims "arising from or related to" the agreement). |
| Illinois | *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 862 (N.D. Ill. 2002) ("[T]ort claims that are dependent upon the contract are subject to a contract's choice-of-law clause regardless of the breadth of the clause.") (*citing Precision Screen Machs. Inc. v. Elexon, Inc.*, 1996 WL 495564, at *3 (N.D. Ill. Aug.28, 1996)). |
| Kansas | *Enter. Bank & Tr. v. Barney Ashner Homes, Inc.*, 300 P.3d 115 (Kan. Ct. App. 2013) (applying choice of law to tort claims, noting that "courts have held that narrow choice-of-law clauses establishing the law 'governing' or 'construing' the documents in which they appear, nonetheless, encompass tort claims directly related to or affecting the rights and obligations created or memorialized there.") (citation omitted). |
| Minnesota | *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1392 (8th Cir. 1997) (holding under Minnesota law that a "governed by" choice of law clause applied to tort claims "closely related to the interpretation of the contracts") |
| New Jersey | *Portillo v. Nat'l Freight, Inc.*, 323 F. Supp. 3d 646, 657 (D.N.J. 2018) (gathering cases and concluding that, only where non-contractual claims "do not directly arise out of" the agreement, do they fall outside of a choice of law clause stating that a contract is "governed by" state law). |
| Nevada | *Tuxedo Int'l Inc. v. Rosenberg*, 127 Nev. 11, 25 (2011) (adopting a hybrid test for application of choice of law clauses to tort claims under which "contract-related tort claims [that] involve the same operative facts as a parallel breach of contract claim" are governed by choice of law clause). |

**Appendix Table 9**

| State | Case |
|---|---|
| **For Policies that choose the law of Arizona, Florida, Georgia, Kentucky, Maryland, Michigan, Pennsylvania, and Texas, the choice of law clause does not apply to tort claims related to the agreement.** *See* **Section V.A.** | |
| Arizona | *Winsor v. Glasswerks PHX, L.L.C.*, 204 Ariz. 303, 306 (Ct. App. 2003) ("Claims arising in tort are not ordinarily controlled by a contractual choice of law provision. Rather, they are decided according to the law of the forum state.") (quotation omitted). |
| Florida | *Burger King Corp. v. Austin*, 805 F. Supp. 1007, 1012 (S.D. Fla. 1992) (choice of law provision stating that the contract "shall be governed and construed under" Florida law did not apply to tort claims arising out of the contract) (quotation omitted). |
| Georgia | *Baxter v. Fairfield Fin. Servs., Inc.*, 307 Ga. App. 286, 292 (2010) (choice of law clause stating contract was "governed by" state law does not apply to tort claims arising in connection with agreement). |
| Kentucky | *United Propane Gas, Inc. v. NGL Energy Partners, LP*, 2020 WL 7295180, at *4 (Ky. Ct. App. Dec. 11, 2020) (holding that Kentucky's significant contacts test rather than contractual choice of law provision governed tort claims arising out of contract). |
| Maryland | *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 619 (2007) (holding that contractual choice-of-law claim in an insurance contract does not apply to tort claims that do not concern the "validity of a contractual term" or "decide questions of coverage"). |
| Michigan | *Live Cryo, LLC v. CryoUSA Imp. & Sales, LLC*, No. 17-CV-11888, 2017 WL 4098853, at *4 (E.D. Mich. Sept. 15, 2017) (holding under Michigan law that a choice-of-law provision stating the contract was "governed by" Texas law was "a narrowly defined choice-of-law provision" that "does not apply to tort claims"). |
| Pennsylvania | *Panthera Rail Car LLC v. Kasgro Rail Corp.*, 985 F. Supp. 2d 677, 695 (W.D. Pa. 2013) (holding under Pennsylvania choice of law analysis that "tort claims are outside the scope of the choice-of-law clause" stating that contract would be "governed by" state law). |
| Texas | *Red Roof Inns, Inc. v. Murat Holdings, L.L.C.*, 223 S.W.3d 676, 684 (Tex. App. 2007) ("A choice of law provision in a contract that applies only to the interpretation and enforcement of the contract does not govern tort claims."). |

**Appendix Table 10**

| State | Case |
|---|---|
| **In both Delaware and Massachusetts [and NY, KS, MN, NJ, and NV], a plaintiff cannot bring a claim for conversion along with a contract claim unless the plaintiff can show that "the defendant violated an independent legal duty, apart from the duty imposed by contract."  *See* Section V.A and V.C.** | |
| Delaware | *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009) ("[T]o assert a tort claim along with a contract claim, the plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract."). |
| Massachusetts | *Rac Associates v. R.E. Moulton, Inc*, 2011 WL 3533221 (Mass. Super. Feb. 01, 2011) (for a claim that "arises out of the failure to pay sums due on a contract for services[,]" holding that "while an action for contract does lie in the circumstances of this case, an action for conversion does not"). |
| New York | *Jeffers v. Am. Univ. of Antigua*, 3 N.Y.S.3d 335 (1st Dep't 2015) ("A cause of action for conversion cannot be predicated on a mere breach of contract") (citations and quotations omitted). |