**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

VICOF II TRUST; VIDA LONGEVITY
FUND, LP; WELLS FARGO BANK,
NATIONAL ASSOCIATION, as securities
intermediary for VICOF II TRUST and VIDA
LONGEVITY FUND, LP; and PF
PARTICIPATION FUNDING TRUST,

           Plaintiffs,

         v.

JOHN HANCOCK LIFE INSURANCE
COMPANY OF NEW YORK,

           Defendant.

Index No. 19-cv-11093 (AKH)

---

VICOF II TRUST; VIDA LONGEVITY
FUND, LP; LIFE ASSETS TRUST II S.A.
DELAWARE TRUST; VIDAQUANT
SUBFUND DELAWARE TRUST; VIDA
INSURANCE FUND II SERIES INTERESTS
OF THE SALI MULTI-SERIES FUND, LP;
WELLS FARGO BANK, NATIONAL
ASSOCIATION, as securities intermediary for
VICOF II TRUST, VIDA LONGEVITY
FUND, LP, LIFE ASSETS TRUST II S.A.
DELAWARE TRUST, VIDAQUANT
SUBFUND DELAWARE TRUST, and VIDA
INSURANCE FUND II SERIES INTERESTS
OF THE SALI MULTI-SERIES FUND, LP;
DLP MASTER TRUST; DLP MASTER
TRUST II; GWG DLP MASTER TRUST
LIFE FUNDING TRUST; PF
PARTICIPATION FUNDING TRUST; and
PALM BEACH SETTLEMENT COMPANY,

           Plaintiffs,

         v.

JOHN HANCOCK LIFE INSURANCE
COMPANY (U.S.A.),

Defendant.

EFG BANK AG, CAYMAN BRANCH; and
WELLS FARGO BANK, NATIONAL
ASSOCIATION, as securities intermediary for
EFG BANK AG, CAYMAN BRANCH,

        Plaintiffs,

    v.

JOHN HANCOCK LIFE INSURANCE
COMPANY (U.S.A.),

        Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION *IN LIMINE* NO. 1: REGARDING THE ADMISSIBILITY OF EVIDENCE CONCERNING JOHN HANCOCK'S CREATION AND USE OF FAKE "MODIFIED ORIGINAL PRICING ASSUMPTIONS"**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 3

      A.    John Hancock Priced Performance UL ███████████████████
            ████████ ........................................................................................... 3

      B.    Manulife Initiated a Plan to ████████████████████ ..................... 5

      C.    ██████████████████████████████ ............... 5

      D.    John Hancock Created Fake Assumptions ████████████████
            ████████ ........................................................................................... 6

      E.    John Hancock Raised COI Rates on Plaintiffs' Policies by as Much as
            75% ..................................................................................................... 8

III.  LEGAL STANDARDS ....................................................................................... 8

IV.   ARGUMENT ................................................................................................... 9

      A.    Evidence Concerning John Hancock's Creation of the Fake "Modified
            Original Pricing Assumptions" Is Relevant ...................................... 9

            1.    The "Modified Original Pricing Assumptions" Are Relevant to
                  Plaintiffs' Implied Covenant Claims and Punitive Damages ................... 9

            2.    The Modified Original Pricing Assumptions Are Relevant to
                  Whether John Hancock Breached Plaintiffs' Policies ............ 12

      B.    The Evidence of John Hancock's Interactions with NYDFS Are Not
            Hearsay or Subject to Exclusion Under Federal Rule of Evidence 403 ............ 14

V.    CONCLUSION ................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AXA Equitable Life Ins. Co. COI Litig.*,
  595 F. Supp. 3d 196 (S.D.N.Y. 2022), on reconsideration in part, No. 16-CV-
  740 (JMF), 2022 WL 3018104 (S.D.N.Y. July 29, 2022) .................................................11, 15

*Carma Devs. (Cal.), Inc. v. Marathon Dev. California, Inc.*,
  2 Cal. 4th 342 (1992) ...................................................................................................................9

*Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n,
  Inc.*, No. 10-CV-02349-WJM-KMT, 2014
  WL 1583993 (D. Colo. Apr. 21, 2014)........................................................................................16

*Egan v. Mut. of Omaha Ins. Co.*,
  24 Cal. 3d 809 (1979) ...................................................................................................................9

*Iorio v. Allianz Life Ins. Co. of N. Am.*,
  No. 05CV633 JLS (CAB), 2010 WL 11508761 (S.D. Cal. Jan. 27, 2010) ..............................15

*In re MetLife Demutualization Litig.*,
  262 F.R.D. 217 (E.D.N.Y. 2009) ..........................................................................................11, 15

*Nat'l Ass'n. for Advancement of Colored People v. A.A. Arms, Inc.*,
  No. 99 CV 3999(JBW), 2003 WL 2003788 (E.D.N.Y. Apr. 7, 2003) ......................................9

*Rivera v. City of New York*,
  40 A.D.3d 334 (1st Dep't 2007) ................................................................................................10

*Sec. & Exch. Comm'n v. Westport Cap. Markets LLC.*,
  No. 3:17-CV-02064 (JAM), 2020 WL 948434 (D. Conn. Feb. 27, 2020) ............................8-9

*U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*,
  112 F. Supp. 3d 122 (S.D.N.Y. 2015)...................................................................................15-16

**Other Authorities**

CACI No. 3940 ...............................................................................................................................10

CACI No. 3945 ...............................................................................................................................10

Fed. R. Evid. 401 ..............................................................................................................................9

Fed. R. Evid. 403 ..................................................................................................................3, 14, 15

Fed. R. Evid. 801 ...................................................................................................14

Fed. R. Evid. 803 ...................................................................................................15

Plaintiffs VICOF II Trust, Vida Longevity Fund, LP, Life Assets Trust II S.A. Delaware Trust, Vidaquant Sub-Fund Delaware Trust, and Vida Insurance Fund II Series Interests of the SALI Multi-Series Fund, LP (collectively, the "Vida Funds"); EFG Bank AG, Cayman Branch ("EFG"); Wells Fargo Bank, National Association ("Wells Fargo"), as securities intermediary for the Vida Funds and EFG (in such capacity, "Wells Fargo SI"); DLP Master Trust, DLP Master Trust II, GWG DLP Master Trust, Life Funding Trust, PF Participation Funding Trust, and Palm Beach Settlement Company (collectively, "EAA Plaintiffs," and together with Vida Funds, EFG, and Wells Fargo SI, "Plaintiffs") move the Court to enter an order *in limine* that evidence relating to the "modified original pricing assumptions," including communications from and with NYDFS, is admissible.

## I.    **INTRODUCTION**

Plaintiffs filed this action to hold Defendants John Hancock Life Insurance Company (U.S.A.) ("JHUSA") and John Hancock Life Insurance Company of New York ("JHNY," and together with JHUSA, "John Hancock" or "Defendants") accountable for the unjustified cost of insurance ("COI") rate increases (the "COI Rate Increases") it began imposing in 2018 on certain of Plaintiffs' Performance UL policies ("Policies").  Plaintiffs claim John Hancock breached the Policies in several ways, including because the COI Rate Increases were not based on John Hancock's "expectations of future mortality, persistency [and other enumerated factors]."  *See, e.g.,* Dkt. No. 179-4 at 12.  Plaintiffs also claim John Hancock breached the implied covenant of good faith and fair dealing, including a claim in tort under California law, and John Hancock converted Plaintiff's property through its unauthorized COI deductions.  Plaintiffs seek punitive damages for the California bad faith claim and conversion claims.  Among other things, Plaintiffs contend John Hancock breached Plaintiffs' Policies and engaged in bad faith by not basing COI

rates on its expectations of the future but on fake assumptions.  Plaintiffs seek an Order *in limine* regarding the admissibility of evidence concerning the creation and use of these fake assumptions, including John Hancock's communications with the New York Department of Financial Services ("NYDFS").

Throughout this litigation, John Hancock has defended its use of these fake assumptions, which it euphemistically refers to as "modified original pricing assumptions," as an exercise in discretion to reduce the impact of the COI Rate Increases on policyholders.  Nothing could be further from the truth.  The evidence will show ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████  LeQuang Decl. Ex. 1; *Id.* Ex. 2 at -254.  The evidence will further show that the "modified original pricing assumptions" were not based on John Hancock's experience or expectations and that John Hancock █████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████.  Such evidence is directly relevant to Plaintiffs' breach claims, as well as whether John Hancock acted with malice, oppression, and fraud, justifying an award of punitive damages.  There is no basis to exclude such highly relevant evidence simply because it involves NYDFS.  The evidence is not hearsay because Plaintiffs are not offering NYDFS's findings for the truth of the matters asserted, but rather to show John Hancock's state of mind and explain how and why John Hancock created the "modified original pricing assumptions."  The evidence also should not be excluded under Federal Rule of Evidence

403 because its probative value substantially outweighs any dangers of unfair prejudice or any of the other Rule 403 factors.  Any concern the Court may have about the potential of unfair prejudice can be appropriately addressed through a limiting instruction.

## II.    **BACKGROUND**

### A.    **John Hancock Priced Performance UL** ███████████████████████████
███████████

Plaintiffs own 108 Performance UL policies that John Hancock sold between 2004 and 2009 and are the subject of John Hancock's cost of insurance rate increases.  Dkt. No. 179 ¶¶ 24-26.

In 2003, John Hancock found ████████████████████████████████████████████ ███████████████████████████████████████████.  LeQuang Decl. Ex. 3 at -398.  In response, it created a new product—Performance UL Core—████████████████████████████ ███████████████████████████████."  *Id.*  Thereafter, John Hancock developed new versions of Performance UL that addressed ██████████████████████████.  When pricing Performance UL 06, John Hancock's Vice President of Product Management argued John Hancock ████████████████████████████████████████████."[1]  *Id.* Ex. 4 at -008. And when pricing Performance UL 2007, John Hancock adopted █████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████[.]"  *Id.* Ex. 5 at -826.

But the only way John Hancock could offer ████████████████████████████████ was by using aggressive mortality and lapse assumptions that were more favorable than John Hancock's actual expectations.  For example, in setting its mortality assumptions, John Hancock

---

[1] A "premium solve" is a projection provided to a potential policyholder that shows her how much premiums she may expect to pay over the life of the policy.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████, *id.* Ex. 6 at -140, █████████████

████████████████████████████████████. As another example,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ ████ ████████████████████

████████████████████. *See, e.g., id.* Ex. 7 at -587-588; *id.* Ex. 8 at -813.   Additional

examples abound.

John Hancock also ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. *See, e.g., id.* Ex. 9 at -487

████████████████████████████████████████████████████████

████████████████████████████████████████████). ████

████████████████████████████████████████████████████████

████████████. *See, e.g., id.*  As one actuary stated in 2005, ████████████

████████████████████████." *Id.* Ex. 10 at -247.  Significantly, John Hancock

designed Performance UL 2007 to hit these mortality losses in or around duration 11, or in 2018,

the same year John Hancock raised COI rates. *Id.* Ex. 11 ¶ 106.

John Hancock profited hugely from these new products. █████████████████████

████████████████████████████████████████████████████████

---

[2] John Hancock Financial Services, Inc. merged with Manulife Financial Corporation on April 28, 2004.

████████████████████████████ *See, e.g.*, *id.* Ex. 12 at -551.  John Hancock was the

████████████████████████████ with the Performance UL series being ████████████

████████████████████████." *See, e.g.*, *id.*; *id.* Ex. 13 at -115.  According to its financial

statements, John Hancock's U.S. insurance division made over $11 billion in premiums and

deposits in 2005 and 2006 alone.  *See, e.g. id.* Ex. 14 at 7.

      **B.**      **Manulife Initiated a Plan to** ████████████████████████

But in the years following the Great Recession, John Hancock's corporate parent,

Manulife, ████████████████████████████████████████████.

LeQuang Decl. Ex. 15.  In September 2016, it began looking for ways to ████████████

████████████████." *Id.*  It ████████████████

████████████████████████████████████████████████

████████████████████████.  *Id.* Ex. 16 at -051, -058.  The goal was to ████████████

████████████████████████████████████████████████

████████████████████████████." *Id.* Ex. 17 at -617.

Three months later, John Hancock declared it would ████████████████████

████████████████████████████████████████████████

████████████████████." *Id.* Ex. 18 at -048.

      **C.**      ████████████████████████████████

Initially, John Hancock proposed ████████████████████████████

████████████████████████████████████████████████.

LeQuang Decl. Ex. 19 at -801, -808.  Although NYDFS was not required to approve John

Hancock's proposed rate increases, ████████████████████████████

████████████████████████████████." *See* LeQuang Decl. Ex. 19.

Because NYDFS's approval was not required, it is evident ████████████████████

███████████████████████████████████████████. *See, e.g.,*
*id.* Ex. 20 at -502 (████████████████████████████). But John Hancock's plan
backfired.  After receiving the submission, ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████." *Id.* Ex. 21 (emphasis added).

████████████████████████████████



*Id.* Ex. 2 at -254 (emphasis added).  In response, ████████████████████████

███████████████████████████████████. *See, e.g.*, *id.* Ex. 22 at -
517-520. ████████████████████████████████████████████

████████████████████████████████

*Id.* Ex. 1 (emphasis added).

    **D.**    **John Hancock Created Fake Assumptions** ████████████████████████
████████████

Rather than accept responsibility for its pricing choices, John Hancock came up with a

workaround to ███████████.   That workaround involved ████████████

████████████████████████████████████████████████

██████████████████████████████████████████████.

*See, e.g.*, LeQuang Decl. Ex. 1; *id.* Ex. 23 at 195:5-196:16.   While John Hancock calls these

assumptions "modified original pricing assumptions," they had nothing to do with the original

pricing of the Performance UL policies.   *See, e.g.*, *id.* Ex. 23 at 195:5-196:16.   As John Hancock

explained in its motion for summary judgment, "NYDFS raised questions about certain mortality

and lapse and surrender rate assumptions used in original pricing," and "*[i]n response to the

regulator's position*, John Hancock, *for purposes of the Redetermination methodology* [i.e., the

COI Rate Increases], adopted a set of modifications to the original pricing mortality and lapse and

surrender rate assumptions."   Dkt. No. 191 at 9 (emphasis added).

John Hancock created these fake assumptions through an arbitrary process:   ████████

████████████████████████████████████████████████

*See, e.g.*, *id.* Ex. 24 at -411; *id.* Ex. 25 at -408.

But replacing its actual assumptions with fake assumptions did not cure   ████████

████████████████████████████████.   So, John Hancock went around him and

sought a non-disapproval letter from someone else—James Regalbuto.   Unlike Mr. Carmello, Mr.

Regalbuto was not an actuary but a political appointee with no actuarial background.   *See, e.g.*,

*See, e.g.*, *id.* Ex. 26; *id.* Ex. 27 at -090 (████████████████████████████

████████████████████████████████); *id.* Ex. 28; *id.* Ex. 29 ¶¶ 16, 26;

*id.* Ex. 30 at -421 (describing plans to threaten to ████████████████████

if NYDFS did not buy in to its proposed rate increases).   Shortly thereafter, Mr. Regalbuto gave

John Hancock the non-disapproval it sought, noting, however, that he was relying "upon

representations made by John Hancock related thereto . . . ." *Id.* Ex. 31.

### E. John Hancock Raised COI Rates on Plaintiffs' Policies by as Much as 75%

John Hancock finalized the COI Rate Increases on or about April 23, 2018, shortly after receiving Mr. Regalbuto's "non-disapproval" letter. *See, e.g.*, LeQuang Decl. Ex. 20. John Hancock calculated the COI Rate Increases using the fake "modified original pricing assumptions." *See, e.g.*, *id.* John Hancock ███████████████████████████████████ ██████████████████████████████. *Id.* at -512.

In May 2018, John Hancock sent letters to Plaintiffs notifying them about the rate increases. *See, e.g.*, Dkt. No. 179-7. The letters stated: "We are writing to let you know that we have completed a review of John Hancock Performance Universal (UL) Life Insurance policies. As a result of this review, our expectation of future experience has changed, and therefore the Cost of Insurance rates on your Performance UL policy will be increasing[.]" *See, e.g.*, *id.*

The letters did not say what expectations had changed or how much Plaintiffs' rates would be increasing. *See, e.g.*, *id.* Plaintiffs' counsel sent letters to John Hancock requesting this information. *See, e.g.*, *id.* Ex. 32. John Hancock ignored them. Plaintiffs' counsel then made public records requests for this information from state regulators, including NYDFS. *See, e.g.*, *id.* Ex. 33. John Hancock intervened and objected, claiming the information was confidential and trade secret. *See, e.g.*, *id.* Ex. 34. As a result of John Hancock's intervention, ███████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████. *See, e.g.*, *id.* Ex. 34; *id.* Ex. 35.

## III. LEGAL STANDARDS

"The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *Sec. & Exch. Comm'n v. Westport*

*Cap. Markets LLC.*, No. 3:17-CV-02064 (JAM), 2020 WL 948434, at *2 (D. Conn. Feb. 27, 2020) (citations omitted).  "Evidence is relevant if (a) it has any tendency to make a fact more or less probably than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.

If evidence is relevant for one purpose, but irrelevant for another, the court may issue a limiting instruction that instructs the jury that the evidence in question may only be considered for some issues and not for others.  *See, e.g.*, *Nat'l Ass'n. for Advancement of Colored People v. A.A. Arms, Inc.*, No. 99 CV 3999(JBW), 2003 WL 2003788, at *1 (E.D.N.Y. Apr. 7, 2003).

## IV.   ARGUMENT

### A.   Evidence Concerning John Hancock's Creation of the Fake "Modified Original Pricing Assumptions" Is Relevant

#### 1.   The "Modified Original Pricing Assumptions" Are Relevant to Plaintiffs' Implied Covenant Claims and Punitive Damages

It is undisputed that John Hancock created the fake "modified original pricing assumptions" ███████████████████████████████████████████████████████████████. *See, e.g.*, Dkt. No. 191 at 9.  This evidence is admissible because it is relevant to Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing, bad faith under California law, and punitive damages.

"A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable."  *See, e.g.*, *Carma Devs. (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 372 (1992).  Furthermore, under California law, the implied covenant of good faith and fair dealing requires an insurance company to "take the public's interest seriously, where necessary placing it before [its] interest in maximizing gains."  *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 820 (1979).  To assess punitive damages, the jury must determine whether John Hancock acted with "malice, oppression, or fraud," California Civil Jury Instructions

("CACI") No. 3945, or if John Hancock's actions were "wanton and reckless or malicious," *Rivera v. City of New York*, 40 A.D.3d 334, 344 (1st Dep't 2007).   "Malice" and "oppression" mean conduct that was "despicable" or "done with a willful and knowing disregard" of another's rights. "Fraud" means intentionally misrepresenting or concealing facts.   "Wanton and reckless" means "conscious indifference" or "utter disregard" of another's rights.   CACI No. 3940 (defining malice, oppression, and fraud); N.Y. Pattern Jury Instr.--Civil ("N.Y. PJI") 2:278 (defining wanton and reckless and malicious).

The facts concerning John Hancock's development of the "modified original pricing assumptions" is relevant to whether John Hancock acted with malice, oppression, or fraud, or with a wanton and reckless disregard of Plaintiffs' and other policyholders' rights.   The evidence shows ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████   LeQuang Decl. Ex. 1; *Id.* Ex. 2 at -254.   John Hancock nonetheless proceeded to raise COI rates using fake "modified original pricing assumptions."   A jury is entitled to know these facts and from them could reasonably find John Hancock acted without a good faith belief in the validity of its actions and that its fabrication of "modified original pricing assumptions" ████████████████████████ evidences a lack of good faith, as well as malice, oppression, fraud, and a wanton and reckless disregard of Plaintiffs' rights.   John Hancock would never have sold all the policies it sold and made the hundreds of millions it made in premiums over the past two decades had it used the "modified original pricing assumptions."   But rather than accepting responsibility for its choices, John Hancock created fake "modified original pricing assumptions" simply ██████████████████████████████████████

███████████████████████████████████████████████████████

████. LeQuang Decl. Ex. 19 at -801; *Id.* Ex. 20 at -512.

This evidence is especially relevant when John Hancock's defense throughout this litigation has been that it genuinely believed the COI Rate Increases were justified, including because NYDFS ultimately issued the "non-disapproval" letter John Hancock coveted. *See, e.g.*, Dkt. No. 191 at 43; Dkt. No. 192 ¶ 47 ("John Hancock engaged with NYDFS over a period of five months during which John Hancock shared information supporting a contemplated COI redetermination."); ¶ 48 ("NYDFS stated, 'Based upon a complete review of the submission and in reliance upon representations made by John Hancock related thereto, the Department is satisfied that the proposed changes do not violate any New York State statutes or regulations.'"); ¶ 49 ("John Hancock's actuaries involved in the Redetermination ***acted in good faith***") (emphasis added). The evidence also will show that John Hancock misrepresented to its policyholders that it needed to raise COI rates because its "expectation of future experience has changed." *See, e.g.*, Dkt. No. 179-7. The jury is entitled to know John Hancock made that statement with knowledge of ████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* Ex. 1 (emphasis added). And when policyholders like Plaintiffs challenged John Hancock's story, John Hancock took affirmative steps to conceal that story, ████████████████████████████████████

████████████████████████████████████. *See, e.g.*, LeQuang Decl. Ex. 35.

This highly relevant evidence is not rendered inadmissible merely because it involves NYDFS. *See, e.g.*, *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 254 (S.D.N.Y. 2022) (admitting NYDFS's "no-objection" letter as evidence of "good faith"); *In re MetLife Demutualization Litig.*, 262 F.R.D. 217, 237 (E.D.N.Y. 2009) (admitting NYDFS's letter

of compliance as evidence of, *inter alia*, "scienter").   While John Hancock seeks to exclude

evidence that other insurers have sought to admit, insurance companies should not be allowed to

introduce evidence of their actions with regulators when it is good for them and exclude it when it

is bad for them.  John Hancock has put these matters at issue throughout this case, including most

recently in its motion for summary judgment and exhibit list.  Indeed, John Hancock relied on the

non-disapproval letter in its motion for summary judgment, and the ***second*** exhibit on John

Hancock's exhibit list is the non-disapproval letter from NYDFS.  Dkt. No. 191 at 10-11; LeQuang

Decl. Ex. 36 (showing the non-disapproval letter as Ex. B, JH_LEONARD_000001589).

The facts concerning John Hancock's development of the "modified original pricing

assumptions" also is relevant to Plaintiffs' claim that the COI Rate Increases were objectively

unreasonable.  A jury could find it is objectively unreasonable for John Hancock to create fake

original pricing assumptions ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████. Furthermore, ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████  A jury could easily find it was objectively unreasonable to create

fake pricing assumptions ███████████████████████████ using fake assumptions in no way

changes the fact John Hancock had already ███████████████████████████████████

███████████

### 2.   The Modified Original Pricing Assumptions Are Relevant to Whether John Hancock Breached Plaintiffs' Policies

John Hancock's fabrication of the "modified original pricing assumptions" also is relevant

to show it breached Plaintiffs' Policies.  First, understanding the origin of the "modified original

pricing assumptions" is crucial for determining the breach question.  The Policies require COI rates to be "based on our *[John Hancock's] expectations*."  *See, e.g.*, Dkt. No. 179-2 at 18 (emphasis added); Dkt. No. 179-4 at 17 (emphasis added).  To answer this question, the jury is entitled to know why and how John Hancock created the "modified original pricing assumptions." It did so to replace its true original pricing assumptions because ████████████████████ ████████████████████████████████████████████████████████████████ ████████; and it did not base those assumptions on its expectations at pricing, but ████████ ████████████████████████████████████████████████████████████████ ████████████████.

Furthermore, and as noted in Section IV.A.1 above, the origin of the "modified original pricing assumptions" is especially relevant because John Hancock has tried to justify its use of fake assumptions by claiming they were a generous exercise in discretion to reduce the size of the COI Rate Increases.  For example, John Hancock asserted in its summary judgment motion:

> In the Redetermination, John Hancock *in its discretion* used Modified Original Pricing Assumptions *as one way of reducing the COI increases* to below the level to which John Hancock believed it was entitled.  The Modified Original Pricing Assumptions *were generally more conservative* than the original pricing assumptions and therefore *led to lower COI increases*[.] … It is undisputed that John Hancock's use of the Modified Original Pricing Assumptions *limited* the size of the COI rate increases[.] … [T]here is no evidence that use of the Modified Original Pricing Assumptions caused Plaintiffs any harm.

Dkt. No. 191 at 27-28 (emphasis added).  Indeed, 11 of the 67 statements in John Hancock's Rule 56.1 Statement of Undisputed Material Facts submitted concurrently with its motion for summary judgment concern NYDFS and the "modified original pricing assumptions."  *See* Dkt. No. 192 ¶¶ 29-37, 47-48.

John Hancock's actuarial expert, Timothy Pfeifer, asserts that John Hancock's use of the "modified original pricing assumptions" "reduced the value to John Hancock of the COI Redetermination" and "reduced the size of the COI increases." *See* LeQuang Decl. Ex. 37 ¶¶ 77-78, 82.  Mr. Pfeifer further opines: "The Modified Original Pricing Assumptions were simply a mechanism—similar to John Hancock's decision to exclude the deterioration in future expectations of premium funding, investment earnings, and tax requirements—by which ***John Hancock exercised its discretion to lower the COI rate increase*** to which John Hancock was otherwise entitled." *Id.* ¶ 257 (emphasis added).  Similarly, John Hancock's damages expert, Bruce Deal, asserts that "John Hancock's decision to re-determine COI rates using modified original pricing assumptions was ***a conservative decision*** that generally led to lower COI rate increases than the COI rate increases resulting from using original pricing assumptions," and "John Hancock ***exercised its discretion*** to use the generally more conservative modified original pricing assumptions." *Id.* Ex. 38 ¶ 30 (emphasis added).  Given John Hancock's defense that it did policyholders a favor by using fake assumptions, Plaintiffs are entitled to counter this testimony with the real story behind those assumptions.

**B.** **The Evidence of John Hancock's Interactions with NYDFS Are Not Hearsay or Subject to Exclusion Under Federal Rule of Evidence 403**

The communications between John Hancock and NYDFS are not hearsay.  Hearsay is an out of court statement offered to prove the truth of the matter asserted in the statement.  Fed. R. Evid. 801.  Here, however, Plaintiffs are not offering NYDFS's findings for the truth of the matter asserted in their communications.  Neither ███████████████████████████████████ ██████████████████████████████ nor Mr. Regalbuto's "non-disapproval" of the COI Rate Increases are offered for the truth of the matter.  Instead, as discussed above, Plaintiffs offer John Hancock's communications with NYDFS (i) to show John Hancock's state of mind when it raised

COI rates and (ii) to explain the origin of the "modified original pricing assumptions."  Evidence offered to prove state of mind is not hearsay and is admissible.  *See, e.g.*, Fed. R. Evid. 803(3).  For example, in *In re MetLife Demutualization Litig.*, Judge Weinstein found a letter from NYDFS stating MetLife was in compliance with New York Insurance law was not hearsay because it was offered to show MetLife acted in good faith when relying on the letter.  *See In re MetLife Demutualization Litig.*, 262 F.R.D. at 236.  Similarly, in *Iorio*, the court admitted a market conduct report by California Department of Insurance to show the insurer's knowledge or notice, that the insurer "knew or should have known that its sales practices are deceptive."  *Iorio v. Allianz Life Ins. Co. of N. Am.*, No. 05CV633 JLS (CAB), 2010 WL 11508761, at *6 (S.D. Cal. Jan. 27, 2010).

Similarly, John Hancock's communications with NYDFS are not excludable under Federal Rule of Evidence 403.  This evidence has substantial probative value, for the many reasons discussed above.  To the extent the Court has any concern about the potential unfair prejudice of this evidence, a limiting instruction could easily address this concern.  The Federal Rules of Evidence require courts to consider limiting instructions before excluding evidence.  *See* Fed. R. Evid. 403 Advisory Committee Notes ("In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction.").  Courts in New York admitting NYDFS's opinions regarding other insurance companies' COI rate increases have found limiting instructions to be sufficient to address any unfair prejudice relating to a regulatory opinion.  *See, e.g.*, *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 254 (S.D.N.Y. 2022), on reconsideration in part, No. 16-CV-740 (JMF), 2022 WL 3018104 (S.D.N.Y. July 29, 2022) ("To the extent that [NYDFS's] opinions, and DFS's "no-objection" letter and other regulatory evidence, risk prejudicing the jury, the issues can be addressed via limiting instructions."); *U.S. Bank Nat. Ass'n*

*v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 148 (S.D.N.Y. 2015) ("To the extent that the jury might infer something about the New York regulatory authority's inadmissible ultimate conclusion regarding the rate increase, that possibility can be cured with a limiting instruction."). Similarly, in *Chimney Rock*, the court admitted state regulatory proceedings against the defendant because the defendant's admissions in these proceedings factually supported the plaintiff's breach of contract claim. *Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.*, No. 10-CV-02349-WJM-KMT, 2014 WL 1583993, at *3 (D. Colo. Apr. 21, 2014).

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request the Court enter an order *in limine* that evidence relating to the "modified original pricing assumptions," including communications from and with NYDFS, is admissible.  To the extent that the Court believes a limiting instruction would be useful, Plaintiffs will submit a proposed limiting instruction.

Dated: January 27, 2023

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____

KHAI LEQUANG

Attorneys for Plaintiffs
VICOF II TRUST; VIDA LONGEVITY
FUND, LP; LIFE ASSETS TRUST II S.A.
DELAWARE TRUST; VIDAQUANT SUB-
FUND DELAWARE TRUST; VIDA
INSURANCE FUND II SERIES INTERESTS
OF THE SALI MULTI-SERIES FUND, LP;
EFG BANK AG, CAYMAN BRANCH;
WELLS FARGO BANK, NATIONAL
ASSOCIATION, as securities intermediary for
VICOF II TRUST, VIDA LONGEVITY
FUND, LP, LIFE ASSETS TRUST II S.A.
DELAWARE TRUST, VIDAQUANT SUB-
FUND DELAWARE TRUST, VIDA
INSURANCE FUND II SERIES INTERESTS
OF THE SALI MULTI-SERIES FUND, LP,
AND EFG BANK AG, CAYMAN BRANCH;
DLP MASTER TRUST; DLP MASTER
TRUST II; GWG DLP MASTER TRUST; LIFE
FUNDING TRUST; PF PARTICIPATION
FUNDING TRUST; AND PALM BEACH
SETTLEMENT COMPANY